PD-0241-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/4/2015 4:20:51 PM
Accepted 3/4/2015 6:29:05 PM
ABEL ACOSTA
CLERK

# PD-0241-15

**Cause No. _____**

In the Court of Criminal
Appeals of Texas

**Antonio Leija, Jr.**,
Appellant

v.

**State of Texas**,
Appellee

On Review from Cause No. 02-13-00473-CR
in the Second Court of Appeals
Fort Worth, Texas

## State's Petition for Discretionary Review

**Maureen Shelton**
Criminal District Attorney
Wichita County, Texas
State Bar No. 24076904
Maureen.Shelton@co.wichita.tx.us

**John Gillespie**
First Asst. Criminal District Attorney
Wichita County, Texas
State Bar No. 24083252
John.Gillespie@co.wichita.tx.us

900 Seventh Street
Wichita Falls, Texas 76301
(940) 766-8113 phone
(940) 716-8530 fax

**John W. Brasher**
Special Prosecutor
900 8th Street, Suite 415
State Bar No. 02907800
brasherappeals@gmail.com
900 8th Street
Wichita Falls, Texas 76301
(940) 244-0244 phone
(940) 244-0245 fax

**Oral Argument Requested**

## *Identity of Parties and Counsel*

**Hon. Judge Barney Fudge**
Judge, 78th District Court of Wichita County
Cause No. 52,563-B

**Antonio Leija**, **Jr.,** Appellant
TDCJ #01874593
West Texas Intermediate Sanction Facility
2002 Lamesa Hwy
Brownfield, Texas 79316

**Michael Payne**
Counsel for Antonio Leija on appeal
1211 Bluff Street
Wichita Falls, TX 76301

**Maureen Shelton**
Criminal District Attorney
Wichita County
Attorney for the State
900 Seventh Street
Wichita Falls, Texas 76301

**John Gillespie**
First Assistant Criminal District Attorney
Wichita County
Attorney for the State
900 Seventh Street
Wichita Falls, Texas 76301

**John Brasher**
Special Prosecutor
Attorney for the State before the C.C.A.
900 8th Street
Wichita Falls, Texas 76301

## Table of Contents

Identify of Parties and Counsel ..................................................................... ii

Table of Contents .......................................................................................iii

Index of Authorities .................................................................................... v

Statement of the Case ..............................................................................viii

Statement Regarding Oral Argument.........................................................viii

Procedural History ..................................................................................... ix

Questions Presented for Review...................................................................xii

Argument ...................................................................................................1

    1.    Recusal is required because half of Justice Dauphinot's colleagues—including Chief Justice Livingston—believe she has expressed such a significant antagonism toward the WCDA that she no longer appears to be fair and impartial .......1

    2.    Recusal is required because Justice Dauphinot applies a different set of rules when the WCDA is a party than she applies in other cases. ...........................................................3

    3.    Recusal is required because, regardless of her motivations, by speaking out and plainly stating that she has formed a negative opinion about the WCDA that influences her on every case, Justice Dauphinot departed the realm of impartial judging and improperly entered the realm of advocacy. ...............................................................8

    4.    Recusal is required because Justice Dauphinot's bias was clearly revealed by her astounding claim that she can discern a discovery abuse from a case where the issue was neither preserved nor reached by the court of appeals. ..........11

5.  Recusal is required because Justice Dauphinot's lack of fairness is evidenced by her sweeping advisory pronouncement of a pattern of constitutional abuse when this alleged pattern A) was not an active controversy before her; B) was not necessary to the determination of the appeal; and C) when the WCDA had no opportunity to provide testimony, evidence, or briefing on such a consequential accusation. ...................................................... 14

6.  Recusal is required because the timing of Justice Dauphinot's abject lack of judicial fairness in *Roberson* suggests it may have been retaliatory and motivated by the State prevailing on its motion for en banc reconsideration in the *Joe Johnson* case after the State referred to her memorandum opinion's drastic departure from the trial record as "troubling." ............................................................... 18

Prayer ................................................................................................. 20

Certificate of Compliance ................................................................... 22

Certificate of Service .......................................................................... 22

iv

# Index of Authorities

**Cases**                                                                        Page

*BNSF Railway Co. v. Phillips*, 434 S.W.3d 675 (Tex. App.—Fort Worth 2014, pet. filed) ................................................................. 5

*Brazzell v. State*, 481 S.W.2d 130 (Tex. Crim. App. 1972) ......................... 4

*Caldwell v. Texas,* 137 U.S. 692 (1891) ................................................. 3, 8

*Francis v. State,* 428 S.W.3d 850 (Tex. Crim. App. 2014) ........................... 6

*Garrett v. State*, 749 S.W.2d 784 (Tex. Crim. App. 1988) ......................... 14

*Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App. 1997) ........................... 6

*In re Murchison*, 349 U.S. 133 (1955) ................................................. 2, 18

*In the Interest of M.C.B.,* 400 S.W.3d 630 (Tex. App.—Dallas 2013, no pet.) ...................................................................................... 16

*Johnson v. State*, 2013 WL 531079 (Tex. App.—Fort Worth Feb. 14, 2013) (mem. opinion) .................................................................. 19

*Johnson v. State*, No. 02-11-00253-CR, 2014 WL 5583345 (Tex. App.—Fort Worth Oct. 9, 2014) (en banc) ................................... 1, 19

*Jordy v. State*, 969 S.W.2d 528, 532 (Tex. App.—Fort Worth 1998, no pet.) ....................................................................................... 7

*Juarez v. State*, No. 2-08-167-CR, 2009 WL 1564926 (Tex. App.—Fort Worth June 4, 2009, no pet.) ............................................. 12, 13

*Likety v. U.S.*, 510 U.S. 540 (1994) .................................................... 11

*Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997) ....................... 14, 16

*Norton v. State*, 755 S.W.2d 522 (Tex. App.—Houston [1st Dist.] 1988—pet. ref'd) .................................................................... 11

*Pitman v. State*, 372 S.W.3d 261 (Tex.App-Fort Worth 2012, pet. ref'd) ................................................................................ 17

*Roberson v. State,* No. 02-13-00582-CR, 2015 WL 148476 (Tex. App.—Fort Worth Jan. 8, 2015, no pet. h.) .............................. passim

*Rogers v. Bradley*, 909 S.W.2d 872 (Tex. 1995) ........................................ 1

*State v. Stevenson*, 993 S.W.2d 857 (Tex. App.—Fort Worth 1999, no pet.) ................................................................................ 8

*State v. Taylor,* 264 S.W.3d. 914 (Tex. App.—Fort Worth 2008, no pet.) ................................................................................ 13

*State v. Woodard*, 314 S.W.3d 86 (Tex. App.—Fort Worth 2010, pet. filed), *aff'd*, 341 S.W.3d 404 (Tex. Crim. App. 2011) ........................ 6

*U.S. v. Bremers*, 195 F.3d 221, 227 (5th Cir. 1999) ................................. 2

**Statutes**

Tex. Code. Crim. Proc. Ann. art. 39.14(a) (West Suppl. 2014) ................. 17

**Rules**

Tex. Code Jud. Conduct, Preamble ........................................................... 3

Tex. Code Jud. Conduct, Canon 3(B)(4) ................................................ 10

Tex. Code Jud. Conduct, Canon 3(B)(5) .................................................. 3

Tex. R. App. P. 9.4(i)(1) ......................................................................... 22

Tex. R. App. P. 16.3(c) ........................................................................... vii

Tex. R. App. P. 33.1 ............................................................................... 11

Tex. R. App. P. 44.4 ............................................................................... 16

Tex. R. App. P. 47.1 ............................................................... 8, 16

Tex. R. App. P. 68 ...................................................................vii

Tex. R. App. P. 68.2(a) ............................................................. xi

## *Statement of the Case*

The State is asking for this Court to review the Second Court of Appeals' 4-3 decision on its motion to recuse Justice Dauphinot. As Justice Dauphinot has irrevocably compromised any appearance of impartiality toward the Wichita County District Attorney ("WCDA"), the State asks this Court to grant review pursuant to Rule 68 and Rule 16.3(c) of the Texas Rules of Appellate Procedure, and to order recusal of Justice Dauphinot.

## *Statement Regarding Oral Argument*

The State respectfully requests Oral Argument. The WDCA and her staff appreciate the gravity of this situation. The WCDA has always had great respect and an excellent working relationship with the Second Court of Appeals and its honorable justices.

Thus, it was astonishing that Justice Dauphinot accused the WCDA and her attorneys of a pattern of constitutional discovery abuses in a dissent in a published opinion.[1] As this alleged pattern of abuse was not an issue before the trial court, the WCDA had no opportunity to provide evidence to rebut the allegations and no forum for appeal since the WCDA

---

[1] *See Roberson v. State,* No. 02-13-00582-CR, 2015 WL 148476 (Tex. App.—Fort Worth Jan. 8, 2015, no pet. h.) (Dauphinot, J. dissenting)

had prevailed on the merits.[2]

Not only does the WCDA deny, in the strongest terms possible, Justice Dauphinot's inappropriate, incendiary, and unsupported allegations that her office engages in a pattern of discovery abuses with constitutional dimensions, but the WCDA also requests the courtesy of being able to openly address any question by any judge on this Honorable Court as to why the WCDA had no choice but to seek Justice Dauphinot's recusal.

The WCDA does not seek a recusal lightly. Yet, the ramifications of this dissent are too serious to ignore: questions about the integrity of the criminal justice system, potential disciplinary and licensure issues, potential civil claims, and wrongfully sullied reputations. Because of these significant ramifications, the WCDA requests Oral Argument.

### *Procedural History*

Appellant appealed to the Second Court of Appeals and Justice Dauphinot was assigned to the panel.[3] While the appeal was pending, the Second Court released *Ex Parte Roberson* on January 8, 2015.[4] In *Roberson*, Justice Dauphinot issued a vitriolic dissent that made many

---

[2]   *Id.*

[3]   *See* Letter from Debra Spisak to Parties regarding submission (April 1, 2014), *available* *at* http://www.search.txcourts.gov/SearchMedia.aspx?MediaVersionID=344b3640-401b-4a30-a6c8-72575b047add (last visited March 4, 2015).

[4]   *Roberson,* 2015 WL 148476, at *5-6 (Dauphinot, J. dissenting).

ix

unfounded allegations against the WCDA and even alleged a pattern of discovery abuses of constitutional proportions.[5]

As her dissent has dispelled any notion that she could be fair to the WCDA, on January 21, 2015, the WCDA filed a motion to recuse Justice Dauphinot.[6]

On January 26, 2015, the Second Court announced that Justice Dauphinot's six remaining colleagues could not reach a decision on recusal.[7] Half of Justice Dauphinot's colleagues believed that the WCDA met the standard for recusal.[8] Chief Justice Hecht appointed a justice to break the tie.[9]

On February 26, 2015, the Second Court denied the motion to recuse on a highly-divided 4-3 vote.[10] On February 27, 2015, the WCDA asked the Second Court to stay the issuance of opinions in this case and notified the Second Court of its intent to appeal under T.R.A.P. 16.3(c).

---

[5] *Id.* at *5.

[6] *See* Docket Sheet for *Leija v.State*, No. 02-13-00473-CR in the Second Court of Appeals of Texas, available at http://www.search.txcourts.gov/Case.aspx?cn=02-13-00473-CR (last visited Mar. 4, 2015);

[7] *See* Letter from Chief Justice Livingston to Chief Justice Hecht (January 26, 2015), *available at* http://www.search.txcourts.gov/SearchMedia.aspx?MediaVersionID=5eee4ad1-a306-41c8-a450-23d5860bdecb (last visited Mar. 4, 2015).

[8] *Id.*

[9] *See* Letter from Debra Spisak to Parties regarding appointment of visiting justice (Feb. 3, 2015), *available at* http://www.search.txcourts.gov/SearchMedia.aspx?MediaVersionID=3dfdc6bb-4bd2-413e-8e0c-8f364fb5d33f (last visited Mar. 4, 2015).

[10] State's Attachment A, Order denying Motion to Recuse.

The State timely files this Petition for Discretionary Review under Tex. R. App. P. 16.3(c) which states that "the denial of a recusal motion is reviewable." Section 5(b) of the Texas Constitution states that for all matters other than death penalty appeals; thus, review by the Court of Criminal Appeals is discretionary, the State respectfully requests review of the recusal decision under Tex. R. App. P. 68.2(a) as Justice Dauphinot has irrevocably compromised any appearance of fairness toward the WCDA.

### *Questions Presented for Review*

(1) Is recusal required when half of Justice Dauphinot's colleagues—including Chief Justice Livingston—believe she has expressed such a significant antagonism toward the WCDA that she no longer appears to be fair and impartial?

(2) Is recusal required because Justice Dauphinot applies a different set of rules when the WCDA is a party than she applies in other cases?

(3) Is recusal required when, regardless of her motivations, by speaking out and plainly stating that she has formed a negative opinion about the WCDA that influences her on every case, Justice Dauphinot departed the realm of impartial judging and improperly entered the realm of advocacy?

(4) Is recusal required because Justice Dauphinot's bias was clearly revealed by her astounding claim that she can discern a discovery abuse from a case where the issue was neither preserved nor reached by the court of appeals?

(5) Is recusal required because Justice Dauphinot's lack of fairness to the WCDA is evidenced by her sweeping advisory pronouncement of a pattern of constitutional abuse when this alleged pattern A) was not an active controversy before her; B) was not necessary to the determination of the appeal; and C) the WCDA had no opportunity to provide testimony, evidence, or briefing on such a consequential accusation?

(6) Is recusal required because the timing of Justice Dauphinot's abject lack of judicial fairness in *Roberson* suggests it may have been retaliatory and motivated by the State prevailing on its motion for en banc reconsideration in the *Joe Johnson* case after the State referred to her memorandum opinion's drastic departure from the trial record as "troubling"?

## *Argument*

**1.     Recusal is required because half of Justice Dauphinot's colleagues—including Chief Justice Livingston—believe she has expressed such a significant antagonism toward the WCDA that she no longer appears to be fair and impartial.**

Chief Justice Terrie Livingston, Justice Sue Walker, and Justice Lee Gabriel all voted to recuse Justice Dauphinot.[11]     Half of Justice Dauphinot's six colleagues on the Second Court believe that, based upon the dissent in which she expresses negative general opinions about the WCDA and departs from guiding judicial principles, she should not hear cases involving the WCDA.   Additionally, these justices were aware of the background on the initial memorandum opinion authored by Justice Dauphinot in the Joe Johnson appeal (Johnson I) and all participated in the en banc reconsideration (Johnson II) that forms much of the context to the State's recusal motion.[12]

Recusal is required when "a reasonable member of the public at large, knowing all the facts in the public domain concerning the judge and the case, would have a reasonable doubt that the judge is actually impartial."[13]   A reasonable member of the public at large would certainly

---

[11]     State's Attachment A.

[12]     *Johnson v. State*, No. 02-11-00253-CR, 2014 WL 5583345, at *1 (Tex. App.—Fort Worth Oct. 9, 2014) (en banc) (Johnson II).

[13]     *Rogers v. Bradley*, 909 S.W.2d 872 (Tex. 1995).

1

have a reasonable doubt that a justice is actually impartial upon hearing that half of the justice's colleagues—including her Chief Justice—doubt her ability to be fair and impartial.[14]

Importantly, the Fifth Circuit has emphasized that when a judge's own colleagues publicly express a lack of confidence in the judge's ability to appear impartial with a particular attorney or party, this factor militates in favor of recusal.[15]

Additionally, Due Process requires a neutral and detached hearing officer.[16] As these Due Process rights are paramount, when half of a justice's colleagues are willing to go on record and vote for recusal, this Court should seriously consider these justices' concerns.[17]

These three justices' courage to publicly vote against Justice Dauphinot heavily militates for recusal.[18] Such an important matter with Due Process implications should not be left to a closely divided 4-3 vote. Permitting the decision to stand would cause serious questions to linger about Justice Dauphinot's impartiality. Thus, this Court should grant review

---

[14] *See* State's Attachment A.
[15] *See U.S. v. Bremers*, 195 F.3d 221, 227 (5th Cir. 1999) (explaining when a judge's "own colleagues believed there would be at least an appearance of impropriety" if the judge presided over a case involving a particular attorney it would lead a reasonable person to harbor doubts as to the judge's impartiality).
[16] *In re Murchison*, 349 U.S. 133, 136 (1955).
[17] *See, e.g., U.S. v. Bremers*, 195 F.3d at 227.
[18] *Id.*

2

and examine the evidence that lead Chief Justice Livingston, Justice Walker, and Justice Gabriel—all well-respected jurists—to conclude that their colleague should be recused.

**2. Recusal is required because Justice Dauphinot applies a different set of rules when the WCDA is a party than she applies in other cases.**

Justice Dauphinot applies a different set of rules when the WCDA is a party than in other cases. The Code of Judicial Conduct requires judges to fairly apply the law without prejudice or bias toward any party.[19] Foundational to American justice is the idea of "equal and impartial justice under the law" which is accomplished when "the laws operating on all alike."[20] Applying different standards to different parties is the antithesis of "an equal and impartial justice under the law."[21]

Comparing Justice Dauphinot's dissent in *Roberson* to her prior jurisprudence demonstrates that she applies a markedly different standard to the WCDA than to other litigants.

First, Justice Dauphinot treats motion in limine rulings differently with the WCDA. In *Roberson* to support her theory that the State intentionally prompted a mistrial, she conflates a ruling on a motion in limine with an

---

[19] Tex. Code Jud. Conduct, Preamble & Canon 3(B)(5).
[20] *Caldwell v. Texas,* 137 U.S. 692 (1891).
[21] *Id.*

3

evidentiary ruling on admissibility.[22] A motion in limine is not a ruling on admissibility.[23] Yet, Justice Dauphinot states "[t]he trial judge **ruled** that the notice of extraneous acts of misconduct that the State intended to offer into evidence was untimely and that the evidence, presumably, were inadmissible."[24]

When he granted the limine, the trial judge said: "Without hearing [the witnesses], I'd be inclined to say they might have had previous contact or something like that that's how they recognized. But to go any further *might* be a problem. But we'll discuss that. So I'll go ahead and grant that limine on that ground. Make sure you come up before you start with them."[25]

For the WCDA, Justice Dauphinot considers a motion in limine an evidentiary ruling "that the notice of extraneous acts of misconduct that the State intended to offer into evidence was untimely" and that the evidence was inadmissible.[26] Yet, the trial judge had made no ruling beyond requiring the parties to approach.[27]

---

22      *Roberson*, 2015 WL 148476 at *5-9.
23      *Brazzell v. State*, 481 S.W.2d 130, 131 (Tex. Crim. App. 1972).
24      *Roberson*, 2015 WL 148476 at *8 (Dauphinot, J., dissenting) (emphasis added).
25      *See* State's Attachment B, III R.R. at 6 (transcript excerpts in *Roberson*).
26      *Roberson*, 2015 WL 148476 at *8 (Dauphinot, J., dissenting).
27      *See* State's Attachment B, III R.R. at 4-14 (hearing on motions in limine in *Roberson*).

With other parties, she applies a different (and correct) standard to limine rulings: "The granting of a motion in limine is not a ruling on the admissibility of the evidence and does not preserve error. A motion in limine simply prohibits references to specific issues without first obtaining a ruling on the admissibility of those issues outside the presence of the jury."[28] Justice Dauphinot clearly understands the difference between a ruling on a motion in limine and an evidentiary ruling.[29] Indefensibly, she applies a different standard with to WCDA.

Second, Justice Dauphinot applies a different standard of assessing credibility determination with to WCDA. In *Roberson*, she states that "[u]nlike trial judges, who primarily see only the conduct in the courtrooms over which they preside, appellate courts are presented with records from other courts in that county…Appellate judges are in a better position than the trial judge to see patterns of conduct."[30] Thus, she begins her dissent by stating why she believes she is in a better position than the trial judge to know what was really going on in his courtroom.

Justice Dauphinot cites the trial judge's credibility determination of Investigator Cavinder: "And I'm not casting fault on Investigator Cavinder at

---

[28] *BNSF Railway Co. v. Phillips*, 434 S.W.3d 675, 699 (Tex. App.—Fort Worth 2014, pet. filed) (opinion authored by J. Dauphinot).

[29] *Id.*

[30] *Roberson*, 2015 WL 148476 at *5-6. (Dauphinot, J., dissenting).

5

all. I understand that was an honest mistake. I completely believe that he believed he was speaking to Ms. Steele."[31] Then, Justice Dauphinot promptly discards this credibility determination and instead substitutes her own judgment: "The record casts doubt on Cavinder's testimony concerning his own knowledge."[32] Despite the trial judge stating on the record that he was not casting fault on Cavinder, that it was an "honest mistake" and that he completely believed Cavinder, Justice Dauphinot instead implicitly calls Cavinder a liar and relates that she does not believe him.[33] For the WCDA, Justice Dauphinot rejects the trial judge's credibility determination.[34]

With other parties, Justice Dauphinot applies a different (and correct) standard: "We cannot and must not substitute our determination of the facts and the credibility of the witnesses in order to achieve the result we believe the trial court should have reached."[35] Additionally, Justice Dauphinot has explained the deference an appellate judge owes the trial judge: "When the findings are based on an evaluation of a witnesses' credibility and

---

[31] *Id.* at *7.
[32] *Id.* at *7.
[33] *Id.* at *8.
[34] *See Francis v. State,* 428 S.W.3d 850, 855 (Tex. Crim. App. 2014); *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997).
[35] *See, e.g., State v. Woodard*, 314 S.W.3d 86, 100 (Tex. App.—Fort Worth 2010, pet. filed) (Dauphinot, J., dissenting), *aff'd*, 341 S.W.3d 404 (Tex. Crim. App. 2011).

demeanor, the appellate court should afford almost total deference to the trial court's fact findings."[36]

Third, Justice Dauphinot ignores binding precedent of the Court of Criminal Appeals when the WCDA is the party.[37]  While Justice Dauphinot in *Roberson* recites that this Court requires proof that the prosecution intended to cause a mistrial for jeopardy to bar a second prosecution, she ignores that standard in favor of her own standard: "At some point, appellate courts must hold that the conduct is so egregious that the party cannot avoid its consequences."[38]  Instead of applying the Court of Criminal Appeals factors in *Ex parte Wheeler* (as the majority opinion does), Justice Dauphinot ignores the *Wheeler* factors and seeks to apply her own standard formulated ad hoc, unmoored from the precedent of the Court of Criminal Appeals.[39]  This is not a situation where Justice Dauphinot simply disagrees with the majority about the particular *Wheeler* factors or how much weight to give them; rather, Justice Dauphinot would reverse the case without reference to *Wheeler*.[40]

---

[36]     *See Jordy v. State*, 969 S.W.2d 528, 532 (Tex. App.—Fort Worth 1998, no pet.) (J. Dauphinot).
[37]     *Roberson*, 2015 WL 148476 at *5-9 (Dauphinot, J., dissenting).
[38]     *Id.* at *5.
[39]     *Id*. at *10-11 (Dauphinot, J., dissenting).
[40]     *Id*.

7

Conversely, with other litigants, Justice Dauphinot carefully applies binding precedent of this Court, explaining that "Because a decision of the court of criminal appeals is binding precedent, we are compelled to comply with its dictates."[41]

This disparate treatment of the WCDA versus other parties is the antithesis of "the laws operating on all alike."[42] These concrete, undeniable examples of a separate set of rules for the WCDA are likely why half of Justice Dauphinot's colleagues believe she should be recused.

**3.    Recusal is required because, regardless of her motivations, by speaking out and plainly stating that she has formed a negative opinion about the WCDA that influences her on every case, Justice Dauphinot departed the realm of impartial judging and improperly entered the realm of advocacy.**

Rather than limit her dissent to the issues before the court in *Roberson*, as required by the T.R.A.P. 47.1,[43] Justice Dauphinot vividly expresses general opinions that she has formed against the WCDA. First, as she directs her dissent to the popular, yet unclothed emperor (the District Attorney), it is clear this dissent is about far more than the issues before the Second Court in *Roberson*.[44] Justice Dauphinot confirms this in the second paragraph: "[a]ppellate judges are in a better position than trial

---

[41]    *State v. Stevenson*, 993 S.W.2d 857, 867 (Tex. App.—Fort Worth 1999, no pet.) (J. Dauphinot).

[42]    *Caldwell v. Texas*, 137 U.S. 692 (1891).

[43]    Tex. R. App. P. 47.1.

[44]    *Roberson*, 2015 WL 148476 at *1-9.

judges to see patterns of conduct."[45]   Justice Dauphinot then casts this case as part of an observed pattern: "appellate judges have an obligation to **speak up** when observed patterns show a course of conduct at odds with constitutional mandates and fundamental fairness."[46]

It is clear from Justice Dauphinot's own words that she is looking beyond the record in this case to "observed patterns" and that these "observed patterns" have prompted her to "speak up" and tell the popular, yet unclothed emperor that her office is "at odds with constitutional mandates and fundamental fairness."[47]

Justice Dauphinot concludes her dissent by placing *Roberson* within an observed pattern by citing *Dabney v. State, Pitman v. State*, and *Juarez v. State*.[48]   Justice Dauphinot could not be clearer: she would not decide *Roberson* just on the record before the court, but would use an "observed pattern" as her rationale for deciding the case and impugning the motivations and integrity of the WCDA and staff, including the misdemeanor prosecutor and investigator.[49]   Thus, Justice Dauphinot has

---

[45]   *Roberson*, 2015 WL 148476 at *5 (Dauphinot, J., dissenting).
[46]   *Id*. at *5-6. (emphasis added).
[47]   *Id*.
[48]   *Id.* at *5-9.
[49]   *Id.*

9

admitted she has formed opinions about the WCDA that she carries from case-to-case that influence her judgment and even outweigh the record.[50]

First, her dissent reveals she has departed the realm of appellate judging and entered the realm of advocacy because she ignores T.R.A.P. 47.1's limitation of an appellate court decision to the issues "raised and necessary to final disposition of the appeal." Rather, her dissent far exceeds the issues necessary to decide whether jeopardy bars a re-trial.[51]

Second, she characterizes herself as needing to "speak-up" and tell a popular, yet naked emperor a few things about a pattern of discovery abuses.[52] This is an odd tone for a supposedly dispassionate appellate justice required by the Texas Code of Judicial Conduct to be "dignified and courteous to litigants…with who the judge deals."[53]

Regardless of Justice Dauphinot's subjective motives for needing to "speak-up" against the WCDA, by becoming an advocate and expressing her general, negative opinion about the WCDA, she has compromised her ability to treat the WCDA fairly.

As Justice Kennedy has explained, "A judge may find it difficult to put aside views formed during some earlier proceeding. In that instance we

---

[50]    *Id.*
[51]    *Id.*
[52]    *Id.* at *5.
[53]    Tex. Code Jud. Conduct, Canon 3(B)(4).

10

would expect the judge to heed the judicial oath and step down, but that does not always occur. If through obduracy, honest mistake or simple inability to attain self-knowledge the judge fails to acknowledge a disqualifying predisposition or circumstance, an appellate court must order recusal…"[54] Texas courts have also long-recognized that when a judge articulates such a predisposition against a party, recusal is required.[55] Justice Dauphinot's dissent demonstrates exactly such a disqualifying predisposition toward the WCDA.

**4.    Recusal is required because Justice Dauphinot's bias was clearly revealed by her astounding claim that she can discern a discovery abuse from a case where the issue was neither preserved nor reached by the court of appeals.**

Justice Dauphinot's citation of *Juarez v. State* as a "similar decision" (i.e. case) where the WCDA made a "conscious decision" to violate a discovery order is astounding.[56]

Texas law requires alleged error to be preserved by a timely objection before an appellate court will reach the ultimate issue.[57] Without a timely objection, the appellate court will not reach the merits.[58]

---

[54]    *Likety v. U.S.*, 510 U.S. 540 (1994) (J. Kennedy, concurring).
[55]    *See, e.g., Norton v. State*, 755 S.W.2d 522 (Tex. App.—Houston [1st Dist.] 1988—pet. ref'd) (finding judge's statement, which was tantamount to pre-judging a party, "was evidence of bias sufficient to require recusal.").
[56]    *Roberson*, 2015 WL 148476 at *5-9.
[57]    Tex. R. App. P. 33.1.
[58]    *Id.*

11

While this is basic legal procedure that any long-tenured appellate justice understands, Justice Dauhpinot's actions in not following these basic prescripts in misusing *Juarez* proclaim her blatant unfairness to the WCDA.[59]

Although Justice Dauphinot cites *Juarez* as a "disturbing" example of a "conscious decision" of the WCDA "withholding mandated discovery," a fair reading of *Juarez* shows no such discovery abuse.[60]

In *Juarez,* after a revocation hearing at which appellant's court ordered sex offender treatment provider testified, appellant complained that this testimony constituted extraneous evidence and that the WCDA had failed to give notice.[61] The Second Court declined to reach the merits of appellant's claim because appellant "did not preserve his claim for review" because his only objection was to relevance.[62] Simply reading the one-page opinion demonstrates that the Second Court did not reach the merits.[63]

---

[59] *Roberson*, 2015 WL 148476 at *9.
[60] *Juarez v. State*, No. 2-08-167-CR, 2009 WL 1564926 (Tex. App.—Fort Worth June 4, 2009, no pet.).
[61] *Id.*
[62] *Id.*
[63] The State also doubts the merits of Juarez's claim as he was ordered by the terms of probation to see the treatment provider; thus, the provider's testimony would likely be contextual to the revocation. Regardless, the appellant failed to preserve the error, so the court of appeals never reached the merits. *See id.*

To cite a one-page opinion where the merits were not reached and where the appellate court did not find a discovery violation as a "disturbing" example of a previous "conscious decision" of the WCDA to "withhold mandated discovery" violates every basic rule for the use of case authority.[64]

How could any reasonable member of the public expect Justice Dauphinot to be fair to the WCDA when she claims the unique power to look-behind the appellate court's decision in *Juarez* and see a "disturbing" failure and pattern by the WCDA of "consciously deciding" not to give mandated discovery?

Her misuse of *Juarez* is further evidence that Justice Dauphinot applies a different set of rules to the WCDA. In *State v. Taylor*, an opinion she authored, she explains that when a party fails to preserve error, the appellate court does not reach the merits.[65] Incredibly, she ignores this rule in her use of *Juarez*.[66]

As this Court is aware, many baseless claims are made in appellant points of error. Is there any Texas Rule of Appellate Procedure that empowers Justice Dauphinot to sua sponte re-determine the validity of an

---

[64]    *Roberson*, 2015 WL 148476 at *9.
[65]    264 S.W.3d. 914 (Tex. App.—Fort Worth 2008, no pet.).
[66]    *Juarez,* 2009 WL 1564926.

13

appellate point when the panel hearing the case did not reach the merits

and she wasn't even a member of the panel?  It is hard to excuse Justice

Dauphinot's extreme misuse of *Juarez* as an honest mistake when the

opinion is only one-page long and one of only three cases that she cited for

her alleged pattern.[67]  No fair-minded person could read *Juarez* and believe

that the court reached the merits or cite it as an example of a conscious

discovery violation.

**5.    Recusal is required because Justice Dauphinot's lack of fairness is evidenced by her sweeping advisory pronouncement of a pattern of constitutional abuse when this alleged pattern A) was not an active controversy before her; B) was not necessary to the determination of the appeal; and C) the WCDA had no opportunity to provide testimony, evidence, or briefing on such a consequential accusation.**

Justice Dauphinot's violation of the proscription against advisory

opinions without the WCDA being afforded the opportunity to present

evidence or briefing on such an important issue demonstrates her abject

lack of fairness.[68]

While Justice Dauphinot cites "observed patterns" that "show a

course of conduct at odds with constitutional mandates and fundamental

---

[67]    *Id.*

[68]    *Garrett v. State*, 749 S.W.2d 784, 803 (Tex. Crim. App. 1988) (explaining that "judicial power does not include the power to issue advisory opinions" which result "when a court attempts to decide an issue that does not arise from an actual controversy capable of final adjudication.") *overruled on other grounds*, *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997).

14

fairness" as the basis for her dissent, this supposed pattern was not a controversy in issue before the trial judge.[69]   There was no allegation before the trial judge of any such pattern.[70]   Rather, the only issues before the trial court were (1) what had happened; and (2) why did it happen.[71] The trial court never asked for, heard, or received any evidence about any pattern of misconduct by the WCDA.[72]   Therefore, the WCDA has never been afforded any opportunity to offer testimony or evidence rebutting any such pattern.

Incredibly, the WCDA never had the opportunity to brief this alleged pattern because the court requested submission without briefs.[73] Since no Appellant's brief raised a pattern, Justice Dauphinot's disqualifying predisposition alone lead her to lurch into this area.[74]

---

[69]     *See* State's Attachment B, IV-V R.R. (motion for mistrial and hearing on habeas application).
[70]     *Id.*
[71]     *Id.*
[72]     *Id.*
[73]     *See* Letter from Debra Spisak to Parties regarding submission (Apr. 1, 2014), available                                                                                                        at http://www.search.txcourts.gov/SearchMedia.aspx?MediaVersionID=344b3640-401b-4a30-a6c8-72575b047add (last visited Mar. 4, 2015).
[74]     *See* Letter from Debra Spisak to Parties regarding immediate submission without briefing            (Feb.            20,            2014),            *available            at* http://www.search.txcourts.gov/SearchMedia.aspx?MediaVersionID=10bed362-04fb-49c7-9d7b-1d9a1d5cf937.

15

Appellate courts are not evidentiary courts.[75] When an appellate court needs additional evidence, the remedy is to abate the appeal for an evidentiary hearing in a trial court.[76]

The WCDA never had the opportunity to offer any evidence to refute this erroneous claim. To state such a serious conclusion in the dissent of a published opinion when there has been no briefing or evidentiary hearing before a trial court is completely contrary to the tenets of judicial fairness, the Rules of Appellate Procedure, and the proscription against advisory opinions.[77]

Justice Dauphinot deprives the WCDA of the ability to rebut such a serious claim with evidence: what Brady training does the WCDA mandate? What processes does the WCDA have in place to comply with discovery requests? How many cases has the WCDA tried where there have been no discovery complaints? What training do prosecutors receive on compliance with discovery requests?

---

[75]    *See, e.g., In the Interest of M.C.B.,* 400 S.W.3d 630, 633 (Tex. App.—Dallas 2013, no pet.) (explaining that appellate courts do not take testimony or receive evidence).

[76]    Tex. R. App. P. 44.4.

[77]    Tex. R. App. P. 47.1 (limiting an appellate court decision to the issues "raised and necessary to final disposition of the appeal); *see also Garrett,* 749 S.W.2d at 803 (explaining that "judicial power does not include the power to issue advisory opinions" which result "when a court attempts to decide an issue that does not arise from an actual controversy capable of a final adjudication."), *overruled on other grounds*, *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997).

A fair-minded jurist would give a party the ability to offer such evidence before making this sweeping pronouncement. Instead, Justice Dauphinot bases her improper advisory pronouncement on three cases in five years out of thousands of criminal cases handled by the WCDA.[78] Remarkably, of the three cases that she cites for her pattern of constitutional discovery abuse, in two, the court of appeals made **no** finding of a discovery violation and affirmed the trial court.[79] In *Pitman*, which Justice Dauphinot cites for a previous discovery abuse, she was on the panel that unanimously found no such abuse.[80]

The third case, *Dabney v. State*, had a petition for discretionary review pending at the time she cited it.[81] On March 4, 2015, this Court granted review in *Dabney*.[82] Neither the trial judge in *Dabney* nor Justice Sue Walker believed that the State committed a discovery violation.[83] The State also questions the fairness of citing a case for such a momentous

---

[78] *Roberson,* 2015 WL 148476 at *11 (Dauphinot, J., dissenting).

[79] *Pitman v. State*, 372 S.W.3d 261 (Tex.App-Fort Worth 2012, pet. ref'd); *Juarez*, 2009 WL 1564926 at *1.

[80] *Pitman*, 372 S.W.3d 261. While the appellate court, in dicta, expressed concerns about the WCDA's policy relating to privacy of CPS records, the Legislature has since expressly recognized these concerns in 39.14(a) by expressly referencing the privacy of CPS records. Tex. Code. Crim. Proc. Ann. art. 39.14(a) (West Suppl. 2014). Regardless, the appellate court did not hold there was a discovery abuse in *Pitman*. *Id*.

[81] *Roberson*, 2015 WL 148476 at *9 (citation in FN7 states "pet. filed").

[82] *See* Docket Sheet for *Dabney v. State*, No. PD-1514-14 in the Court of Criminal Appeals, *available at* http://www.search.txcourts.gov/Case.aspx?cn=PD-1514-14 (last visited Mar. 4, 2015).

[83] *Id*.

proposition when the justice knows the contested issue is the subject of a pending petition for discretionary review.[84]

This advisory pronouncement and the failure to afford the WCDA the opportunity to brief or rebut with evidence irrefutably establishes Justice Dauphinot's unfairness to the WCDA.[85]

**6.    Recusal is required because the timing of Justice Dauphinot's abject lack of judicial fairness in *Roberson* suggests it may have been retaliatory and motivated by the State prevailing on its motion for en banc reconsideration in the *Joe Johnson* case after the State referred to her memorandum opinion's drastic departure from the trial record as "troubling."**

While the State does not have to prove (nor does this Court have to find) actual bias or Justice Dauphinot's subjective motivations for her significant departure from basic judicial norms for recusal to be required,[86] the timing of the *Roberson* dissent with its vitriolic and unsubstantiated claims provides an important context to the Court. The *Roberson* dissent did not occur in a vacuum; rather, it occurred almost concomitantly with the State's seeking and obtaining the extraordinary relief of en banc reconsideration and withdrawal of an opinion authored by Justice Dauphinot.  The State prevailed on its motion for en banc reconsideration

---

[84]    *Roberson*, 2015 WL 148476 at *9 (citation in FN7 states "pet. filed").
[85]    *Roberson*, 2015 WL 148476 at *5-9.
[86]    *Murchison*, 349 U.S. at 136.

18

on October 9, 2014.[87]  Justice Dauphinot dissented.[88]  Then, the *Roberson* dissent was released a mere three months later on January 8, 2015.[89]

In *Johnson,* Justice Dauphinot authored an opinion that made many factual assertions that were not supported by the record.[90]  Justice Dauphinot's opinion was premised upon a false open-door theory.[91] Because reversal would have caused a child rape victim to re-testify, the WCDA had no choice but to seek the extraordinary relief of en banc reconsideration.[92]  The State's motion detailed with exhaustive record cites how drastically Justice Dauphinot's memorandum opinion deviated from the actual trial record and referred to this departure as "troubling."[93]

On October 9, 2014, a majority of the Second Court agreed, thereby withdrawing Justice Dauphinot's memorandum opinion, and affirming the conviction.[94]  Justice Dauphinot dissented.[95]  Justice Walker and Justice

---

[87]  *Johnson v. State*, 449 S.W.3d 240 (Tex. App.—Fort Worth 2014, pet. filed) (en banc) (*Johnson II*).

[88]  *Id.* (J. Dauphinot, dissenting).

[89]  *Roberson*, at *1.

[90]  *Johnson v. State*, 2013 WL 531079 (Tex. App.—Fort Worth Feb. 14, 2013) (mem. opinion) (*Johnson I*), opinion withdrawn and superseded by *Johnson v. State*, 449 S.W.3d 240 (Tex. App.—Fort Worth 2014, pet. filed) (en banc).

[91]  *Id.*

[92]  *Johnson II,* 449 S.W.3d at 240.

[93]  State's Attachment C, State's Motion for En Banc Reconsideration.

[94]  *Johnson II,* 449 S.W.3d at 240.

[95]  *Id.*

Gabriel, who had joined in the memorandum opinion, reversed their votes, and Justice Gabriel authored the majority opinion.[96]

While neither the State nor this Court can gauge Justice Dauphinot's subjective motives, the objective facts demonstrate that three months after the State prevailed on a motion for extraordinary relief whereby two of her colleagues abandoned her opinion, which the State had called "troubling," Justice Dauphinot dissented in *Roberson* with her incendiary, gratuitous, and unfounded accusations against the WCDA.[97]

The State hopes this timing is an unfortunate coincidence, but the fact remains that the appearance is so troubling as to call into question Justice Dauphinot's ability to be fair and impartial. A party should be able to exercise its rights under T.R.A.P. 49.7 and seek extraordinary relief when an opinion dramatically departs from the trial record without fearing reprisal. Regardless of subjective intent, the objective appearance of a retaliatory motive supports recusal.

### *Prayer*

The State prays that this Court grant discretionary review of the Second Court of Appeals' recusal decision; that the Second Court of Appeals' decision be reversed; and that Justice Dauphinot be recused.

---

[96] *Id.*
[97] *Roberson*, 2015 WL 148476 at *5-9.

20

Respectfully submitted,

/s/Maureen Shelton
**Maureen Shelton**
Criminal District Attorney
Wichita County, Texas
State Bar No. 00786852
Maureen.Shelton@co.wichita.tx.us

 /s/John Gillespie
**John Gillespie**
First Asst. Criminal District Attorney
Wichita County, Texas
State Bar No. 24010053
John.Gillespie@co.wichita.tx.us

900 Seventh Street
Wichita Falls, Texas 76301
(940) 766-8113 phone
(940) 766-8177 fax

/s/John Brasher
**John Brasher**
Special Prosecutor
State Bar No. 02907800
brasherappeals@gmail.com
900 8th Street
Wichita Falls, Texas 76301
(940) 244-0244 phone
(940) 244-0245 fax

21

**Certificate of Compliance**

I certify that this document contains 4,452 words, counting all parts of the document except those excluded by Tex. R. App. P. 9.4(i)(1). The body text is in 14 point font, and the footnote text is in 12 point font.

/s/Maureen Shelton
**Maureen Shelton**

**Certificate of Service**

I do certify that on March 4, 2015, a true and correct copy of the above document has been served electronically to Michael F. Payne (attorney for Antonio Leija, Jr.) at michaelfpayne@gmail.com and the State Prosecuting Attorney's Office at information@spa.texas.gov.

/s/Maureen Shelton
**Maureen Shelton**

FILE COPY



# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00319-CR

MICHAEL OLIVER SMITH                                    APPELLANT

V.

THE STATE OF TEXAS                                          STATE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY
TRIAL COURT NO. 52,047-B

------------

## NO. 02-13-00473-CR

ANTONIO LEIJA, JR.                                         APPELLANT

V.

THE STATE OF TEXAS                                          STATE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY
TRIAL COURT NO. 52,563-B

------------

**NO. 02-13-00482-CR**

KURLEY JAMES JOHNSON                                        APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

------------

FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY
TRIAL COURT NO. 53,445-C

------------

# **ORDER**

------------

Currently pending before this court in each of the above referenced causes is a "State's Motion to Recuse the Hon. Justice Lee Ann Dauphinot," filed January 21, 2015, requesting the recusal of Justice Lee Ann Dauphinot in each cause under Texas Rule of Appellate Procedure 16.

Rule 16 states that the grounds for recusal are the "same as those provided in the Rules of Civil Procedure." Tex. R. App. P. 16.2; *see also* Tex. R. Civ. P. 18a, 18b. Rule 18b(b) of the Texas Rules of Civil Procedure identifies the grounds for recusal. Tex. R. Civ. P. 18b(b); *McCullough v. Kitzman*, 50 S.W.3d 87, 88 (Tex. App.—Waco 2001, pet. denied) (order). Rule 18b(b)(1) provides that a judge must recuse himself or herself in a proceeding in which the judge's

FILE COPY

impartiality might reasonably be questioned. Tex. R. Civ. P. 18b(b)(1). The State's motions challenge the impartiality of Justice Dauphinot under this rule.

Rule 16.3(b) of the Texas Rules of Appellate Procedure prescribes the procedure to be followed for recusal of an appellate justice or judge:

> Before any further proceeding in the case, the challenged justice or judge must either remove himself or herself from all participation in the case or certify the matter to the entire court, which will decide the motion by a majority of the remaining judges sitting en banc. The challenged justice or judge must not sit with the remainder of the court to consider the motion as to him or her.

Tex. R. App. P. 16.3(b).

Pursuant to the procedure set forth in rule 16.3(b), upon the filing of the recusal motions and prior to any further proceedings in these appeals, Justice Dauphinot considered the motions in chambers. *Id*. Justice Dauphinot found no reason to recuse herself and certified the matter in writing to the remaining members of the court en banc. *See id*.; *McCullough*, 50 S.W.3d at 88. This court then followed the accepted procedure set out in rule 16.3(b). Tex. R. App. P. 16.3(b); *Manges v. Guerra*, 673 S.W.2d 180, 185 (Tex. 1984); *McCullough*, 50 S.W.3d at 88. A majority of the remaining justices of the court could not agree on a decision, so that fact was certified to the Chief Justice of the Supreme Court. The Chief Justice temporarily assigned former Justice Rebecca Simmons as a visiting justice to sit with the court of appeals to consider the motions. *See* Tex. R. App. P. 41.2(b).

3

The visiting justice then met with the six remaining justices to deliberate and decide the motions to recuse Justice Dauphinot by a vote of a majority of the justices. Justice Dauphinot did not sit with the other members of the court when her challenges were considered. *See* Tex. R. App. P. 16.3(b); *McCullough*, 50 S.W.3d at 88. The determination of whether recusal was necessary was made on a case-specific, fact-intensive basis. *See McCullough*, 50 S.W.3d at 89; *Williams v. Viswanathan*, 65 S.W.3d 685, 688 (Tex. App.—Amarillo 2001, no pet.) (order).

The en banc court, Justice Dauphinot not participating, has carefully examined the motions and the records as to the allegations pertaining to Justice Dauphinot. The majority of the remaining justices have concluded that the motions should be denied. *See* Tex. R. App. P. 16.2; Tex. R. Civ. P. 18b(b). Accordingly, the State's motion to recuse Justice Dauphinot in each of the above referenced causes is denied.

DATED February 26, 2015.


PER CURIAM

EN BANC; with REBECCA SIMMONS (Former Justice, Sitting by Assignment).

DAUPHINOT, J., not participating.

LIVINGSTON, C.J.; WALKER and GABRIEL, JJ., would grant.

4

REPORTER'S RECORD

VOLUME 3 OF 6

TRIAL COURT CAUSE NO. 58017-E

| THE STATE OF TEXAS | § | IN THE COUNTY COURT |
| | § | |
| VS. | § | AT LAW NO. 1 |
| | § | |
| BYRIAS ROBERSON | § | WICHITA COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL ON MERITS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 21st day of August, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gary W. Butler, Judge presiding, held in Wichita Falls, Texas, Wichita County, Texas:

Proceedings reported by computerized stenotype machine in real-time. Reporter's Record produced by computer-aided transcription.

CAYCE COSKEY - CCL NO. 1, WICHITA FALLS, TX 940.766.8266

A P P E A R A N C E S

Ms. Victoria Honey
SBOT NO. 24073195
Ms. Allyson Renee Kucera
SBOT NO. 24081858
Assistant District Attorneys
WICHITA COUNTY CRIMINAL DISTRICT ATTORNEY
900 7th Street
Third Floor
Wichita Falls,TX 76301-2402
940.766.8113
ATTORNEYS FOR THE STATE OF TEXAS

-AND-

Mr. Mark Richard Briley
SBOT NO. 24069418
WICHITA COUNTY PUBLIC DEFENDER'S OFFICE
600 Scott Ave
Suite 204
Wichita Falls, TX  76301-2531
940.766.8199
Ms. Kristen Homyk Howcroft
SBOT NO. 24032433
THE LAW OFFICES OF JEFF MCKNIGHT, P.C.
900 8th Street
Suite 815
Wichita Falls, TX 76301
940.687.1576
ATTORNEYS FOR DEFENDANT BYRIAS ROBERSON

I N D E X

VOLUME 3

JURY TRIAL ON MERITS

AUGUST 21, 2013                                    Page      Vol.

Appearances.................................   2        3

Motions In Limine..........................   4        3

Preliminary Instructions by the Court......  14        3

Jury Voir Dire Examination by the State.....  21        3

Jury Voir Dire Examination by the Defendant.  89        3

Court's Instructions To Jury............... 150        3

WITNESSES

                    Direct    Cross    Voir Dire      Vol.
DONNIE CAVINDER        156                             3

Adjournment................................ 158        3

Court Reporter's Certificate............... 159        3

P R O C E E D I N G S

(Open court, defendant present, no panel)

MOTIONS IN LIMINE

THE COURT: Court's going to call Cause No. 58017-E, styled the State of Texas versus Byrias Roberson. The Court will call that case for trial. We're here on pretrial matters which the Court has found through its motion in limine by both the State and the defense. The Court will note for the record the State's present through their attorneys from the District Attorney's office; the defendant is present with his attorneys. I have Mr. Roberson's motion in limine sitting here, so we'll just go ahead and take it up first if you don't mind.

Mr. Briley, I know you've provided a copy of this to the District Attorney's office, and I assume that y'all have conferred with regard to the motion in limines, and I've reviewed it as well. So we'll take it up in this matter. Is there any -- tell me this. Which numbers does the State object to on the motion in limine?

MS. HONEY: No. 1, 2, 3, 4 and 15.

THE COURT: 1, 2, 3, 4 and what?

MS. HONEY: Fifteen.

THE COURT: All right. Let's take them up in

order. No. 1?

MS. HONEY: I have an objection to No. 1 if it includes felony convictions and crimes of moral turpitude. The rules provide for impeachment if there's a felony conviction or crime of moral turpitude.

THE COURT: Mr. Briley?

MR. BRILEY: I don't see my reason that we couldn't approach the bench before those were got into.

THE COURT: We can, but if it's a crime of moral turpitude or a felony conviction, wouldn't you agree that's subject to cross-examination? I'll let you approach so we can determine if it's a felony or crime of moral turpitude at that point and we'll go forward.

MS. HONEY: No. 2, I anticipate that there will be testimony in this case regarding the officer's entry into the home. If defense counsel intends to challenge the legality of that entry, I would like the opportunity to question some of the State's witnesses regarding a prior encounter between the defendant and these witnesses about and regarding a disturbance call. He had barricaded himself and his family inside his home. The SWAT team was called to get him out of the home. Two of the members of the SWAT team are witnesses in this case. This prior incident between the defendant and these officers is important for several reasons. It goes to

their familiarity with the defendant, their ability to identify him on the date of the offense. It's part of how they recognized him on the date of the offense. It also goes to their state of mind on the date of the offense, goes to why gang task force officers were asked to serve these warrants on the defendant, and also goes to their reason to believe that the defendant lived in this particular residence.

THE COURT: Mr. Briley?

MR. BRILEY: Well, Your Honor, we've asked or requested notice of any bad acts or convictions, and we haven't received any of those.

THE COURT: Well, let's do it this way. I'll go ahead and sustain or grant on this limine that y'all will approach, and then we would get into exactly what the officers could or could not go into. Without hearing them, I'd be inclined to say they might have had previous contact or something like that that's how they recognized. But to go any further might be a problem. But we'll discuss that. So I'll go ahead and grant that limine on that ground. Make sure you come up before you start with them. No. 3?

MS. HONEY: No. 3, I have an objection to No. 3 if bad reputation or character as stated in No. 3 includes a witness's character for truthfulness or

untruthfulness. Again, that is proper impeachment under Texas Rules of Evidence.

THE COURT: As long as the proper predicate is laid.

MS. HONEY: Yes, Your Honor.

THE COURT: Mr. Briley?

MR. BRILEY: No response.

THE COURT: Okay. So as long as the proper predicate is laid, of course. So that essentially will be denied. However, I understand there could be an objection for proper predicate not being laid if you want to go into that. Four?

MS. HONEY: I don't anticipate there being any testimony in this case regarding the defendant ever being a member of a criminal street gang, currently being a member of a street gang. However, I do anticipate that as part of some of the State's witnesses talking about their work experience, their training, their job assignments on the date of the offense, they're going to testify that they were part of the gang task force.

THE COURT: Mr. Briley, if their testimony is limited to what their duties were at the time, do you still have a problem with that?

MR. BRILEY: No. And I don't anticipate any evidence is going to be shown that Byrias was part of a

gang. But if it was to go to that, then I would ask that they --

THE COURT: I'll grant it as to that specific according to their assignments. It is what it is. Fifteen?

MS. HONEY: No. 15, this -- I guess my objection is if the defendant takes the witness stand during the defendant's case in chief -- the State's not saying the defendant has to or will -- but if the defendant takes the witness stand and attempts to bolster his credibility with the jury by talking about his law enforcement background, and in talking about that law enforcement background creates a false impression in the mind of the jurors, we would ask for the opportunity to correct that false impression in the mind of the jurors.

Additionally, his law enforcement background goes to the heart of this case, the facts of our case, the force that he used against the officers. He was trained as a police officer, familiar with how to effectuate an arrest, and trained on how to do hand-to-hand combat.

MR. BRILEY: With the first part, you know, if we had brought it up.

THE COURT: If you open the door, I understand.

MR. BRILEY: I understand that, but my motion is

any reference by them to begin with.  I don't see how that it's relevant and it is holding Byrias to a higher standard, which I would disagree that they should be able to do.

THE COURT:  The motion in limine will be granted as to that and approach before you go into it.  As to the others, you agree that they should be granted?

MS. HONEY:  Yes, Your Honor.  On numbers 5 through 14, the State has no objection.

THE COURT:  Those will be granted.  With regard to the State's motion, Mr. Briley, you had an opportunity to review that?

MR. BRILEY:  Yes and no, Your Honor.  I received an e-mail.  I didn't actually see the final copy.  And there was only one that I initially had an objection to, but let me re-read No. 6.

THE COURT:  Okay.

MR. BRILEY:  Our only objection to No. 6 is that we plan on talking about the use of force that day.  But if they're only talking about official claims made by either Byrias or people in the past, we have no objection to that.

MS. HONEY:  And, Your Honor, if I could have an opportunity to clarify?

THE COURT:  That's fine.

MS. HONEY: No. 6 may have been overly broad whenever I wrote it. Obviously, we have no objection to them going into the facts of this particular case and questioning officers about the facts of this particular case.

THE COURT: Okay. All right. It sounds like there's actually an agreement then with regard to 6 as long as we're just talking about this case. I think you would -- I would stay away from using the terms excessive force as I think that creates -- is -- it's almost like a term of art because it creates some -- it has some legal concepts to it.

If we get there, the jury's going to determine what amount of force was necessary. So I would say that I grant the motion in limine as to anything outside of the date in question. If you're wanting to get into that, then let's approach and talk about it. As far as the date in question, whatever the use of force was, of course, it will come out in testimony with, I assume, your witnesses, and the jury is the fact finder and they can go from there.

With regard to the others, Mr. Briley, have any objections to 1, 2, 3, 4, 5, and 7?

MR. BRILEY: No, Your Honor.

THE COURT: Of course, those would be granted

then.  Is there anything else with regard to pretrial matters that we need to take up?

MS. HONEY:  I don't believe so.

MR. BRILEY:  None from the defense.

THE COURT:  One thing.  There have been rulings by the court yesterday on in camera inspection of the documents that were provided by the City Attorney's office.  I've reviewed those thoroughly, and in my review I find nothing that would be exculpatory or would tend to lead to that with regard to this matter.  So those are under seal and will remain under seal.  All right.  We're going to start with the jury at 9:30, so y'all have got some time.  Please be back in here at 9:15 so we can be ready to go right at 9:30 when the jury comes in.  I know you've each been provided yesterday a copy of the venire panel list.  At this time, do you believe that a shuffle is necessary or --

MS. HONEY:  Your Honor, the State would request a shuffle.

THE COURT:  The State's going to request a shuffle.

MR. BRILEY:  We did not receive the questionnaires from jurors No. 16, 17, and 18, or they were misplaced by my office.

THE COURT:  Mr. Briley, I have it in my packet.

Maybe it was not copied to you.

MR. BRILEY:  Could I make a copy?

THE COURT:  They want a shuffle.  Let's go off the record for a second.

(Discussion off the record)

THE COURT:  Let's go back on the record.  With regard to the jury, I believe the State's saying they're going to request a shuffle just by looking at the array.

MS. HONEY:  Yes, Your Honor, that's correct.

THE COURT:  Mr. Briley, typically, I would have to bring the jury in and seat them so you could see the array before we do the shuffle, and then it would be done without you having an opportunity to shuffle again.  Are you okay with not seeing the array and going ahead and shuffling and waiving what I would assume would be your right to ask for another shuffle?

MR. BRILEY:  Yes, Your Honor.

THE COURT:  All right.  We'll go off the record.

(Recess taken)

THE COURT:  On the record.  Back in cause 58017-E parties are present.  Defendant's present.  There's an issue with one of the jurors.  It's now 10:20.  She's supposed to be here at 9:30.  The juror No. 22, Claudia Sciarra has issues with child care today.  No. 22 is outside the cut line.  We are waiting on one other juror,

but are being told he's right on his way outside.  That would leave us with 23 potential jurors.  Ms. Honey, do you have any objection to going forward with 23?

MS. KUCERA:  No, Your Honor.

THE COURT:  Mr. Briley?

MR. BRILEY:  No, Your Honor.

THE COURT:  Twenty-two will be excused for cause.  I will deal with her and the ones who were late after trial.  I'm not going to say anything during trial.  I just want to get through the trial and get going.  I'm still going to leave a spot for No. 22.  That way it makes it easier on y'all.  Okay.  We'll go off the record.

(Open court, defendant and jury panel present)

THE BAILIFF:  Everyone's present, Your Honor.

THE COURT:  All right.  Thank you.  If the venire panel will remain standing, I'm going to issue an oath.  Would each of you please raise your right hand for me?

(The jury panel was sworn)

THE COURT:  Thank you.  Y'all be seated, please.  All right.  This is Cause No. 58017-E, State of Texas versus Byrias Roberson.  The Court will note for the record the venire panel is seated with the exception of one member, No. 22.

The State is present through its attorneys, defendant present, defendant's attorneys.  What I'm going to do first, I'm going to give you some instructions that you'll have to go by during this voir dire process and then what I'll do is introductions and I'll explain the process to you and what's going on.

PRELIMINARY INSTRUCTIONS FOR JURORS

CRIMINAL CASES

"1.  Turn off all phones and other electronic devices.  While you are in the courtroom and while you are deliberating, do not communicate with anyone through any electronic device.  For example, do not communicate by phone, text message, email, chat room, blog, or social networking sites such as Facebook, Twitter, or Myspace.  Do not post information about the case on the Internet before these court proceedings end and you are released from jury duty.  Do not record or photograph any part of these court proceedings, because it is prohibited by law.

2.  To avoid looking like you are friendly with one side of the case, do not mingle or talk with the lawyers, the witnesses, the parties, or any other person who might be connected with or interested in the case.  Do not remain within the hearing of anyone who might be discussing the case.  These persons have to follow these same instructions as you, so you should not be offended

when they follow these instructions.

         3.   Do not accept from, nor give to, any of these persons any favors, no matter how slight the favor, such as rides, food or refreshments.

         4.   Do not discuss or mention anything about this case, the defendant, the alleged victim, or witnesses to anyone, including your spouse, family members, co-workers, and do not permit anyone to mention anything about this case in your presence or your hearing until you are discharged as jurors or excused from the case.  Do not communicate with anyone via any electronic means, including, but not limited to text messages, emails, Tweets or any other method of communication.  Do not permit anyone to communicate with you by any such electronic means.

         If anyone attempts to discuss anything about the case, the defendant, the alleged victim or the witnesses with you, you must report it to me at once.  We do not want you to be influenced by something other than the evidence admitted in court.

         5.   Do not even discuss anything about this case, the defendant, the alleged victim or the witnesses among yourselves until after you have heard all the evidence, the Court's Charge, the attorneys' arguments and until I have sent you to the jury room to consider

your verdict. Even then, you cannot discuss the case among yourselves except when you are all together in the jury room. Do not form or express any opinions about this case until you begin your deliberations."

The supreme court said I have to read that to you before we start since all the electronic devices and phones that we have now. Of course when I started, we didn't have to deal with that, but, man, do times change.

My name is Gary Butler. I'm the judge here for County Court At Law No. 1. I took over about three years ago for Judge Hogan, who was here some 30 years. This is a very active court. We don't waste time. We move very quickly as I have general jurisdiction, which means I hear criminal misdemeanor cases, all family law types of cases, probate, mental health, civil cases under $200,000. So you can tell we'd be quite busy just with those. And that's just the jurisdictions I can remember off the top of my head.

What we have here today is a criminal matter that will be tried and be heard. I expect this trial to last quite possibly to Friday noon. Of course, we're gonna to move through this trial as quickly as we can. However, the defendant, of course, in this matter is entitled to a fair trial, and we're gonna take as much as time as we need to ensure that that happens. I think

that would be what each and every one of you would want if you were on trial.

Let me introduce everybody to you. I've already said who I am. They're going to be asking a little bit about your background in this voir dire process. What they're trying to do is make educated strikes, so they really need to know a little bit about you. If they ask questions of such a personal nature as you do not feel comfortable asking those questions in front of 20 something or 30 something people, then you can ask to come after and speak with just myself and the attorneys and, of course, the court reporter as well.

Now, I'm here from Wichita Falls. I've always livid here. I went to Old High, went to college here. Went off for law school, came back. So I'm about as Wichita Falls as you get. I recognize a few of the people here on the venire panel. Some I've known for a number of years, so that shouldn't come as a shock to anybody.

I have a daughter in Florida and two little boys here and a wife that I've been married to for, ooh, 20 years. Over 20. Over 20 years, let's go with that. Let me introduce who you're going to be seeing. Karen James back there, you've already had dealings with. She's my court coordinator and bailiff. She keeps everything

running as smoothly as possible. She doesn't carry a gun, thank goodness, but still she still has the classification of bailiff.

The other people you're going to see in the courtroom, probably the most important but that you're not going to hear anything from, is Ms. Cayce Coskey who's sitting right over here to my right. She's my court reporter. She's taking down everything that I say and everything that you say. When a question is asked, you have numbers, if you would stand and give your name and or show your number, that's gonna let her make a more accurate record during the voir dire process. The only time we use those numbers is during voir dire.

Also, if you'll stand when answering questions, it just makes it easier for everybody to hear. This air conditioner that is only for my court is going, and sometimes it makes it difficult to hear. When I first started, we didn't have an air conditioner, and in a trial in about August, I believe it was, the temperature was 80 degrees. So thank goodness we've got an air conditioner. The other people that you're going to see is going to be from the State's attorneys, being Victoria Honey.

MS. HONEY: Good morning.

THE COURT: Allyson Kucera.

MS. KUCERA: Good morning.

THE COURT: The investigator for the District Attorney's office who will be assisting them is Donnie Cavinder.

MR. CAVINDER: Good morning.

THE COURT: For the defense, you have Mr. Mark Briley.

MR. BRILEY: Good morning.

THE COURT: And Ms. Kris Howcroft.

MS. HOWCROFT: Good morning.

THE COURT: And the defendant Byrias Roberson.

THE DEFENDANT: Good morning.

THE COURT: A little bit about the process. This is what's known as voir dire, to seek and tell the truth or to question and tell the truth is what they said when I was in law school. Jury selection process is a better way of saying it for me. Since I'm from Wichita Falls, if I butcher voir dire, I apologize. But I didn't take French in high school.

The process we'll go through is the voir dire will commence; the State will ask questions; the defense will ask questions. Once we get through that, they're going to exercise their strikes. I'd like to get through the voir dire process hopefully by lunch. We'll see. And then if not, it will be shortly thereafter. We

should have a jury seated by two o'clock today.  So those of you who are not one of the lucky six, as I call them, will be released at that time.

Now, we don't keep substitute or alternative jurors in this court, so it will just be the six.  After that, there will be opening statements, and we'll move forward into the presentation of evidence and closing statements, and then you'll get other instructions at that time.  This does -- everybody's familiar with trials pretty much.  It's somewhat like in the movies and TV shows, but really not.  There are more delays and it's just inevitable, and that's part of the process.  I'll keep those delays to a minimum if possible and move this trial as quickly as possibly while still affording a fair trial for the defendant in this matter.

All right.  With that, I'm going to turn it over to Ms. Kucera to do voir dire for the State.

Oh, sorry, one more thing.  Somebody said this in a prior trial.  If you see me on my computer, I'm not playing on the Internet or anything like that.  I'm the only judge in the courthouse who is lucky enough to have real time court reporting.  And so if I'm on the computer, nine times out of ten I'm going back through testimony or I'm looking at some legal cases or precedence.  One lady mentioned that to me before, so I

always want to tell you that.  Go ahead.

                    JURY VOIR DIRE EXAMINATION

BY MS. KUCERA:

          Good morning.  How are you guys doing?  All right.  Fun group.  First of all, thank you so much for showing up today.  We appreciate you for doing that. This process cannot work if you guys don't show up, so I wanna thank you so much for doing that.  That's the first step of the process.  Okay.

          First, I just want to ask a general question, easy one.  Raise your hand if this is your first time you've been in a courtroom on a jury selection panel. Excellent.  So a fair amount of you.  All right.  Well, you are in good company today because this is my very first voir dire or jury selection.  So if it is a train wreck, I apologize, but we'll work through it today.  I'm going to introduce myself and talk a little bit about myself and my trial partner and the type of questions I'm going to ask you and talk to you about today.

          My name is Allyson Kucera, as the judge said.  I grew up in Houston Texas, and I grew up -- I was an athlete growing up.  I ended up playing soccer for the University of Oklahoma and stayed there for law school. So I apologize for being a Sooner, but I am happy to be back in Texas.

Let's see.  What else about me?  Okay.  I decided to share a personal story because I am going to ask you guys to sort of talk about yourselves a little bit.  I am a huge fan of sports.  I guess that probably goes without saying.  But what comes with that is growing up with an older brother and an athletic background is that I'm not an emotional person.  I don't really cry a lot in real life.  The problem with that is that when great sporting events occur, I am a disaster.  I'm bawling.  You just worked so hard; I'm so proud of you.  You know, so I pretty much only cry in sporting events.  I think that's pretty weird that I only cry in sporting events, but there you go.  That's a weird fact about me.

Essentially, today this is just going to be a jury selection process.  I'm going to ask you some questions and ask you to just be honest with us and talk to us about your experiences, your feelings, your opinions, okay.  So I'm going to put a slide show up to help you guys follow along with what I'm going to tell you.  If you can't see it, you can't understand it -- another weird fact about me is that I talk incredibly fast.  So if you don't understand what I'm saying, need me to repeat something, let me know, raise your hand, stand up and we'll all get through this process together.  Does this sound like something everyone can do.  Nods?

Yes.

Okay. This is the State of Texas versus Mr. Byrias Roberson. Okay. Mr. Roberson has been charged with the offense of resisting arrest. Okay? So welcome jurors. I thought this might help us a little bit. So these are some helpful hints. I will attempt to take deep breaths and slow down. I will ask you guys to do the same. Don't be nervous. This is gonna be easy. We'll get you out of here before lunchtime hopefully.

All right. There are no wrong answers. These are opinion questions. These are things that I'm going to ask you guys and just ask you to be honest, okay. There's no trick questions or anything like that, okay. Honesty is the best policy, okay. We really want you guys to be honest, all right. And the reason we want you to be honest is that the goal of this process is to ensure that Mr. Roberson gets a fair trial, okay? And that's what the State wants and that's what the defense wants, okay? So we wanna make sure that we get the best six jurors that are going to sit appropriately for this case. Okay? So just be honest and make sure that we get this guy a fair trial. Okay?

All right. So the offense he has is resisting arrest. All right. I'm going to back up and ask you why do you think the offense resisting arrest is something

that we should try people for?  Why do you think it's a crime.  Can anyone think of a reason why we wouldn't want someone to arrest a person resisting arrest?  Anyone have any idea, try to help me out, why we think resisting arrest might be -- might be an offense under the Texas Penal Code?  Yes!

VENIREPERSON FOSTER:  Chris foster.

MS. KUCERA:  Okay.  Mr. Foster, why do you think that --

VENIREPERSON FOSTER:  We need to protect the people that are out there protecting us.

MS. KUCERA:  Okay.  And who are some of those people?

VENIREPERSON FOSTER:  Police officers.

MS. KUCERA:  Okay.  So you appear to be a police officer.  Is that in fact true?

VENIREPERSON FOSTER:  Yes.

MS. KUCERA:  Great.  So your statement is that resisting arrest is something we need to protect the officers that are generally making the arrests?

VENIREPERSON FOSTER:  Right.

MS. KUCERA:  Okay.  Are there any other people you can think we would want to protect?

VENIREPERSON FOSTER:  Well, protect the citizens by making the arrest.

MS. KUCERA: Good. Absolutely. Anyone else have an idea why we think it's important to protect the citizens who might be near the arrest? Anyone have an idea as to why that might be the case? Anyone just raise your hand. I know you can do this. Anyone think of a reason? Let's say there are a group of people all together and they're in -- let's say they're in a bar. Alcohol is being served and there's someone who's becoming rowdy, maybe had too much to drink. There are a lot of people in a bar, and if the officers go to make an arrest in a bar, wouldn't it be safer if that person didn't resist arrest for all the people in the bar that could possibly be injured, you know, by that person who needs to be arrested? Does that make sense? Okay. Can everybody understand how would be the case?

So the officer says we want to protect the officers who are making the arrest and also the citizens around the arrest. We don't want anyone to be hurt by the officers who are trying to make an arrest. Okay? Understand? Nod with me. Everyone got it? Okay. What about the defendant? Wouldn't we also want to protect him? Okay, good. All right. Can you understand why it's safer if the defendant doesn't also resist arrest? Everyone understand why that would be important? Good.

Okay. All right. So now we're going to go over

the definition of -- up here on this slide is the definition of resisting arrest, okay.  Everyone following along so far?  Great.  All right.  Texas Penal Code Section 38.03.  All right.  It's a long definition. We're going to go through it and break it down for you guys so we all understand it together.  Okay?

All right.  A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer from effecting an arrest.  It's just that sentence right there.  He intentionally prevents or obstructs a person he knows is a peace officer, okay, from effecting an arrest or effecting a search or transportation of that actor -- so the person who is being arrested is the actor in this case -- or another person by using force against that peace officer or another person.

Okay.  I know it's a little confusing, but did everyone follow that and understand?  Okay.  He has to intentionally know that he is preventing or obstructing a person who he knows to be a peace officer -- and that's important, all right -- from effecting an arrest.  Okay. So if someone goes to try and arrest him, he can not, if he knows they're a peace officer and they're arresting him, he can not use force and potentially prevent them from arresting him.  Everyone understand?  Everyone

good?  Okay.

All right.  The second part of that is that it's no defense to prosecution under this section if the arrest or search is unlawful.

Okay.  So I'm going to try to explain that as best I can.  Officer Foster, I'm going to try and use you to help us understand that.  Okay?  All right.  Let's say you go to make an arrest of an individual.  What do you need in order to make an arrest?

VENIREPERSON FOSTER:  Probable cause.

MS. KUCERA:  Okay.  So you need to believe that that person has committed an offense; is that correct?

VENIREPERSON FOSTER:  Yes.

MS. KUCERA:  Okay.  If you go to make an arrest and you believe you have probable cause, right?

VENIREPERSON FOSTER:  Yes.

MS. KUCERA:  What if for some reason you might arrest the guy's twin brother who you think is that person, but he's not.  He's actually his twin brother.  Okay?  Does that make sense?  Everyone following me?  So he's actually arresting the wrong person, right?  But he believes that he's arresting the right person.  Okay?  So we would consider that an arrest.  He's trying to arrest the right person.  He believes he's arresting the right person.  Even though he arrests the wrong person, the

wrong person still, the law says, cannot resist arrest. Does that make sense? Okay. Everyone understand?

Okay. Now we're gonna break it down a little bit and we're gonna go over the elements, okay. All right. Okay. All right. So this is the elements, okay. Mr. -- this is what -- okay. Let me explain. This is what Victoria and I have to prove to you, okay, that we're going to go through this trial and this is what we have to prove to you, okay. The first element that we have to demonstrate to you guys is that Mr. Roberson is the particular person in this case, okay. Second is that the offense occurred on or about July 10, 2012. Okay? Second, is that it occurred in Wichita County, Texas, did then and there intentionally prevent or obstruct Officer Gabriel Vasquez, a person the defendant knew was a peace officer, from effecting the arrest of the defendant Mr. Roberson by using force against that said peace officer.

Now, does anybody know what a peace officer is? Anybody? Somebody's gotta raise their hand. Yes! Let me get your name. Hang on just a second. Your name is Clay Parsons, No. 23.

VENIREPERSON PARSONS: My definition is a person who was in some kind of uniform, carrying a weapon, that I could distinguish him from just a common person who was

just hanging out at the bar where this was taking place.

MS. KUCERA: Okay.

VENIREPERSON PARSONS: You'd have to visually know this person has some kind of authority to be doing what he was doing.

MS. KUCERA: Okay. Very good. Does anyone else agree with what Ms. Parsons said, about that they would have to have some sort of demonstration that they're a police officer? Raise your hand if you agree with what Ms. Parsons said. There you go. Did you raise your hand, sir? Good. Do you believe it as well?

VENIREPERSON TEAKELL: Yes, I do.

MS. KUCERA: Excellent. Okay. Do you wanna stand up, sir, for me? Do you think there's any other -- say your name.

VENIREPERSON TEAKELL: Ronnie Teakell, No. 2.

MS. KUCERA: Great. Do you think there is any other -- is there anything you want to add to Ms. Parsons' definition?

VENIREPERSON TEAKELL: I think a police officer is somebody who's supposed to -- supposed to protect you.

MS. KUCERA: Okay.

VENIREPERSON TEAKELL: He should have a badge or some kind of emblem on his shirt so that you know he's a police officer.

MS. KUCERA:  Okay.  Great.  Mr. Cavinder, could you stand up, please?  This is our investigator.  This is Mr. Cavinder.  I forgot to introduce him, but I'll introduce him to y'all now.  Mr. Cavinder's our investigator.  Can you see anything on him that demonstrates that he's a peace officer?  Ms. Wright, what do you see on him?

VENIREPERSON WRIGHT:  The badge.

MS. KUCERA:  He's not wearing a police uniform, though, right?  You can see the badge and it demonstrates he's a police officer, correct?

VENIREPERSON WRIGHT:  Correct.

MS. KUCERA:  Good story about Mr. Cavinder.  This morning he sat in the witness chair and he broke it.  So that is a sub witness chair.

The next thing we're going to do is go through the elements one by one.  So we have the first three and we're going to talk about intentionally.  So the defendant has to have intentionally resisted the arrest, right?  Okay.  Anybody a baseball fan out here?  Yes, oh, I got a small hand.  All right.  Stand up and say your name.

VENIREPERSON THOMASON:  Tyler Thomason, No. 11.

MS. KUCERA:  No. 11, okay.  What's your favorite baseball team?

VENIREPERSON THOMASON:  The Rangers.

MS. KUCERA:  Okay.  Good choice.  Excellent choice.  All right.  So is Yu Darvish the pitcher for the Rangers?

VENIREPERSON THOMASON:  Yes, he is.

MS. KUCERA:  Good.  Good job.  Okay.  Who is the catcher for the Rangers?  Do you know?

VENIREPERSON THOMASON:  There's been three so far.

MS. KUCERA:  Okay.  Give me a name, one name.

VENIREPERSON THOMASON:  A.J. Pierzynski.

MS. KUCERA:  A.J. Pierzynski.  Okay.  So Yu Darvish is the pitcher for the Rangers and A.J. Pierzynski, okay, is the catcher.  Okay.  You're a baseball fan, you said, right?

VENIREPERSON THOMASON:  Yes.

MS. KUCERA:  Okay.  So let's say the Rangers are playing the Yankees, and it's bottom of the ninth and the Rangers are up one-nothing.  Okay?  There is a man on first base and there's two outs, okay, and the No. 1 home run hitter in the league is going to come up to bat.  All right.  Do you think that it's a possibility that the Rangers might decide to walk that batter?

MR. BRILEY:  It's a possibility.

MS. KUCERA:  Okay.

VENIREPERSON THOMASON:  Wouldn't be smart, but it's a possibility.

MS. KUCERA:  Okay.  All right. Let's pretend that it is a smart idea.  I'm not super knowledgeable about baseball, but I know this is what they do.  Okay.  So what do they call that when they decide to walk the batter?

VENIREPERSON THOMASON:  An intentional walk.

MS. KUCERA:  Very good.  He's doin' great, you guys.  Okay.  So it's an intentional walk, yes.  Okay. So how do you, when you're the batter and/or you're a fan, how do you know that they're going to do an intentional walk?

VENIREPERSON THOMASON:  Normally, the catcher will stand up and move over to the side of where the batter stands and hold up that other arm and the pitcher will throw four balls out that way.

MS. KUCERA:  Okay.  So nowhere near the strike zone, right?

VENIREPERSON THOMASON:  Yes.

MS. KUCERA:  Okay.  Now, is the -- so is the pitcher going to talk to the batter?

VENIREPERSON THOMASON:  He could, but normally no.

MS. KUCERA:  Normally, no, right?  The pitcher

doesn't normally talk to the batter. All right. Does the batter know that he's going to be intentionally walked, though?

VENIREPERSON THOMASON: When he sees the catcher stand up and hold his arm up.

MS. KUCERA: Right. Very good, yeah. So the catcher will stand up and stand way outside the batter's box way behind the batter's box, and he'll hold his glove up way outside the strike zone to catch the ball, okay. He doesn't want his pitcher throwing it anywhere near the strike zone, right? He wants to walk the batter all the way to first base. Okay? He wants to throw four balls in a row. All right. So would it be fair to say -- you're doing great so you're going to keep standing up, okay.

So intentionally. Under the Texas Penal Code, it says a personal acts intentionally or with intent with respect to the nature of his conduct, okay, or to a result of his conduct when his conscious objective or desire is to engage in the conduct or cause the result. Okay? All right. I know I say okay a lot. Just bear with me. We're going to get through this. Would it be fair to say in an intentional walk that the pitcher is aware of his conduct?

VENIREPERSON THOMASON: Yes.

MS. KUCERA: Okay. So is it also fair to say that he desires to engage in that particular conduct?

VENIREPERSON THOMASON: Yes.

MS. KUCERA: Okay. he is standing on the pitcher's mound and intentionally throwing it way outside the batter's box, correct?

VENIREPERSON THOMASON: Yes.

MS. KUCERA: Excellent. All right. Does he know what the result's gonna be?

VENIREPERSON THOMASON: I would hope he would know.

MS. KUCERA: Right. One of the two, yeah.

VENIREPERSON THOMASON: But, yes, normally he would.

MS. KUCERA: Yeah. Normally, he would know, right? He knows he's gonna walk that batter, okay.

VENIREPERSON THOMASON: Yes.

MS. KUCERA: So he's aware of his conduct, right? He is acting with intent. He's intentionally walking. They call it an intentional walk for a reason. All right. Does everyone understand where I'm going with this? We have to recognize we've got a person who's acting with a conscious objective. He knows what his actions are causing or may cause, okay. He knows that it may cause this particular result or he is aware of the

actions that he is currently making. Okay? He is acting with purpose. Everyone understand? Yes. You've done beautifully. Thank you so much. Have a seat. All right. Everyone understand intentionally? You're nodding. Great.

Okay. Now, the next part of the definition we talked about is force, okay. All right. What -- let's see. Mr. Garcia, would you stand up for a second? Okay. And you are Anthony Garcia. Excellent. All right. What does the word force mean to you?

VENIREPERSON GARCIA: Applying pressure.

MS. KUCERA: Applying pressure, okay. Good. What -- you can think of it in terms of a person acting. How could they use force?

VENIREPERSON GARCIA: They could use force to get what you want.

MS. KUCERA: Okay. Let's work on that a little bit. What would you do if you're using force. You said apply pressure. Is there any other ways you could think of that you would use force?

VENIREPERSON GARCIA: Physically.

MS. KUCERA: Okay. Good. What might you do if you're using force physically, specifically in terms of this.

VENIREPERSON GARCIA: Use your body, use your,

you know, arms, whatever you need to do to.

MS. KUCERA: Yeah. No, you're right. Absolutely. So you could use your arms. What about your legs?

VENIREPERSON GARCIA: Yeah. Arms, legs, teeth.

MS. KUCERA: Great. You've done well. Have a seat. Good job. So can anyone think of something that might be less than what Mr. Garcia said, which was using his arms, his legs, punching out. Is there anything else anyone can think of that might possibly be considered force? Yes, Ms. Parsons.

VENIREPERSON PARSONS: Being a teacher, I think you could also use verbal force, presenting the case to them. If you don't do this, this is going to happen to you. To me, that would be a way of forcing the situation, too.

MS. KUCERA: Excellent suggestion. So that is great. So we have sort of two extremes here. We have Ms. Parsons saying that force is, you know, it could be mere words, right? And then you have Mr. Garcia suggesting using your arms and legs; it's punching out, it's kicking out; it's being aggressive or violent to get force. That's correct? Everyone understood Mr. Garcia to say that? Okay. What if I were to tell you that the law falls in the middle of those two things, okay. That

it has to be more than your words, but it doesn't have to be as excessive as punching out, kicking out, applying pressure, those sorts of things.  Okay.  So this is what the law says.  It says that it's more than mere passive resistance.  Okay.  So I think words might qualify as passive resistance.  But it says that one who uses force to shake off an officer's detaining grip, by pushing or pulling, may be guilty of resisting arrest.  Okay.  So if an officer has a detaining grip -- Ms. Hair, stand up.

VENIREPERSON HAIR:  No. 4, Jamie.

MS. KUCERA:  Jamie, okay.  When I say detaining grip, what does that word mean to you?

VENIREPERSON HAIR:  Like when they have you in handcuffs and I try to pull away or I push them off.

MS. KUCERA:  Okay.  Do you think detaining grip could mean something less than being in handcuffs?  Can you think of something that's less detaining?

VENIREPERSON HAIR:  Like if they're going to grab me by the shoulder and you push them away or shake them off.

MS. KUCERA:  Very good.  Absolutely right, yeah. It can be just a detaining grip.  Now, the law says that one who uses force to shake off an officer's detaining grip whether by pushing or pulling may be guilty of resisting arrest.  Does that sound right?  Do you

understand that?

VENIREPERSON HAIR:  Yes.

MS. KUCERA:  Okay.  Detaining grip could be less.  Could be -- resisting arrest could be they shake it off, they push, they pull away.  Those are things that the law is talking about that could be resisting arrest.  Done great.  Have a seat.  Gonna keep going.

All right.  So this is the second definition of force.  The statute is also satisfied by evidence of jerking against, okay, turning in circles to resist and struggling against an officer's efforts at making an arrest.  Okay?  Mr. Billing, would you stand up, please?

VENIREPERSON BILLING:  Douglas Billing, No. 7.

MS. KUCERA:  Mr. Billing, the jerking against or turning in circles, what do you think that means to you.

VENIREPERSON BILLING:  Basically turning away from the officer.

MS. KUCERA:  Okay.  If there is -- yes, absolutely right.  What about struggling against an officer's efforts at making an arrest?  What does that mean?

VENIREPERSON BILLING:  I imagine it would be trying to step away from him or get space between you and him.

MS. KUCERA:  Okay.  Excellent.  Yes, you're

absolutely right.  If I were to tell you that the law, like I said, is more than -- have a seat.  Great job.  So we talked about, Ms. Parsons, how that it's more than your words, but it's not -- it doesn't have to be as violent or aggressive as punching or pulling and kicking out.  It can be that.  If, in fact, it is that, that can also be resisting arrest.  But it can also be less than that.  Does everyone understand?  Ms. Vale, do you understand what that means?

VENIREPERSON VALE:  Yes.

MS. KUCERA:  The law is somewhere between those two, and I've given you two cases that talk about what -- something less than words -- or something more than words, less than violence?

VENIREPERSON VALE:  Yes.

MS. KUCERA:  If that's how the statute is defined, can you follow the law?

VENIREPERSON VALE:  Great.  Mr. Billing, you understand?

VENIREPERSON BILLING:  Yeah.

MS. KUCERA:  Officer Foster?

VENIREPERSON FOSTER:  Yeah.

MS. KUCERA:  Mr. Garcia, do you understand that?

VENIREPERSON GARCIA:  Yeah.

MS. KUCERA: And Ms. Hair?

VENIREPERSON HAIR: Yes.

MS. KUCERA: Okay. Ms. Wright, you understand that?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Good. Mr. Teakell, make sense to you?

VENIREPERSON TEAKELL: Yes.

MS. KUCERA: Great. Ms. Taylor?

VENIREPERSON TAYLOR: I haven't heard from you. I'm probably going to call on you in a second, okay? You'll be great. Don't worry. Okay. Can anyone talk to me about what an arrest means just generally? What do you think of when you hear the word arrest? Ms. McClesky, stand on up, No. 12. What do you think of when you hear the word arrest?

VENIREPERSON MCCLESKY: To me it means like if you're doing something wrong, outside the law, you get arrested; you get in trouble.

MS. KUCERA: Okay. Absolutely right. What do you think of as an example of when you can get arrested?

VENIREPERSON MCCLESKY: Maybe when you're in a fight with somebody.

MS. KUCERA: Okay. So let's say -- good. Great example. Let's say you are in a supermarket shopping and

you see two people getting in an argument, right?  You see it.  You tell someone to call the cops.  The cops arrive and they see, physically see, the two people fighting.

VENIREPERSON MCCLESKY:  Right.

MS. KUCERA:  Do you think it's a reasonable time to arrest them?

VENIREPERSON MCCLESKY:  I would think it would be a reasonable time to detain them.  I don't know if it would result in an arrest.

MS. KUCERA:  Okay.  So let's say they -- all right.  All right.  So what they did is they actually physically committed a -- all right.
Maybe they -- let's say they stole from the supermarket.  You watched them; the officer saw them steal; and then they decided that they had enough to arrest them.  Okay.  The officer has physically witnessed the crime.  That would be a reasonable time to arrest them?

VENIREPERSON MCCLESKY:  Yes.

MS. KUCERA:  Great.  You've done great.  Awesome.  Have a seat.  All right.  Ms. Taylor, I told you I was gonna call on you.  You're good.

VENIREPERSON TAYLOR:  Yes.  Cheryl Taylor, No. 1.

MS. KUCERA:  Juror No. 1.  It's a good place to

be. Ms. Taylor, can you think of a time where maybe the officer didn't physically witness the crime occur, but that he would still maybe have showed up later and still have reason to arrest the person who committed the crime?

VENIREPERSON TAYLOR: Yeah, the eyewitnesses and, you know, just what he sees there and --

MS. KUCERA: Excellent. Okay. So he may not have seen it, but he shows up later and let's say 15 eyewitnesses all tell him the same story and they all point to this person and say I saw it; he committed this crime; you know, I witnessed it. Does that seem like a reasonable time to make an arrest?

VENIREPERSON TAYLOR: Uh-huh.

MS. KUCERA: Ms. Taylor, you've done great. Have a seat. Mr. Foster, I'm going to have you stand up again. What is -- let's say that the police department gets a tip about a crime that may have occurred. Okay? And then they conduct an investigation. Right? Okay. You know, they might conduct interviews. What else might they do in this investigation?

VENIREPERSON FOSTER: Look at all the evidence involved.

MS. KUCERA: Okay.

VENIREPERSON FOSTER: Witnesses, even speaking

with the person that's accused and determining what all they have.

MS. KUCERA: All right. Let's say that they -- after doing all that you said, witnesses, reviewing evidence, talking to people, talking to victims, maybe, let's say that they think they're almost positive they know who committed the crime. Okay. What would the steps be? What would happen if that was the case? What would they do if they were almost positive that was the person who committed the crime?

VENIREPERSON FOSTER: If they had probable cause to believe they committed the crime and it was arrestable at that time, they would go make the arrest.

MS. KUCERA: What would they have to do before they make the arrest, though? Would they have to see a judge about something?

VENIREPERSON FOSTER: Depends on the circumstances.

MS. KUCERA: Okay. If I were to tell you they were issued a warrant, what is that? How does that work? What does that do?

VENIREPERSON FOSTER: Well, that's already signed by a judge ordering the arrest of that person.

MS. KUCERA: Okay.

VENIREPERSON FOSTER: Usually, it's a command to

the police officer to make that arrest.

MS. KUCERA: Okay. So that's also another time. If they think they have probable cause to make an arrest, they can go get a warrant issued by what is called a neutral magistrate or a judge to say that you have probable cause to arrest this person; I'm issuing a warrant for this person's arrest?

VENIREPERSON FOSTER: Right.

MS. KUCERA: Is that a fair assessment of how that works?

VENIREPERSON FOSTER: Yes.

MS. KUCERA: So if they have a warrant for the arrest, can they go and make the arrest?

VENIREPERSON FOSTER: Yes.

MS. KUCERA: Great. Officer, you did good again. Well done. So we talked about three different ways that we can make an arrest, right? One of the ways is the officer personally witnesses the crime. Okay? The second way is that they show up to the crime later, but all the eyewitnesses confirm what happened and they can arrest the person based on what they've seen at the scene and then also spoken to the eyewitnesses. Then Mr. Foster talked about the way that they can -- you know, if they, as a result of an investigation, they believe they have probable cause, they get a warrant

issued for his arrest and they can go make the arrest of that person. Anybody have any questions about those three ways that we talked about? Feel free to raise your hand. It's okay. I can go slower. Everyone got it? Okay. All right. So very good.

All right. So warrants and arrests. We kind of talked about it briefly. We'll go into a little more detail. The Texas Code of Criminal Procedure says that officers executing an arrest warrant, which is the type that Mr. Foster talked about, they must have a reasonable belief, okay, that the suspect resides at the place to be entered and they must also have reason to believe the suspect is present at the time the warrant is executed.

All right. I'm going to try and explain that a little bit but use you guys to explain. All right. Now, when -- Mr. Teakell, stand up again. You're doing great.

VENIREPERSON TEAKELL: No. 2.

MS. KUCERA: Okay. If I were to say that the officers executing an arrest warrant must have a reasonable belief, okay, that the suspect resides at that time place that they are entering in order to arrest him, what does reasonable belief mean to you.

VENIREPERSON TEAKELL: He has information that he's there.

MS. KUCERA: Okay. Does that mean they have to

know 100 percent that sure he's there.

VENIREPERSON TEAKELL: I wouldn't think so.

MS. KUCERA: Right. Reasonable belief doesn't say hundred percent. It just says reasonable belief, okay. What do you think they could use to find out -- let's say it's his home. What do you think they could use to find out that he is at the home at the time.

VENIREPERSON TEAKELL: Information that he lives there, his neighbors, whoever lives there, if he lives there.

MS. KUCERA: Okay. Great. Have a seat. You've done great. See, I told you guys he this is easy. So reasonable belief that he's there. What about -- let's see. Ms. Schmidt, stand up.

VENIREPERSON SCHMIDT: Tina Schmidt, No. 13.

MS. KUCERA: Okay. Ms. Schmidt, we talked about they had information or talked to their neighbors. What other information do you think they might be able to use to determine if they have a reasonable belief that that person's home?

VENIREPERSON SCHMIDT: If they've done any surveillance or checked his work record, his work, know he's off and when he would probably be home.

MS. KUCERA: Great. That's excellent. You're absolutely right. That is something they could use. He

works at this time every day; he comes home from work, checks the mail. Excellent. Very, very good. All right. It also says in the second part of the definition that they also have reason to believe that the suspect is present at the time the warrant is executed. So we talked about how we might know that he's at that particular place. How would we know that he's actually present?

VENIREPERSON SCHMIDT: Someone had watched him go in, set up surveillance and seen him come and go, maybe some other neighbors or something.

MS. KUCERA: What about if his car is in the driveway?

VENIREPERSON SCHMIDT: Yeah.

MS. KUCERA: Would that make sense that he was there?

VENIREPERSON SCHMIDT: That seems reasonable.

MS. KUCERA: Very excellent. Done great. Have a seat. Okay. All right. So warrants and arrests in Texas. We talked about how the -- that particular case that we're talking about that defines when officers can make an arrest using a warrant, that comes from the Supreme Court of the United States. Okay. So the Supreme Court is the highest court in the whole land. Every court in the nation has to follow what they say.

Now, state courts like the Texas Supreme Court can qualify what the Supreme Court says and help the lower courts understand.  That's what happens in this case.  So I'm going to explain to you warrants and arrests in Texas, okay.  So in Texas, a warrant for a Class C offense -- anyone know what a Class C offense is?  Someone I haven't heard from?  Class C offense? Anyone.  Okay.

VENIREPERSON RIPPERGER:  Debbie Ripperger, 20. A Class C is a misdemeanor.

MS. KUCERA:  It is a misdemeanor.  Good, yes. If I were to say a speeding ticket is a Class C offense, does that sound like that's a correct answer?

VENIREPERSON RIPPERGER:  Yes.

MS. KUCERA:  Yes, you are correct.  So a speeding ticket is a Class C offense.  Okay.  Very good. All right.  So what this case says is that a warrant for a Class C offense and failure to appear warrant, which is, you know, can be enough to justify entry into a defendant's home to make an arrest.  The officers still have to have reason to believe that the defendant is home at that time, okay.

So what I'm gonna try to explain is -- who's going to be the lucky person?  Mr. Litteken?  You're good.

VENIREPERSON LITTEKEN: No. 9, Gerald Litteken.

MS. KUCERA: Ms. Ripperger suggested that a Class C offense is a misdemeanor. We classify offenses, I guess, in two different ways. We have misdemeanors and then we have the more serious offenses. Do you know what those are called?

VENIREPERSON LITTEKEN: A felony.

MS. KUCERA: Felony. Very good. So if I tell you a felony is more serious than a misdemeanor, and I'm telling you that the Court says that we can or that officers, if they have a reason to believe that the defendant is home at that time, they can make an arrest for not only something as serious as a felony, but also something for a Class C misdemeanor, which is the lowest offense. Does that right? Does that make sense? Do you understand that?

VENIREPERSON LITTEKEN: Uh-huh.

MS. KUCERA: Okay. So if I were to tell you that the law says they can make an arrest by a Class C offense if they believe that the defendant is home at that time, does that sound like something that you could follow if I tell you that if the judge instructs you that if you believe that the officers had reason to believe that they could make an arrest, that you could follow the judge's instructions?

VENIREPERSON LITTEKEN: Sure.

MS. KUCERA: What about you, Ms. Taylor?

VENIREPERSON TAYLOR: No. 1.

MS. KUCERA: If you believe that the officers had reason to believe that they were making -- that the defendant was home and that they could arrest him for something as low as a Class C offense, but also something that's as serious as a felony, that they could go into his home and make an arrest?

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: If the judge told you that that was something, an instruction you have to follow, you could do that?

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: Okay. Good. What about you, Mr. Teakell?

VENIREPERSON TEAKELL: I believe that's correct.

MS. KUCERA: Okay. You could follow the judge's instructions?

VENIREPERSON TEAKELL: Yes.

MS. KUCERA: Great. Ms. Wright, what about you?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Okay. Ms. Hair?

VENIREPERSON HAIR: Yes.

MS. KUCERA: Perfect. Mr. Garcia, do you think

you could follow those instructions?

VENIREPERSON GARCIA:  Yes.

MS. KUCERA:  Okay.  Do you have any questions about what we talked about?

VENIREPERSON GARCIA:  No.

MS. KUCERA:  Mr. Foster, what about you?

VENIREPERSON FOSTER:  Yes.

MS. KUCERA:  You could?

VENIREPERSON FOSTER:  I think I could.

MS. KUCERA:  What about you, Mr. Billing?

VENIREPERSON BILLING:  Yes.

MS. KUCERA:  And Ms. Vale?

VENIREPERSON VALE:  Yes.

MS. KUCERA:  Ms. McKinley, is that something you could you follow?

VENIREPERSON MCKINLEY:  Yes.

MS. KUCERA:  Okay.  Ms. Steele?

VENIREPERSON STEELE:  Yes.

MS. KUCERA:  Great.  Mr. Jantz, is that correct?

VENIREPERSON JANTZ:  Yes, ma'am.

MS. KUCERA:  Okay.  Is that something you could follow if it's an instruction?

VENIREPERSON JANTZ:  Yes, ma'am.

MS. KUCERA:  If you believed that officers had reasonable belief to be in the home that they could

arrest the defendant for something like a felony or Class C offense, they could enter his home to do that?

VENIREPERSON JANTZ: Yes, ma'am.

MS. KUCERA: Okay, great. And Ms. Schmidt?

VENIREPERSON SCHMIDT: Yes.

MS. KUCERA: Good. And Ms. McClesky?

VENIREPERSON MCCLESKY: Yes.

MS. KUCERA: Mr. Thomason, my baseball guy?

VENIREPERSON THOMASON: Yes.

MS. KUCERA: You could do that. All right. Mr. Vasquez, what about you?

VENIREPERSON VASQUEZ: Yes.

MS. KUCERA: Great. Okay. All right. So we're going to review what we talked about to make sure you understand the Penal Code. We have to prove that Mr. Roberson, on or about July 10th of 2012, in Wichita County, Texas, did then and there intentionally -- my baseball fan over here gave us a definition of intentionally, right -- did then and there obstruct Gabriel Vasquez, a person the defendant knew was a peace officer, from effecting an arrest of the defendant by using force against said peace officer.

And Mr. Garcia and Ms. Parsons gave us the range of or definition of force, right? Everyone got it? Everyone understand? Okay. All right.

So the next thing we're going to talk about is the burden of proof. Anyone here know what the burden of proof is in a criminal case? Some of you have served on a criminal jury before; is that correct? Anyone remember what the burden is? Anybody.

VENIREPERSON BILLING: Beyond a reasonable doubt.

MS. KUCERA: Mr. Billing. Stand up. You got it right. Five points. What did you say?

VENIREPERSON BILLING: Beyond a reasonable doubt.

MS. KUCERA: Beyond a reasonable doubt. Mr. Billing, great job. That is true. Beyond a reasonable doubt is the standard that Victoria and I will have to approve to you the elements of the case that we just went over, okay. All right. So beyond a reasonable doubt, what is it? Do you have a suggestion for what beyond a reasonable doubt is, or is it self-explanatory?

VENIREPERSON BILLING: It's self-explanatory.

MS. KUCERA: Okay. By the way, you're doing a great job. Thank you. All right. Let me tell you what beyond a reasonable doubt is not. It's not beyond all doubt, okay. It's not beyond the shadow of a doubt or not beyond any doubt, okay. It's beyond a reasonable doubt, okay. So you can have a doubt, but it has to be

based in reason.  All right.

This is the best example I could come up with. I'm going to try to help you understand what beyond a reasonable doubt means.  I don't know if you guys are familiar with the process of law school, but we have professors and they teach us different subjects.  My professor, which I lovingly refer to, we call him Uncle Murray, of course not in class.  But his name is Professor Tabb.  He taught us contracts and torts and a class called law and literature.

All right.  In torts, they were things like were they acting with negligence or were their actions reasonable under the circumstances?  Torts is civil, so we don't have to worry about that right now.  But the reason I bring up Professor Tabb is that he kept explaining to us that the courts, when they're doing negligence evaluations, always use a demonstration of the reasonable man.  So it kind of became a joke in our law school class that Professor Tabb, who drinks coffee; he's a deacon at his church and loves the book to kill a mocking bird; he wears argyle, has the same cup of coffee every morning; he's just Mr. Practical.  So we used to joke that he was a reasonable man.  What Mr. Tabb thinks is reasonable may not be the same thing that Mr. Garcia thinks is reasonable.  Okay?  Reasonableness is sort of

subjective.  It's what each individual thinks is reasonable.  Okay?  everyone understand what I'm talking about?

All right.  Is there anyone in here that is a television fan of, let's say, NBC's, in the late 90's, the Must See TV lineup?  Anyone watch those shows?  Seinfeld?  Frasier?  Mr. Jantz, all right.  All right.  Mr. Jantz, stand up for just a second.

VENIREPERSON JANTZ:  Fourteen, Chris Jantz.

MS. KUCERA:  Okay.  Mr. Jantz, you watched that lineup, right?  You watched Seinfeld?  Frasier?  Did you watch the whole lineup?  Did you watch Friends as well?

VENIREPERSON JANTZ:  I watched them all.

MS. KUCERA:  Great.  Okay, so you're familiar with the shows then?

VENIREPERSON JANTZ:  Yes.

MS. KUCERA:  Okay.  If I were to show you this picture, could you tell me what that's a picture of?  Not a trick question.

VENIREPERSON JANTZ:  Some of the friends.

MS. KUCERA:  Okay.  Do you see those parts that are blacked out?

VENIREPERSON JANTZ:  Yes, ma'am.

MS. KUCERA:  Okay.  So do you see there are two people that are sort of blacked out, but you can see that

they're still in the photograph, right?

VENIREPERSON JANTZ: Yes, ma'am.

MS. KUCERA: So if I were to ask you what that's a picture of, what would you say?

VENIREPERSON JANTZ: Some of the friends.

MS. KUCERA: Okay. How many friends are there? Do you remember?

VENIREPERSON JANTZ: Six.

MS. KUCERA: Six. Very good. Are there six people in the photo?

VENIREPERSON JANTZ: Yes.

MS. KUCERA: Yes, there are. So it is a picture of the cast of Friends. Mr. Jantz, you are correct. It is a picture of the cast of Friends. Anyone else recognize that photograph? Okay. All right. Ms. Wright, do you recognize that photograph?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Did you watch Friends?

VENIREPERSON WRIGHT: I did.

MS. KUCERA: Okay. Stand up. Mr. Jantz, good job. Ms. Wright, you watched Friends, right?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Okay. Did you look at this picture and also know that it was the cast of Friends?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Okay. Now, let me ask you this. You can't see the whole picture, right?

VENIREPERSON WRIGHT: Right.

MS. KUCERA: But you can see four of them and you can see that there are two other people in that photograph; is that correct?

VENIREPERSON WRIGHT: That's correct.

MS. KUCERA: Okay. Now, did you know beyond a reasonable doubt that it was the cast of Friends?

VENIREPERSON WRIGHT: No.

MS. KUCERA: You didn't? Okay. Why not?

VENIREPERSON WRIGHT: The left hand side of the picture is faded.

MS. KUCERA: Okay. We talked with Mr. Jantz about how he liked the Must See TV lineup, all that kind of stuff, right? He talked about how he liked the show Friends. Okay. And if I were to show you a picture and you could see four of them, but you couldn't see the other two --

VENIREPERSON WRIGHT: I would assume that it's the cast of Friends.

MS. KUCERA: Okay. Yes, you would assume that it's the cast of Friends, right?

VENIREPERSON WRIGHT: Right.

MS. KUCERA: Okay. Let me ask you this. Do you

think if I was doing a demonstration that it would be, let's say, reasonable for me to put four of the cast of Friends but two people that are like arbitrary and aren't related.  Does that seem like a reasonable thing that I would do?

VENIREPERSON WRIGHT:  No.

MS. KUCERA:  No.  Okay.  So maybe it would be fair to say that you knew or your assumed beyond a reasonable doubt that that was the cast of Friends?  Okay?

VENIREPERSON WRIGHT:  I assumed, yes.

MS. KUCERA:  Yes, okay.  Have a seat.  Great job.

Okay.  Now, in this particular case, you know, I obviously was trying to do a demonstration where I blacked out some of the photographs because you can't see the whole picture.  In this particular case, if you -- let's say Officer Foster was on duty that day and he witnessed the entire event taking place, we would probably call him as a witness, correct?  He saw the whole thing take place, right?  He would be a witness in that case.  He would have seen all the elements take place of that offense.  So we would call him as a witness.  So he couldn't be a juror because he would have seen the whole picture.  Understand?

So in this case we're going to bring in witnesses who will tell you what they saw and try to fill in as much of the picture as they can. There may be things blacked out, but they're going to try to give you as much of the picture that happened. Now, I'm going to ask each of you if you can follow the law and not hold the State to a higher burden than beyond a reasonable doubt, okay. Understand what I'm asking you?

All right. Ms. Taylor, I'll have you stand up again. All right. Do you think that you can -- reasonable is different for each person, right?

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: We talked about that. Okay. So your definition of reasonable may be different than Mr. Teakell's, right?

VENIREPERSON TAYLOR: Uh-huh.

MS. KUCERA: Do you think that you can still promise not to hold the State to a higher burden than beyond a reasonable doubt? Can you do that?

VENIREPERSON TAYLOR: I think so.

MS. KUCERA: Is that yes?

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: Yes or no only.

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: All right. Mr. Teakell, can you

stand up? We talked about this. Beyond a reasonable doubt. It's different for you. Professor Tabb is the epitome of practicality. His may be different than yours. Can you promise not to hold the State to a higher burden than beyond a reasonable doubt?

VENIREPERSON TEAKELL: Yes.

MS. KUCERA: You can. Excellent. Great job. Ms. Wright, stand up again. All right. Do you think that you could promise not to hold the State to a higher burden than beyond a reasonable doubt?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Okay. And you could be fair in this case?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Great. Have a seat. Ms. Hair. All right. Do you understand that reasonableness is different for each person?

VENIREPERSON HAIR: Yes.

MS. KUCERA: Okay. And you're not going to require us to fill in the whole picture, just the same standard that's beyond a reasonable doubt, and that's reasonable in your mind?

VENIREPERSON HAIR: Yes.

MS. KUCERA: Have a seat. Mr. Garcia, stand up. Same question. Do you think that you can -- you can

promise not to hold the State to a higher burden than beyond a reasonable doubt in this case? You're not going to require us to fill out every single detail of every picture, but you're gonna hold us to the standard of beyond a reasonable doubt? And reasonableness is your own opinion.

VENIREPERSON GARCIA: The State?

MS. KUCERA: Well, okay. Let me say this. You're not going to hold the State to a higher burden than beyond a reasonable doubt?

VENIREPERSON GARCIA: Yes.

MS. KUCERA: Okay. All right. Have a seat. Mr. Foster, could you please stand up.

VENIREPERSON FOSTER: Yes to the question you asked No. 5, Mr. Garcia.

MS. KUCERA: Okay. All right. Just -- I know, I know. Do you think that you can hold -- promise not to hold the State to a higher burden than beyond a reasonable doubt?

VENIREPERSON FOSTER: Yes.

MS. KUCERA: What's reasonable is different to you than Mr. Garcia, than Ms. Hair, than Ms. Wright.

VENIREPERSON FOSTER: I promise.

MS. KUCERA: Okay. Mr. Billing, do you understand what we're talking about when we say beyond a

reasonable doubt?

VENIREPERSON BILLING: Yes.

MS. KUCERA: You said it's self-explanatory; you understand it. Very good. And you promise not to hold the State to a higher burden than beyond a reasonable doubt?

VENIREPERSON BILLING: Yes.

MS. KUCERA: Okay. And that you're not going to require us to fill the whole picture, but just beyond a reasonable doubt to you, with reasonableness as your own definition?

VENIREPERSON BILLING: Yes.

MS. KUCERA: Have a seat. Doing great. Ms. Vale, same question. Do you promise not to hold the State to a higher burden than beyond a reasonable doubt?

VENIREPERSON VALE: (Nods head) I will.

MS. KUCERA: Now, I'll try to go a little bit slower, but I need a confirmation. I need a yes or a no from each juror. Mr. Litteken, can you promise not to hold the State to a higher burden than beyond a reasonable doubt?

VENIREPERSON LITTEKEN: Yes, ma'am.

MS. KUCERA: Mr. Vasquez?

VENIREPERSON VASQUEZ: Yes.

MS. KUCERA: Okay. Mr. Thompson? I'm sorry.

Mr. Thomason?

VENIREPERSON THOMASON: Yes.

MS. KUCERA: Okay. Ms. McClesky?

VENIREPERSON MCCLESKY: Yes.

MS. KUCERA: Ms. Schmidt?

VENIREPERSON SCHMIDT: Yes, I can.

MS. KUCERA: Mr. Jantz?

VENIREPERSON JANTZ: Yes, ma'am.

MS. KUCERA: Okay. Ms. Steele?

VENIREPERSON STEELE: Yes.

MS. KUCERA: Ms. McKinley?

VENIREPERSON MCKINLEY: Yes.

MS. KUCERA: And Mr. Davis?

VENIREPERSON DAVIS: Yes.

MS. KUCERA: Ms. Parsons?

VENIREPERSON PARSONS: Yes.

MS. KUCERA: And Ms. Reno?

VENIREPERSON TREJO: Yes.

MS. KUCERA: Okay. And Ms. Ripperger?

VENIREPERSON RIPPERGER: Yes.

MS. KUCERA: What about you, Ms. Logsdon?

VENIREPERSON LOGSDON: Yes.

MS. KUCERA: And Mr. Young?

VENIREPERSON YOUNG: Yes, ma'am.

MS. KUCERA: Okay. And Mr. Chavez?

VENIREPERSON CHAVEZ: Yes.

MS. KUCERA: Okay. All right.

So one of the things we're going to talk about is a lot of times in the case the defense is going to assert, properly named, a defense, right. In this case, the Penal Code provides a defense of self-defense, okay. Now, in the case of resisting arrest, can anyone think of a reason why the legislature might carve out a defense of self-defense? Any reason? Let me ask it this way. Mr. Foster, how long have you been an officer?

VENIREPERSON FOSTER: Total of 15 years.

MS. KUCERA: So quite a while?

VENIREPERSON FOSTER: Yes.

MS. KUCERA: Okay. In your 15 years, using your own observations and your own experiences, are you aware of that there are good cops and there are occasionally maybe a cop that isn't the best at being a cop; is that correct?

VENIREPERSON FOSTER: Any time you have humans doing a job, there's going to be some.

MS. KUCERA: Okay. So is it fair to say that there might be a time when an officer might potentially abuse his authority?

VENIREPERSON FOSTER: Yeah.

MS. KUCERA: And it doesn't happen often, but

they might abuse their authority; okay?

VENIREPERSON FOSTER: Right.

MS. KUCERA: Is that fair?

VENIREPERSON FOSTER: Yeah, that's fair.

MS. KUCERA: So in resisting arrest, can you think of a reason why they might allow in a limited circumstance this defense of self-defense?

VENIREPERSON FOSTER: Yeah, if you had an officer who was -- their intent was hurting or killing that person or using excessive force to inflict serious bodily injury or death, I think the law would allow for a person to fight back in that instance.

MS. KUCERA: That's an excellent point. If it's the officer's goal to use physical violence, you know, that person might be able to defend themselves against something that severe?

VENIREPERSON FOSTER: Yes.

MS. KUCERA: Is that what you're saying?

VENIREPERSON FOSTER: Yes.

MS. KUCERA: Okay. Does everyone understand what Officer Foster is saying? That they could protect themselves from that kind of extreme violence. All right. This is the statutory definition of self-defense in this type of case, in resisting arrest. "The use of force to resist an arrest is justified," -- all right,

the statute says it's limited, but allowed in this particular circumstance: "if, before the actor", who is the person who is being arrested, "offers any resistance." So if before the actor offers any resistance -- which means, we talked about what resisting arrest means, shake off a grip, twist, turn, step away from the officer. Those are all types of resisting arrest, right? "If before the actor offers any resistance at all, the peace officer uses or attempts to use what we call greater force than necessary," all right, "to make an arrest."

So that's the first part of the definition. Let's see. Mr. Vasquez, can you stand up for me?

VENIREPERSON VASQUEZ: Ten, Thomas Vasquez.

MS. KUCERA: Okay. If I were to give you this scenario: A seven-year-old walks into Walgreen's, and she takes -- let's see. I don't even know if they sell iPods at Walgreen's, but let's pretend that they do. So let's say this seven-year-old really wants an iPod and, okay, and she takes an iPod and goes out of the store with it.

And let's say Officer Foster is in the store. He witnesses the seven-year-old take the iPod out of the store, and he runs up to the seven-year-old when she exits the store, and he uses his taser on a seven-year-

old girl in pig tails and a girl scout uniform, okay. And he takes her to the ground because, you know what, she committed an offense and that is against the law. Okay?  If I were to give you that scenario, would you think tasing a seven-year-old would be maybe greater force than necessary?

VENIREPERSON VASQUEZ:  Yes.

MS. KUCERA:  Okay, great.  You've done great. Have a seat.  All right.  Now, officer foster, would you tase a seven-year-old if she stole an iPod?

VENIREPERSON FOSTER:  No.

MS. KUCERA:  Okay.  But is that protocol to tase a seven-year-old for stealing an iPod?

VENIREPERSON FOSTER:  No.

MS. KUCERA:  Okay, good.  So greater force than necessary, you get an idea of what that means.  Can you think of another example of greater force than necessary?  I gave you a seven-year-old taking an iPod. Mr. Vasquez, I know I had you stand up a second ago, but can you give another example of greater force than necessary?

VENIREPERSON VASQUEZ:  No.  I mean --

MS. KUCERA:  Yes, Mr. Garcia.  A suggestion.  I love it.

VENIREPERSON GARCIA:  Multiple cops if they're

not resisting --

MS. KUCERA:  Okay.

VENIREPERSON GARCIA:  -- putting up that much of a fight.  Or if he's willing to go, but then you've got like five or six cops that slam down and take him down.

MS. KUCERA:  Yes.  He's not resisting at all and 25 cops pull up in their squad cars and start wailing on this guy.  Yeah, that's what we consider greater force than necessary.  The stipulation is if it's only before the actor offers any resistance.  So if he offers resistance in this case, then it doesn't qualify for the self-defense, and then they're allowed to use certain necessary force to arrest him, right?  Make sense?

Remember, we've got to keep the people safe; we've gotta keep the cops safe; we've gotta keep the defendant safe.  We've gotta keep everybody involved in this particular situation safe, right?

Okay.  Now, the second part of this definition is this.  And it's two parts, right?  He's got to meet this standard and he's got to meet this standard.  "When and to the degree the actor reasonably believes that the officers are using greater force than necessary to arrest him, and he thinks it's immediately necessary to protect himself.  So not only can the actor not resist arrest first, but he's got to be passive and, I don't know, very

stoic, and he's got to reasonably believe that force is immediately necessary to protect himself against the greater force than necessary the officer is using.

To use the seven-year-old, for example. If he pulls out his weapon and is aiming to tase her, she hasn't resisted arrest yet; she's only walked out of the store. She's got to reasonably believe that he's going to use the taser on her and that he's using greater force than necessary, and then she can act in self-defense, right? Everyone understand? Okay. Ms. Hair, you're nodding. You understand?

VENIREPERSON HAIR: Uh-huh.

MS. KUCERA: Ms. -- I can do this. Ms. Wright, you understand?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Mr. Teakell?

VENIREPERSON TEAKELL: Yes.

MS. KUCERA: Make sense? Mr. Teakell, you understand that's a limited circumstance, right? They can't have resisted first, and they have to reasonably believe that the officers are using greater force than necessary and that they need to use force in order to protect themselves from the greater force than necessary the officers are using. Everyone understand? Limited circumstance, right? Ms. Parsons?

VENIREPERSON PARSONS: Let me see if I'm understanding.

MS. KUCERA: Okay.

VENIREPERSON PARSONS: So to reasonably believe this,

MS. KUCERA: Uh-huh.

VENIREPERSON PARSONS: -- the person that they're going to arrest, in their mind, they have to be seeing something in the demeanor of the police officers or something that they can verifiably say, They were going to do this or that, and that's why I resisted?

MS. KUCERA: Right. Yes. To answer your question, you are correct and I'm going to help you through that, all right. So the first part is that they can't have resisted at all before the actor -- it has to happen before the actor offers any resistance, okay. And the actor has to believe that the officers are using greater force than necessary to make the arrest. Okay? So they have to meet those two things. And the second part of the definition -- and this is kind of where it gets confusing -- the person who is being arrested has to reasonably believe that the force is immediately necessary -- he has to believe it right then -- to protect himself against the police officer's use of greater force than necessary.

VENIREPERSON PARSONS:  Right.  That's what I'm saying.

MS. KUCERA:  Uh-huh.

VENIREPERSON PARSONS:  To think that he was reasonable in doing that, who would purposely do that to make their situation worse?  He would have to, in my mind, be seeing something that alerts him to, hey, this is not right.  I do need to act.

MS. KUCERA:  Absolutely right, yes.  There would need to be some reason that he thought he needed to use that force.  It would be, like I was saying, immediately necessary.  Okay?  Great.  You've done a great job.  That's a great question.  Does everyone else understand?  Does everyone else agree with Ms. Parsons' understanding of what we talked about, about this wonderful example of self-defense?  Great.

VENIREPERSON TAYLOR:  Yes.

MS. KUCERA:  Great.  Okay.  We're almost done.  All right.  How do you evaluate truthfulness?  Does anyone have children?  I haven't heard from you yet.  You are Ms. Steele.  Ms. Steele, how many children do you have?

VENIREPERSON STEELE:  I have five.

MS. KUCERA:  Oh my gosh.  This is good.  This is a great question for you.  All right.  so you've got five

children. How old are they?

VENIREPERSON STEELE: Two stepchildren --

MS. KUCERA: Okay.

VENIREPERSON STEELE: -- but 16, 15, two 12-year-olds and a two-year-old.

MS. KUCERA: Oh my goodness. That is awesome. Have your children ever lied to you before?

VENIREPERSON STEELE: Yes.

MS. KUCERA: Okay. How do you know they're lying?

VENIREPERSON STEELE: Sometimes it's very obvious that they're lying, and sometimes I know by their demeanor that they're not being truthful with me.

MS. KUCERA: Okay. Fair enough. What in their demeanor suggests to you that they might be lying?

VENIREPERSON STEELE: Well, my oldest son doesn't look me in the eye, and my 15-year-old daughter gets real fidgety.

MS. KUCERA: Okay. She shifts her weight, doesn't look you in the eye.

VENIREPERSON STEELE: Yeas.

MS. KUCERA: What else?

VENIREPERSON STEELE: And my middle daughter gets very -- her voice gets kind of shaky. I can tell in the tone of her voice she's not really being honest with

me.

MS. KUCERA: Very good. Those are all things to think about that someone might want, right? Okay. Mr. -- raise your hand if you have children again. Ms. Taylor, all right. Ms. Taylor, how many children do you have?

VENIREPERSON TAYLOR: Two.

MS. KUCERA: Okay. Did you agree with what Ms. Steele said about how you tell someone's lying?

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: Okay. Would you have anything to add to that? Are there some other things you can look for?

VENIREPERSON TAYLOR: Well, like if you're questioning one of them about something and they get real defensive with you, like, you know, kind of angry and defensive and they're -- one of mine, I have trouble with that.

MS. KUCERA: Okay. Very good. So has anyone seen the YouTube video -- Ms. Hair, you may be my only hope for this, but it's a mom who's questioning her child about whether or not he ate a cupcake, and he's got sprinkles all over his face and it's all on his ears and eyes, and he is, I mean, standing there and he's like, "I did not eat a cupcake; I did not." I mean she is like --

you can -- the camera is shaking she's laughing so hard because he is just adamant about not eating a cupcake, right? But the evidence is there all over his face. I mean he ate the cupcake, all right.

So even though they might be saying something, are there other things you can interpret or reasons to know that they're lying? You can make inferences, right? He's got sprinkles all over his face; there's a cupcake that was sitting on the counter; it's missing and all over his face. He ate it, okay.

Do you guys have pets? Okay. Very good. Ms. Vale, what kind of animals do you have?

VENIREPERSON VALE: Eileen Vale, No. 8. I have three dogs and a cat.

MS. KUCERA: Three dogs and a cat. Okay. Have your dogs ever misbehaved before?

VENIREPERSON VALE: Yes.

MS. KUCERA: Okay. Did you know that they misbehaved?

VENIREPERSON VALE: Yes.

MS. KUCERA: Okay. what did they do?

VENIREPERSON VALE: They ripped up a couch cushion.

MS. KUCERA: Okay. So you came home one day and your couch cushion is in shreds, right?

VENIREPERSON VALE:  Yes.

MS. KUCERA:  Did you rip the couch cushion?

VENIREPERSON VALE:  No.

MS. KUCERA:  Okay.  How did you know the dogs did?

VENIREPERSON VALE:  Well, they had it in their mouths and their stool.

MS. KUCERA:  Yeah, evidence all over the place.  Yeah, I have a dog.  He eats stuff off the counter all the time.  I can't get him to stop.  Yeah.  I mean, how do I know that he ate the loaf of bread?  It's all over the place, right.  I mean you can make an inference.  You may not have seen your dogs eat the couch, but you know that they ate it, right?

VENIREPERSON VALE:  Right.

MS. KUCERA:  Okay.  Very good.  This is that same type of thing we're going to talk about today.  Witnesses are going to tell you about things that happened, and we ask you as jurors to evaluate each witness and their credibility.  How do you know they're telling the truth?  Are they telling the truth?  What sort of things are you going to look for to determine whether or not they're telling the truth?  Ms. Steele suggested they're shifty, maybe not answering the question correctly, dodging it.

Ms. Taylor talked about how they're getting really defensive. Okay. So you guys as jurors are going to have to evaluate a witness's credibility. Does everybody understand that that's your role? Okay? So as a juror, in order to be a juror in this case, you have to use what we call the same standards when evaluating the truthfulness of a witness. Okay? I guess to explain that, you can't -- you can't automatically start one witness off higher than another witness, okay. You have to wait until that witness gets on the stand and testifies and you observe their demeanor, what they're saying, how they're talking, how they're acting, what they're talking about. You have to evaluate what they're talking about. You have to weigh their credibility when they get on the stand.

In other words, you can't hear that there's going to be a witness and automatically give them a bunch of points just because they're going to be a witness. So does everybody understand? Okay. Ms. Taylor, you can, as a witness -- as a juror, you can accept all of what the witness says; you can accept some of what the witness says -- I think he was telling the truth here, may not have been telling the truth here -- or none of what the witness says. I don't think he's credible at all, right. He was shifting his weight; he wasn't telling the truth,

those sorts of things.  He was defensive.  Those are the sorts of things we're going to ask you to do as jurors.

So can you evaluate, as jurors, police officers as witnesses and wait until that particular police officer gets on the stand before you evaluate his credibility?  Okay.  Now, as a police officer, you have to evaluate their credibility the same way you evaluate other witnesses' credibility.  We talked about that, right?  You can't, because they're a police officer, automatically give them -- you know, automatically assume they're telling the truth or automatically assume they're not telling the truth.  It has to be the same standard. You have to wait until they get on the stand, okay.

You can look at their training and experience when evaluating their credibility, all right.  So when we have an expert come testify in court, generally we have to qualify them as an expert.  So if it's a doctor, they've got to have a medical degree.  And they've got to be sort of familiar with the particular reason that we need them to testify.

So my best friend's a doctor, okay, and she deals with infectious disease.  So it's kind of weird, but she really likes diseases like the ebola virus and things and sort of weird off the wall diseases that you deal with in other countries.  So if we had a case -- I

don't know why we would have a case like this -- but she could be an expert, right. We could call her to testify about certain things that she knows about infectious diseases, right? So you can, in that particular instance, look at her credibility, right? She's an M.D.; she's a resident. You know, she's been through all the training that she needs to be to become a doctor. So you can say, yeah, she's a doctor and I can evaluate her truthfulness based on her being a doctor. Everyone understand what I'm saying?

All right. So a police officer, I'm going to need you guys to tell me that you can look at the training and experience, but you're not going to automatically start them out higher or automatically start them out lower because they're a police officer. You're gonna wait until they get on the stand and hear what they have to say and then evaluate their credibility. Ms. Taylor, does that sound like something you can do?

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: Okay. What about you, Mr. Teakell? Can you do that?

VENIREPERSON TEAKELL: Yes.

MS. KUCERA: What about Ms. Wright?

VENIREPERSON WRIGHT: Yes.

MS. KUCERA: Okay. Ms. Hair?

VENIREPERSON HAIR: Yes.

MS. KUCERA: Mr. Garcia?

VENIREPERSON GARCIA: Yes.

MS. KUCERA: Mr. Foster?

VENIREPERSON FOSTER: I'm kind of struggling with the automatically give more, because I deal with them every day. They're held to a higher standard, and I'm going to assume they know more.

MS. KUCERA: Okay.

VENIREPERSON FOSTER: -- and take more into account when they -- like they could walk into this room and observe the scene, and they're going to take more into account when they're processing information than the average witness would.

MS. KUCERA: Right. So --

VENIREPERSON FOSTER: So that's probably the part that I would --

MS. KUCERA: Fair enough. So I guess what this is saying is that you recognize as a police officer that you've had an extensive amount of training and background in observation, you know, crime scene investigation, evaluating people.

VENIREPERSON FOSTER: That would probably fall under the experience.

MS. KUCERA: Yeah.

VENIREPERSON FOSTER: You're talking about a bias towards them just because they have a uniform?

MS. KUCERA: Exactly.

VENIREPERSON FOSTER: I'm not going to give them more or less credit for that, yes.

MS. KUCERA: Exactly. Does everyone understand what the officer is saying? He's saying, listen, I'm a police officer. I know the training they go through. I know certain things that they have to do to become a police officer. But he says -- and I'm going to ask you -- can you set aside not necessarily your knowledge about a police officer, but can you wait until that police officer gets on the stand and testifies before you make an evaluation as to whether or not he's telling the truth?

VENIREPERSON FOSTER: Yes.

MS. KUCERA: Yes. Great. Mr. Billing, what about you?

VENIREPERSON BILLING: Yes.

MS. KUCERA: And Ms. Vale?

VENIREPERSON VALE: Yes.

MS. KUCERA: What about Ms. McKinley? Stand up for a second. So you understood what Officer Foster was saying?

VENIREPERSON MCKINLEY:  Yes.

MS. KUCERA:  Okay.  And you think that even though he's a police officer, that if the police officer testifies, that you can wait until he gets on the stand before you evaluate his credibility?

VENIREPERSON MCKINLEY:  Yes.

MS. KUCERA:  Okay.  And, Ms. Steele, same question.

VENIREPERSON STEELE:  Yes.

MS. KUCERA:  What about Mr. Jantz?

VENIREPERSON JANTZ:  Yes.

MS. KUCERA:  What about Ms. Schmidt?

VENIREPERSON SCHMIDT:  Yes.

MS. KUCERA:  Okay.  And Ms. McClesky?

VENIREPERSON MCCLESKY:  Yes.

MS. KUCERA:  Mr. Thomason?

VENIREPERSON THOMASON:  Yes.

MS. KUCERA:  Mr. Vasquez?

VENIREPERSON VASQUEZ:  Yes.

MS. KUCERA:  Mr. Litteken?

VENIREPERSON LITTEKEN:  Yes.

MS. KUCERA:  All right.  Mr. Davis?

VENIREPERSON DAVIS:  Yes.

MS. KUCERA:  Ms. Parsons?

VENIREPERSON PARSONS:  Yes.

MS. KUCERA:  Okay.  Ms. Trejo?

VENIREPERSON TREJO:  Yes.

MS. KUCERA:  Ms. Ripperger?

VENIREPERSON RIPPERGER:  Yes.

MS. KUCERA:  What about you, Ms. Logsdon?

VENIREPERSON LOGSDON:  Yes.

MS. KUCERA:  Mr. Young?

VENIREPERSON YOUNG:  Yes.

MS. KUCERA:  And Mr. Chavez?

VENIREPERSON CHAVEZ:  Yes.

MS. KUCERA:  Okay.  All right.  The last thing we're gonna talk about -- actually, let me ask a question really quick.  Had anyone had a bad experience here with a police officer before?  Anyone ever had a bad experience?  You or someone you know has had a bad experience?  Mr. Jantz, stand up for me just a second. What was the experience?

VENIREPERSON JANTZ:  Family disturbance.

MS. KUCERA:  Okay.  And it was just because you didn't appreciate what the police officers did in that case or --

VENIREPERSON JANTZ:  Well, at the time -- you told me to be honest here, right?

MS. KUCERA:  Uh-huh.

VENIREPERSON JANTZ:  At the time when I was

there, they just took one side of it all.

MS. KUCERA: Okay. Do you think because of that experience you might not be able to be fair in this case and put aside what happened there and evaluate these witnesses just based on what they testify to in this particular case?

VENIREPERSON JANTZ: No, I wouldn't have a problem with that at all.

MS. KUCERA: Okay. So you're saying even though you've had a bad experience, you could be a fair juror in this case? In other words, you could evaluate what all the witnesses say and evaluate them for their credibility and what they say on the stand?

VENIREPERSON JANTZ: Yes, ma'am.

MS. KUCERA: Okay. All right. Last thing we're going to talk about is the defendant's constitutional rights. The Fifth Amendment says, "No person shall be compelled to be a witness against himself." Mr. Billing, that means that the defendant in a case does not have to get on the stand and testify, all right? If the defendant in this -- you know, we don't have the right to compel somebody to testify against themselves, right? That you're allowed under the Fifth Amendment the constitutional right that you don't have to testify.

Now, Ms. Taylor, do you think that you could, if

the defendant chooses not to testify, that you could -- and the judge instructs you that you cannot because he didn't testify, hold that against -- I'm sorry.  If the judge instructs you that if he didn't testify, you cannot hold that against him, if the judge makes that instruction, do you think you could follow what the judge tells you to do?

VENIREPERSON TAYLOR:  Yes.

MS. KUCERA:  Okay.  What about you, Mr. Teakell?

VENIREPERSON TEAKELL:  Yes.

MS. KUCERA:  Ms. Wright?

VENIREPERSON WRIGHT:  Yes.

MS. KUCERA:  Ms. Hair?

VENIREPERSON HAIR:  Yes.

MS. KUCERA:  Mr. Garcia?

VENIREPERSON GARCIA:  Yes.

MS. KUCERA:  Mr. Foster?

VENIREPERSON FOSTER:  Yes.

MS. KUCERA:  Mr. Billing?

VENIREPERSON BILLING:  Yes.

MS. KUCERA:  Okay.  Mr. Vale?

VENIREPERSON VALE:  Yes.

MS. KUCERA:  Mr. Jantz?

VENIREPERSON JANTZ:  Yes.

MS. KUCERA:  Ms. Schmidt?

VENIREPERSON SCHMIDT:  Yes.

MS. KUCERA:  Ms. McClesky?

VENIREPERSON MCCLESKY:  Yes.

MS. KUCERA:  Thomason?

VENIREPERSON THOMASON:  Yes.

MS. KUCERA:  Vasquez?

VENIREPERSON VASQUEZ:  Yes.

MS. KUCERA:  And Mr. Litteken?

VENIREPERSON LITTEKEN:  Yes, ma'am.

MS. KUCERA:  Okay.  Chavez?

VENIREPERSON CHAVEZ:  Yes.

MS. KUCERA:  Mr. Young?

VENIREPERSON YOUNG:  Yes.

MS. KUCERA:  Ms. Logsdon?

VENIREPERSON LOGSDON:  Yes.

MS. KUCERA:  Ms. Ripperger?

VENIREPERSON RIPPERGER:  Yes.

MS. KUCERA:  Ms. Trejo?

VENIREPERSON TREJO:  Yes.

MS. KUCERA:  What about you, Ms. Parsons?

VENIREPERSON PARSONS:  I could, but I'd rather hear what he has to say.

MS. KUCERA:  Okay.  But even if he doesn't, you won't hold it against him?

VENIREPERSON PARSONS:  No.

MS. KUCERA: And you, Mr. Davis?

VENIREPERSON DAVIS: Yes.

MS. KUCERA: Okay. Well, that is all I have to talk to you about. Do you guys have any questions for me? Okay. You guys have done so well. Thank you so much. I appreciate it. Oh, I'm sorry. Really quickly. Does anyone know anyone that is here today? Anyone know the judge? I know he said he knew a few of you. Raise your hand if you know the judge. Okay. Mr. Vasquez and Ms. Ripperger, do you think your knowledge of the judge would cause you to not be fair in this case? Do you think even though you know the judge, you could set aside your knowledge of him and move forward and be fair in this case?

VENIREPERSON VASQUEZ: Yes.

VENIREPERSON RIPPERGER: Yes.

MS. KUCERA: What about -- anyone know the officers? Does anyone know any people listed on this board? Officer Vasquez?

VENIREPERSON FOSTER: Oh, yes.

MS. KUCERA: Officer Foster, okay. Beesinger, Lee and Iper? Ms. Wright, which one do you know?

VENIREPERSON WRIGHT: Mr. Iper.

MS. KUCERA: Okay. Do you think that even though you know Mr. Iper in this case that you could set

aside that and be a fair juror in this case?

VENIREPERSON WRIGHT:  Yes.

MS. KUCERA:  Okay.  Mr. Teakell, you raised your hand.

VENIREPERSON TEAKELL:  I was a firefighter.  I'm a retired firefighter.  I think I know all of them.

MS. KUCERA:  Okay.  Even though you're a retired firefighter and you sort of have some knowledge of them, do you think you could set that aside and evaluate this case to you as it is today?

VENIREPERSON TEAKELL:  Sure.

MS. KUCERA:  Okay.  Anyone else?

VENIREPERSON STEELE:  This gentleman right here.

MS. KUCERA:  Mr. Cavinder?

VENIREPERSON STEELE:  I don't know him personally, but I know of him.

MS. KUCERA:  Okay.  Do you think that your knowledge of Mr. Cavinder would prevent you from being a fair and impartial juror in this case?

VENIREPERSON STEELE:  No.

MS. KUCERA:  Anyone else?

VENIREPERSON PARSONS:  I've known Charlie Iper since he was a little boy.

MS. KUCERA:  Okay.  Do you think even though you

know Mr. Iper, you could be a fair and impartial juror in this case?

VENIREPERSON PARSONS: Yes.

MS. KUCERA: Anyone else? All right. Now, I'm done. Thank you so much.

THE COURT: All right. Let's go ahead and I think what I need to do is let's go ahead and take a little bit of an early lunch. If you could be back at 11:45 -- excuse me, 12:45. Sorry. Be back at 12:45 and we'll get going right at that time with the defense voir dire. And, also, that might help you find a parking spot, too because I know it's hard to park around here, but if you get back before one, you usually have better luck. So be back at 12:45. Yes, Karen.

THE BAILIFF: Back in the same order.

THE COURT: Yes. I apologize. See, I told you she keeps me straight. If you will, when you come back in, just wait in the hall, assemble in the hall. We'll call you in just like we did. And come back in and sit in the same order. You can see how that's important now to keep track of everybody. All right. Be back at 12:45. Thank you.

(Jury panel exits courtroom)

(Lunch recess taken)

(Open court, defendant and jury panel present)

THE COURT: Y'all be seated, please. I apologize for that. We are technologically challenged here in Wichita County. Actually, there was a proposal that went through the commissioner's court to update all the courts on technology. We're still operating in about, by my estimation, somewhere in the early nineties. So with that comes some problems every once in a while. I apologize for the delay, but we'll be moving forward with Mr. Briley's voir dire. Mr. Briley?

MR. BRILEY: Thank you, Your Honor.

JURY VOIR DIRE EXAMINATION

BY MR. BRILEY:

Hello, everybody. Thank you for your time today. Good afternoon. Again, my name is Mark Briley. I'm happy to be here with Mr. Byrias Roberson. I'm also here with Ms. Kristen Howcroft who has been trying to help me throughout the trial. I went to Midwestern State for college. I went on down to San Antonio to St. Mary's for law school. For about a year I worked in Abilene doing family law and criminal defense and then I came back here and married my wife Jennifer and have been doing criminal defense here. Again, I'm happy to be here to talk to you about Byrias' defense.

There's about four or five topics that I have to talk with you about. I think the State covered quite a

bit, so this should be a little bit shorter. I did have a Power Point prepared. I apologize. A few things are hard, but there's probably only two things that might be a little bit difficult. I'll write it on the board.

The first topic that I want to talk to you about are police interactions. The courts have made law or categorized three different types of police interactions. The first one would be a voluntary encounter. That might be something where an officer comes to you on the street and maybe wants to ask you a few questions about something you may or may not have seen, maybe they give you a call or something like that. That would be a voluntary encounter. The citizen would be free to walk away at any time.

The other two would be seizures and the police officers basically tell them, You have to stay here, or they force them to stay there, something like that.

The first one would be an investigative detention. The most common example would be a police officer coming behind you, turning on their lights and pulling you over. And maybe they think that you're committing a crime or they're there to give you a traffic ticket, but they tell you with a show of authority that you need to stop. They have some kind of reason to do so. But it would be a brief amount of time. They're

just looking to investigate something.

The third type of police interaction would be an arrest.  This would also be something where the police display official authority.  You know, they force you to stop or they take you into custody.

My first question to you all is about your experiences with police interactions.  So, Ms. Taylor, I'll just kind of start with you since you're No. 1.

VENIREPERSON TAYLOR:  Okay.  Want me to stand?

MR. BRILEY:  Have you had a lot of police interactions in your life?

VENIREPERSON TAYLOR:  No, I have policemen in my family, but I don't have -- just normal stops with your car or something.

MR. BRILEY:  Okay.

VENIREPERSON TAYLOR:  Inspection sticker or maybe speeding once, stuff like that.

MR. BRILEY:  So other than your family, just speeding tickets, things like that?

VENIREPERSON TAYLOR:  Uh-huh.  I have two sons, you know, and they've gotten tickets before, so you know.

MR. BRILEY:  Okay.  When the police approached you when they were going to pull you over, what did they do to tell you to pull over, I suppose?

VENIREPERSON TAYLOR:  Well, usually, they do

their lights, you know.  They come up behind you, or you need them and they turn around and they come up behind you and make you pull over.

MR. BRILEY:  Okay.  thank you.  You mentioned that you had some family members who are police officers?

VENIREPERSON TAYLOR:  Yeah.  My nephew is a current Wichita Falls Policeman, and my brother-in-law used to be with the sheriff's department a couple years ago.

MR. BRILEY:  Okay.  Thank you very much.

VENIREPERSON TAYLOR:  Uh-huh.

MR. BRILEY:  Mr. Teakell, what about you?  Do you have a lot of experiences with police interactions?

VENIREPERSON TEAKELL:  Well, I was a fireman for 28 years and, you know, I'd see policemen here or there, call policemen over here or there.  I know a lot of policemen.  I've had a lot of dealings with policemen at fires, car wrecks.

MR. BRILEY:  How about as a citizen?  When you're off duty, has a policemen ever approached you to ask you some questions or --

VENIREPERSON TEAKELL:  I got pulled over one time, but I didn't get a ticket.

MR. BRILEY:  Okay.  And, again, they just put their lights on and stopped you and that was about it?

VENIREPERSON TEAKELL:  Yeah, that was about it.

MR. BRILEY:  Thank you very much.  Ms. Wright, how about you?

VENIREPERSON WRIGHT:  Same.  Speeding tickets, same thing.  Lights flashed, pulled over.  That's it.

MR. BRILEY:  Thank you very much.  Ms. Hair, what about you?

VENIREPERSON HAIR:  No.  I mean I've been pulled over for my inspection sticker, but never had a ticket for speeding or anything like that.

MR. BRILEY:  Same thing.  They pulled you over with their lights and came up and talked to you?

VENIREPERSON HAIR:  Gave me a warning.

MR. BRILEY:  All right.  Thank you. Mr. Garcia?

VENIREPERSON GARCIA:  Speeding, taillight out. Usually, a warning.  Not a ticket yet.

MR. BRILEY:  Same thing.  They put their lights on and let you know to stop?

VENIREPERSON GARCIA:  Uh-huh.

MR. BRILEY:  Sergeant Foster, I know you're a police officer, so you've had many interactions with police officers.

VENIREPERSON FOSTER:  Yes.

MR. BRILEY:  But as a citizen, perhaps when you

were off duty or maybe it was before you were a police officer, did you have any police officers pull you over?

VENIREPERSON FOSTER:  Oh, yeah, when I was younger, I had a lot of tickets.  I served my time, did my time.  I've never been to jail for anything, but, yes, as far as just getting stopped for speeding or traffic violations.

MR. BRILEY:  And in your role as a police officer, how often do you perhaps follow up with a witness, maybe somebody investigating crimes?

VENIREPERSON FOSTER:  Oh, yeah.

MR. BRILEY:  And how do you contact witnesses?

VENIREPERSON FOSTER:  My stuff, since I'm on patrol, is pretty immediate right there at the scene talking to people.  Usually, the way our stuff works, we write up that stuff and a detective may or may not contact the witnesses.  It depends on the case.

MR. BRILEY:  Okay.  Are most of the people that you encounter in those stops, would you say that they are detained?

VENIREPERSON FOSTER:  You're talking about a traffic stop?

MR. BRILEY:  Well, yeah.  I mean any kind of.

VENIREPERSON:  Traffic stop, yes.

MR. BRILEY:  So most of the people -- I guess

most of the citizens that you deal with, would you say that they're detained?

VENIREPERSON FOSTER:  If it's not a consensual stop, like you said, then they're detained.

MR. BRILEY:  Can you tell us about a consensual stop?

VENIREPERSON FOSTER:  You're in a convenience store and a cop walks up to you and says, Do you mind if I talk to you for a second?  I may not have anything to really connect you to anything at that point, but I may recognize you, may want to just talk to you, maybe develop something like maybe you -- maybe your behavior looked like you're casing the store or something.  I'm still trying to formulate if I have enough to detain you or if I even need to be concerned with you.  And with consensual, you know, if they tell me to get bent and turn around and walk off, that's what I do.  I turn around and walk off.  At that point, it's consensual and they have the right to break it.

MR. BRILEY:  Does that happen often or is it rare?

VENIREPERSON FOSTER:  Where I'm working now, there's not much enforcement, but when I was an officer, there would be times, yeah.  But the majority of the time most citizens will talk to you, you know, just out of

respect or -- but, yeah, it happens.

MR. BRILEY: Thank you very much. Mr. Billing, how about you?

VENIREPERSON BILLING: Most people get pulled over for speeding. I've had family members that are in law enforcement. My neighbor across the street is on the police force in Wichita Falls.

MR. BRILEY: What kind of family members?

VENIREPERSON BILLING: My nephew is highway patrol in Minnesota.

THE REPORTER: I need you to speak up a little bit. I'm having trouble hearing you.

VENIREPERSON BILLING: Highway patrol in Minnesota.

MR. BRILEY: But most of your interactions as a citizen with police officers are traffic stops, something like that?

VENIREPERSON BILLING: Yeah. Daily or weekly interactions with my neighbor who's a police officer. We don't discuss any type of police activity.

MR. BRILEY: Okay. Thank you very much. Ms. Vale?

VENIREPERSON VALE: Yes. As a citizen, just the last speeding ticket I got was in 1998 going to school. Twelve years ago I did go through the game warden

academy.  A lot of my family members are in law enforcement, but that's -- I have one in Edinburg, working the border.  So that's my experience.

MR. BRILEY:  Are your family members your siblings?  Cousins?

VENIREPERSON VALE:  Cousins.

MR. BRILEY:  Ms. McKinley?

VENIREPERSON MCKINLEY:  Just the same usual, nothing out of the ordinary.  Speeding.

MR. BRILEY:  No knocks on your door to see if you were a witness to something?

VENIREPERSON MCKINLEY:  No.

MR. BRILEY:  Okay.  Thank you.  And, Ms. Steele, how about you?

VENIREPERSON STEELE:  I've been pulled over for speeding and things like that and gotten warnings and also tickets.  I work in an environment where I work in an ER environment so there are police officers and detectives and things like that that come in and out of our emergency room department.

MR. BRILEY:  Do they ever ask you questions about an investigation that they have?

VENIREPERSON STEELE:  Well, it depends.  Well, I don't know.

MR. BRILEY:  Where you might be a witness?  You

saw somebody that came in?

VENIREPERSON STEELE: The only time that would ever would be is if I was a nurse for that patient and maybe something was said, but I've never encountered that.

MR. BRILEY: Okay. Thank you. Mr. Jantz, have you had a lot of dealings with police officers?

VENIREPERSON JANTZ: Not a lot. One bad experience, and that was it.

MR. BRILEY: Okay.

VENIREPERSON JANTZ: My father was a police officer for many years, federal officer in Wisconsin.

MR. BRILEY: Ms. Schmidt?

VENIREPERSON SCHMIDT: I just can't remember the last encounter. Just regular warnings for speeding. I have a nephew that's a police officer.

MR. BRILEY: Okay. Thank you. And Ms. McClesky?

VENIREPERSON MCCLESKY: Speeding.

MR. BRILEY: Okay.

VENIREPERSON MCCLESKY: Seems to be the norm, but, yeah, that's about it.

MR. BRILEY: All right. Thank you. Mr. Thomason?

VENIREPERSON THOMASON: Just the same as

everybody else.  Just a couple speeding tickets.

MR. BRILEY:  Okay.  And Mr. Vasquez?

VENIREPERSON VASQUEZ:  Yeah.  It's been some 30 years.  Speeding ticket, normal.  I did have them come in my house one time in the middle of the night through the back door.  But it wasn't a problem, you know.

MR. BRILEY:  Can you tell us more about that experience?

VENIREPERSON VASQUEZ:  Well, I think it was a family disturbance.  My niece and her mother, they were having problems, and they thought my niece was staying with us, so they were checking into it.

MR. BRILEY:  Okay. Did they -- I'm sorry.  Go ahead.

VENIREPERSON VASQUEZ:  Everyone was asleep, woke up by the dog.  They came in through the back door, a couple policemen.

MR. BRILEY:  Okay.

VENIREPERSON VASQUEZ:  But, you know, we talked to them and everything was all right.

MR. BRILEY:  So they just -- they knocked on your back door?

VENIREPERSON VASQUEZ:  No.  Well, we were asleep so, you know, they just came in, which I don't think they're supposed to do, but that's what happened.

MR. BRILEY:  I suppose they asked you some questions?

VENIREPERSON VASQUEZ:  Yeah.

MR. BRILEY:  Did you feel free to leave or to turn them away?

VENIREPERSON VASQUEZ:  Yeah.  I mean we just told the truth, that we didn't know what was going on, you know.

MR. BRILEY:  Okay.  Was that a positive or negative experience for you?

VENIREPERSON VASQUEZ:  It's -- well, you never want to be awoken in the middle of the night and see a couple policemen, you know, in the home with your dog fixing to, you know, attack them or whatever.  So it was kind of negative, I guess, because they had their guns for the dog, you know, because he's a big dog.  But, you know, other than that.

MR. BRILEY:  Okay.  Thank you very much.  And Mr. Litteken?

VENIREPERSON LITTEKEN:  I've been pulled over for illegal left hand turn in front of the courthouse.  And usually when I get pulled over, I'll put my keys on top of the dashboard and I'll get my driver's license out and my registration, letting that officer know, you know, I ain't going nowhere.

MR. BRILEY: And same thing? I guess they used their sirens, flashing lights to pull you over?

VENIREPERSON LITTEKEN: Yeah, because I'm half deaf. They've gotta (makes siren noise).

MR. BRILEY: Okay. Thank you very much. I'm sorry if it feels like I'm prying about these type of things. I'm guess I'm not trying to pry too much. That might be a sensitive issue, how many times you've been pulled over by the police, things like that. Anybody here -- I know that I didn't reach the back row, but is there anybody here that's had what they would call a voluntary encounter that they haven't spoken about so far, where a police officer approached them, wanted to ask them questions? Not just a, Hey, how are you doing, but, you know, I have an investigation; I would like to talk with you, but you're not necessarily detained or under arrest. Anybody had that type of experience?

How about has anybody been a victim of a crime? I see a couple nods. Sergeant Foster?

VENIREPERSON FOSTER: Oh, I was just laughing because it seems like that most everybody is at some point a victim of a crime if you live on this planet long enough.

MR. BRILEY: Anybody's cars been broken into, anything like that? Ms. McKinley, can you tell us about

that experience.

VENIREPERSON MCKINLEY:  I was at work in the middle of the day, came back from lunch.  I kept my purse in the car, which is stupid, I know, but tons of people there, you know, in and out.  Within an hour, someone busted the window and took off with it.

MR. BRILEY:  Did you call the police?

VENIREPERSON MCKINLEY:  Yes.

MR. BRILEY:  And they came out and took a report?

VENIREPERSON MCKINLEY:  Took a report.  That was it.

MR. BRILEY:  Okay.  I suppose you didn't get your purse back, did you?

VENIREPERSON MCKINLEY:  No, I did not.

MR. BRILEY:  I've had my car broken into once or twice.  Ms. Steele, you raised your hand.  Did you have some kind of police interaction or did you contact the police in your situation?

VENIREPERSON STEELE:  No, I didn't.

MR. BRILEY:  Okay.

VENIREPERSON STEELE:  I had my wallet stolen once and my son just recently actually had his registration sticker taken out of his vehicle.  That's really about it.  I did speak to a police officer and

kind of got his advice, but it wasn't official.  I was at work and he was in the emergency room with somebody.  I'm not sure why he was there, but he was there.

MR. BRILEY:  Anybody else here who's had police interactions because they were perhaps the victim of a crime or a close family member?  Yes, sir.

VENIREPERSON BILLING:  I was attending a basketball game in Burkburnett in a suburban.  While I was in the game, somebody broke the window out and stole the DVD player that was cosmetically in the vehicle.

MR. BRILEY:  I suppose you called the police?

VENIREPERSON BILLING:  Well, they actually came and got me.  It had an alarm system on it.  So they broke in pretty quick and it did some damage to my seats and stuff like that.

MR. BRILEY:  Okay.  And your dealings with the police are negative?  Positive?

VENIREPERSON:  Positive dealings.

MR. BRILEY:  Anybody else?  Thank y'all.  Thank you, Mr. Billing.

The next question I have, and, you know, still talking about this topic of police interactions, is if you were approached by a police officer like Sergeant Foster has probably approached some people just kind of wanting to feel things out or maybe a police officer has

approached you just to ask you some questions. Is there anybody here -- and let's just take the first row -- how many here would walk away from a police officer or terminate that voluntary encounter just because you don't want to talk to the police? Is there anybody here who would do that? How about the second row? Is there anybody here who would just walk away for anything? It may not be in every situation, but you could think of a situation where you might just not want to talk to the police? Anybody in the second row? Third row? And for those of y'all who said no, which was everybody, my question to you is why not? Ms. McKinley -- sorry, Ms. Vale, what would be some reasons?

VENIREPERSON VALE: Why I wouldn't talk to them? I've never been threatened by any authority figure anyway. To me, they're a public servant there to help you and protect people's property and the public's rights. That's the way I see a police officer.

MR. BRILEY: So you're trying to help them?

VENIREPERSON VALE: Right.

MR. BRILEY: And be polite?

VENIREPERSON VALE: And be polite, because they're doing a service for us.

MR. BRILEY: Mr. Billing, is there any other reasons that you could think of?

VENIREPERSON BILLING:  I mean there are -- just out of respect, a person of authority.  So just general conversation, there's nothing wrong with that.

MR. BRILEY:  Okay.  Thank you.  On the first row, with a show of hands, is there anybody here who's had an experience with a police officer maybe pulling you over just for a speeding ticket and you felt they were rude to you?  Second row?

VENIREPERSON JANTZ:  Just for speeding tickets?

MR. BRILEY:  Any kind of police interaction?  Mr. Jantz, I know that you spoke a little bit about that situation, but could you tell us a little bit more about how you felt.

VENIREPERSON JANTZ:  Well, after decisions were made, after all the decisions were made of who was going where and what was going to happen, people were taking care of their business, doing what they were supposed to do, there was three young cops there and, like I said, I was packing up, leaving.  One of them said, out of the blue, Mr. Jantz, it seems like you've got a problem with something here.  I personally -- I felt like I was invaded at the time.

MR. BRILEY:  Did they kind of make you feel like you were a criminal, perhaps?

VENIREPERSON JANTZ:  Well, I don't know.  Nobody

asked me what happened. Nobody asked me what was going on. They just took one person's side over -- like I said, up to that point it was -- it was a done deal. People were leaving; the decisions were made. There was no reason for that public servant to say that to me.

MR. BRILEY: Okay. Thank you very much for sharing that with us. Anybody else like Mr. Jantz who had some kind of experience where they felt like they were mistreated or a police officer was rude to them? Thank y'all.

Moving on to my next topic, second topic. The elements of resisting arrest, I think the State covered this. You know, but the State is going to have to approve each of these elements beyond a reasonable doubt: That a person intentionally prevents or obstructs a person they know as a police officer from effecting an arrest by using force against the peace officer. Of course, if you have, you know, even one reasonable doubt as to any one of those elements, the law would require you to acquit Mr. Roberson.

And really the main element that I want to talk about is that intent. The law gives us various mental states that the statute may require the State to approve, intentionally, knowingly, recklessly, with criminal negligence. And the State went over the baseball

situation with intentionally. And, you know, some statutes require not just intentional, but it might be intentionally or knowingly, intentionally, knowingly, or recklessly. This statute requires that they prove intentionally. And, again, that is when a person acts intentionally with respect to their nature or conduct or to the result of their conduct when it's their conscious objective or desire to engage in that conduct or to cause that result.

Ms. Taylor, if I could pick on you again. Can you think of just really any action that would be intentional?

VENIREPERSON TAYLOR: Intentional? Like murder? Is that what you're saying, like, intentional? Yes.

MR. BRILEY: Somebody intended --

VENIREPERSON TAYLOR: Premeditated.

MR. BRILEY: That was their conscious desire, to cause that result, the death of another person?

VENIREPERSON TAYLOR: Do I think. Okay, so what are you asking me now?

MR. BRILEY: You already answered me. I'm sorry I'm confusing you.

VENIREPERSON TAYLOR: Intentional act, yes.

MR. BRILEY: Murder. Okay. Mr. Teakell, could

you think of an act that's not intentional?

VENIREPERSON TEAKELL:  I really don't understand what you're saying.

MR. BRILEY:  For example, breaking something or --

VENIREPERSON TEAKELL:  A policemen breaking something?

MR. BRILEY:  No, just anybody.

VENIREPERSON TEAKELL:  Anybody?

MR. BRILEY:  Something that's not intentional, something that perhaps you -- you know, your body's moving, but that is not your intended result.

VENIREPERSON TEAKELL:  I guess that could happen, yeah.

MR. BRILEY:  Okay.  Thank you.  Third topic that I wanted to talk about was the presumption of innocence. Of course, all persons are presumed to be innocent and the presumption of innocence alone is sufficient to acquit.  Of course, the defense does not have to put on any evidence, just that presumption alone is enough to acquit.  And, you know, it's not about which case is better, the defense's case or the State's case.  The State must prove their case beyond a reasonable doubt and each element beyond a reasonable doubt.

And my question to you all is do you believe

that an innocent person should be brought to trial for a charge such as resisting arrest? So just this first row, who would answer yes to that question, I do believe that an innocent person could be brought to trial for a charge such as resisting arrest?

VENIREPERSON: They're innocent coming into it?

MR. BRILEY: Let's say, first of all, there's an allegation that somebody was resisting arrest, but they're innocent. Could they be brought to trial? Could it get so far as the trial process when they're innocent?

VENIREPERSON: Sure.

MR. BRILEY: Yes, okay. Who here would agree? First row? Sergeant Foster, how about you? You don't believe that?

VENIREPERSON FOSTER: No, by the time -- just in my experience, by the time it goes through detectives, my level of patrol sergeant signing off on it and the detective section, and the D.A.'s prosecution packet is put together, and the D.A.'s office looks at it, I don't see it. Again, it's my opinion. But it seems we err on the side of caution with this stuff, as we should. And it just doesn't go to trial if the D.A.'s office sees that there's not enough there.

MR. BRILEY: Thanks for your honest opinion. Of

course, that's what we're looking for is just your opinion.  The law may say one thing, but that doesn't necessarily mean that that's what you believe, and you may believe something different than what the law is.  In the instructions, that's what we're looking for.  So would you say you believe Mr. Roberson is guilty just sitting in the defendant's chair?

VENIREPERSON FOSTER:  I'm not saying I couldn't look at everything objectively, but I'm more inclined to believe that he is knowing the experience that I have within the criminal justice system.  I'm not saying that it doesn't occur, but having a personal knowledge of how things happen here, it seems more often than not people that should be going, don't go.  You know, so it's just my opinion.

MR. BRILEY:  Well, so would you say that just his allegation, just the fact that we're here in trial would be some evidence in your mind against him?

VENIREPERSON FOSTER:  Yeah, to be honest, it would be.  And it's not that I couldn't look at everything objectively.  There may be something that, you know, with the officer's testimony, his testimony.  I don't know if he's going to testify, and I wouldn't hold that against him.  But I understand he's innocent.  I guess I'm talking in circles here.  It's probably just my

15 years of experience as a police officer seeing the this stuff and seeing how it works.  I can look at it objectively and come to a decision, but, yeah, I think I'm prone to believe somebody is guilty, right or wrong.

MR. BRILEY:  So you'd say the State is probably starting off just a little bit ahead?  I mean just the fact they we're even here?

VENIREPERSON FOSTER:  Yeah, I think I'd be dishonest in saying that that would be even in my mind.

MR. BRILEY:  And if the judge or, you know, if we called you back in later on, the judge and the D. A. talked to you and said, I know that's your opinion, but can you set that opinion aside?

VENIREPERSON FOSTER:  Oh, yeah.  We're being honest, just like you said.  That's my honest opinion.

MR. BRILEY:  Would you say it's a pretty strong thing?

VENIREPERSON FOSTER:  It's not something I couldn't put aside to look at a case.  Just everything that I've seen plays on what I feel right now and your question.  It's not that -- if they don't prove beyond a reasonable doubt, they don't prove it.  And then I would vote to show not guilty.

MR. BRILEY:  Okay.  Would you say just the allegation, the fact that he's here, is in your mind a

little bit of evidence that's already in your mind?

VENIREPERSON FOSTER:  Yes.  I can't help it. We're being honest here.  Maybe it's my 15 years experience as a police officer, but to say that it's even at this point would be a lie.

MR. BRILEY:  Thank you very much.  Who here agrees with Sergeant Foster, that in their mind the State's going to start off a little bit ahead just because of the allegation?  Okay.  So on the second row, would everybody here say that an innocent person could be brought to trial?  Yes?  And, Mr. Thomason, I didn't see a hand.  Would you say, No, I don't think an innocent person probably could be brought to trial in a resisting case?

VENIREPERSON THOMASON:  You know, you are innocent until proven guilty, but I'm not really a hundred percent sure how that whole process is going to work.  But I mean if it comes to something whether you stole a piece of candy from the store or you didn't cooperate with the officer when he was trying to do his job, you know, I mean I guess I would kind of go along with what Officer Foster is saying, you know.  If it comes, you know, all the way through here, there would probably be, you know, just that inkling of, you know, well if it's come this far, you know, he might be.

But for me, I would have to go with what the evidence is telling me, go with what the witnesses there are and judge based off the witnesses' testimony on that. So I'm kind of, you know, in between here on something like that, but until I was able to hear all the evidence and/or see all the evidence and hear the witness's statements, I don't know if I'd be able to give an accurate assessment of that whole process until I was able to hear it.

MR. BRILEY: Okay. Well, you know, and if the judge -- let's say that you're chosen as a juror and the judge instructs you that Mr. Roberson is presumed innocent and that the allegation is not to be used against him, that's what the law says. But is your opinion something different, and is it strong enough that you could not put that aside?

VENIREPERSON THOMASON: Well, like I said a while ago, I do believe that you are innocent until you've been proven otherwise. So if the judge told me to set aside, you know, the fact that he is here and whether he could be guilty or not, you know, I would set that aside and, you know, really focus on the evidence, focus on the witness's statements and determine for myself based on those whether he's innocent or not.

MR. BRILEY: Okay. Thank you very much. On

that third row, with a show of hands, who here believes that an innocent person could be brought to trial for resisting arrest? That's everybody. Thank y'all very much.

This is where it's going to get tricky. I'm going to go down the row and ask each person for a number, and that number corresponds to an answer. The question -- I'll repeat it a couple times -- is "If the police charge a person with resisting arrest, that person is probably guilty." The first answer is, "I strongly agree."

VENIREPERSON LITTEKEN: I'm sorry. I didn't hear what you said. I can't hear.

MR. BRILEY: The statement is: "If the police charge a person with resisting arrest, that person is probably guilty." And there's six answers, and the first one would be, "I strongly agree with that statement." The second one would be, "I agree with that statement." The third would be, "I slightly agree with that statement." The fourth would be, "I slightly disagree with that statement." The fifth is, "I disagree with that statement." And the sixth is, "I strongly disagree with that statement." Is everybody -- do y'all have a number in your mind? If I could just go down the line here. Juror No. 1, Ms. Taylor?

VENIREPERSON TAYLOR: Uh-huh.

MR. BRILEY: Could you --

VENIREPERSON TAYLOR: Three.

MR. BRILEY: Three, okay. And, Mr. Teakell?

VENIREPERSON TEAKELL: Two.

MR. BRILEY: Mrs. Wright?

VENIREPERSON WRIGHT: Two.

MR. BRILEY: Ms. Hair?

VENIREPERSON HAIR: Two.

MR. BRILEY: Mr. Garcia?

VENIREPERSON GARCIA: Four.

MR. BRILEY: Mr. Foster?

VENIREPERSON FOSTER: The one that's the strongest?

MR. BRILEY: Yes.

VENIREPERSON FOSTER: One.

MR. BRILEY: Mr. Billing?

VENIREPERSON BILLING: Three.

MR. BRILEY: Ms. Vale?

VENIREPERSON VALE: Three.

MR. BRILEY: And I'll go back down to No. 9. Mr. Litteken?

VENIREPERSON LITTEKEN: Four.

MR. BRILEY: Mr. Vasquez?

VENIREPERSON VASQUEZ: Three.

MR. BRILEY: Mr. Thomason?

VENIREPERSON THOMASON: Three.

MR. BRILEY: Ms. McClesky?

VENIREPERSON MCCLESKY: Three.

MR. BRILEY: Ms. Schmidt?

VENIREPERSON SCHMIDT: Three.

MR. BRILEY: Mr. Jantz?

VENIREPERSON JANTZ: Five.

MR. BRILEY: Ms. Steele?

VENIREPERSON STEELE: Two.

MR. BRILEY: Ms. McKinley?

VENIREPERSON MCKINLEY: Four.

MR. BRILEY: Mr. Chavez?

VENIREPERSON CHAVEZ: Two.

MR. BRILEY: Mr. Young?

VENIREPERSON YOUNG: Four.

MR. BRILEY: Mr. Logsdon? I'm sorry, Ms. Logsdon?

VENIREPERSON LOGSDON: Three.

MR. BRILEY: Ms. Ripperger?

VENIREPERSON RIPPERGER: Two.

MR. BRILEY: Ms. Trejo?

VENIREPERSON TREJO: Four.

MR. BRILEY: Ms. Parsons?

VENIREPERSON PARSONS: Three.

MR. BRILEY:  And Davis?

VENIREPERSON DAVIS:  Two.

MR. BRILEY:  Thank you.  I'll come back and I'll probably follow up with that toward the end of my jury selection presentation.

The fourth topic that I want to talk to y'all about is witness credibility.  Like the State went over, a juror has the right to believe all, part or none of the testimony of any witness that takes the stand.  But that witness credibility comes from the stand.  It shouldn't be something that you already assign to a person before they take the stand.  We talked about police officers. Many people -- some people hold police officers in high esteem, but the law is going to require that you assess their credibility from the stand.

Sergeant Foster, I believe that you told the State that -- and correct me if I'm wrong; I could have easily have gotten it wrong -- that you are going to assess their credibility from the stand, but you might consider their training and experience before they take the stand because you know them as, one, being a police officer, which you know what goes into that, and, two, you might know some of these police officers.

VENIREPERSON FOSTER:  Right.  I don't see how you get around not taking into account their training and

experience. And I just want to be clear. It doesn't matter if it's a police officer up there or not. If -- I have -- it's just like me as a sergeant dealing with officers. You know, I -- I'm objective and I look at both sides, and then I formulate my decision on what I'm gonna do. The same way with somebody on the stand, regardless if it's an officer or not, what they say, if there's no contradiction, stuff just like we talked about with body language, stuff like that, it applies to that side, also. I just want to be clear on that.

MR. BRILEY: Thank you.

VENIREPERSON FOSTER: Did I answer your question?

MR. BRILEY: I think you did answer my question. But if police officers take the stand, are you going to assign them even a little bit of credibility just on their training and experience? You're going to assume that they have certain training and experience?

VENIREPERSON FOSTER: Right. If you're dealing with this case of resisting arrest. You have an officer, obviously, that was right there seeing everything happen, probably multiple officers who are trained from the get-go of noting things, you know, just more than, I would think, than the average person.

MR. BRILEY: But you're going to give them, I

guess, the benefit of the doubt that they already have that training before they even take the stand?

VENIREPERSON FOSTER:  Well, every person on that screen that you put up there is a Wichita Falls police officer.  I'm fully aware of their training.  I'm also a field training sergeant, so I understand completely with having been part of that process, the field training process.  So I know once they get cut loose and on their own, I have an understanding of what they've been through to get to that point.  So maybe if it was an outside agency, I'm not real familiar with their training.  A lot of times I've had experience with those people you put on the screen in working with them.  So I know what all they do and training and everything like that.  All that together, you know.  So --

MR. BRILEY:  Okay.

VENIREPERSON FOSTER:  I can't discount that.  I mean it's -- now, I'll still analyze what they say and see if it meets with what was presented as evidence.  And to me it's no different than what I'm doing when I'm checking a report at the end of a shift for an arrest that I have to sign off on a probable cause.  I have sent people back to jail and dropped charges on people because they didn't meet probable cause.  I'm not afraid to work either side.

MR. BRILEY: Okay. Thank you very much. And this is my second perhaps confusing question because it's not up on the screen. But my question or my statement, I suppose, is, "I will start a police officer off with added credibility before hearing his or her testimony." And the answers are the same. No. 1, "I strongly agree"; No. 2, "I agree;" No. 3, "I slightly agree;" No. 4, "Slightly disagree;" No. 5, "Disagree;" and No. 6, "Strongly disagree." And if I could go down the line again.

VENIREPERSON FOSTER: I've got a question.

MR. BRILEY: Yes, sir.

VENIREPERSON FOSTER: I don't know if everybody else remembered the slide, but the State put a slide up there. And that's when I got hung up on I was trying to decipher, okay, are you talking about a bias or are you talking about training and experience? And if I remember your slide right, the very first one was assigning more or less credibility to a police officer, and the second one you put up there was taking into account their training and experience. Which -- is that what we're talking about, or are we talking about -- is your question better put, Am I going to be biased towards him since he's an officer? Or are we talking about an actual question of, Am I going to take into account his training

and experience?  Which to me is two different things.

MR. BRILEY:  Well, I think my question would include both of those things.  Many people may have police officers in their families here.  And so that might, one, create a bias towards I believe police officers are going to be truth tellers; and, second, that they have certain training and experience before we ever hear what kind of training they have, what kind of experience they have.  Just being in uniform, you might assign them credibility both in their knowledge and experience and training.  And, also, you know, any kind of bias toward -- you know, I have the utmost respect for police officers and I believe that they always tell the truth.  By the way, will you say that police officers sometimes lie?

VENIREPERSON FOSTER:  Will I say that?  Yeah, that's human nature type stuff right there.  I mean that's -- I would like to say that our HC does a good job of getting rid of those kind of people.  Yeah, it happens.  I guess I'm going to have to hear the questions, how you're putting the questions.  Because I separate the two.  That's why -- you remember me asking that?  What are we talking about, because I'm confused. If you get up there and you ask them about their training and experience, are you not supposed to take that into

consideration when they're telling us what they saw and stuff?

THE COURT: Will you approach, please? I think I have a solution for this.

(At the bench, off the record)

MR. BRILEY: I'm sorry about the confusion, everybody. So let me rephrase my question. I suppose the statement is, "I'm going to assign more credibility before I ever hear the police officer simply because of the fact that he wears a police officer's uniform and a badge and that he is a police officer." So before we hear them testify at all, I'm going to assign them more credibility because they are a police officer? And No. 1 is, "I strongly agree with that statement;" No. 2 is "Agree;" No. 3 is, "Slightly agree;" four is "Slightly disagree;" five is, "Disagree;" and six is, "Strongly disagree." Everybody got a number in mind? Ms. Taylor, what would you say?

VENIREPERSON TAYLOR: Two.

MR. BRILEY: And Mr. Teakell?

VENIREPERSON TEAKELL: Two.

MR. BRILEY: And Ms. Wright?

VENIREPERSON WRIGHT: Two.

MR. BRILEY: Ms. Hair?

VENIREPERSON HAIR: Two.

MR. BRILEY: And Mr. Garcia?

VENIREPERSON GARCIA: Two.

MR. BRILEY: Mr. Foster?

VENIREPERSON FOSTER: Three.

MR. BRILEY: And Mr. Billing?

VENIREPERSON BILLING: Two.

MR. BRILEY: Ms. Vale?

VENIREPERSON VALE: Two.

MR. BRILEY: And Mr. Litteken?

VENIREPERSON LITTEKEN: Four.

MR. BRILEY: Mr. Vasquez?

VENIREPERSON VASQUEZ: Three.

MR. BRILEY: Mr. Thomason?

VENIREPERSON THOMASON: Three.

MR. BRILEY: Ms. McClesky?

VENIREPERSON MCCLESKY: Three.

MR. BRILEY: Ms. Schmidt?

VENIREPERSON SCHMIDT: Five.

MR. BRILEY: Mr. Jantz?

VENIREPERSON JANTZ: Four.

MR. BRILEY: Ms. Steele?

VENIREPERSON STEELE: Two.

MR. BRILEY: Ms. McKinley?

VENIREPERSON MCKINLEY: Four.

MR. BRILEY: Mr. Chavez?

VENIREPERSON CHAVEZ:  Two.

MR. BRILEY:  Mr. Young?

VENIREPERSON YOUNG:  Four.

MR. BRILEY:  Ms. Logsdon?

VENIREPERSON LOGSDON:  Four.

MR. BRILEY:  Ripperger?

VENIREPERSON RIPPERGER:  Three.

MR. BRILEY:  And Ms. Trejo?

VENIREPERSON TREJO:  Four.

MR. BRILEY:  And Ms. Parsons?

VENIREPERSON PARSONS:  Three.

MR. BRILEY:  And Mr. Davis?

THE REPORTER:  I'm sorry.  What was Mr. Davis' answer?

MR. BRILEY:  Mr. Davis was two.

THE REPORTER:  Two.

MR. BRILEY:  Okay.  Let me go down the first row here.  Ms. Taylor, do you agree that you would start off a police officer with added credibility before he took the stand and spoke anything, right?

VENIREPERSON TAYLOR:  Uh-huh.

MR. BRILEY:  And my question now, I suppose, is if the judge tells you that the law says something different -- you're familiar with police officers.

VENIREPERSON TAYLOR:  Uh-huh.

MR. BRILEY: That may be why you give them added credibility. Do you think that's something you could put aside, or are your feelings so strong that you would say, No, I'm still going to give them added credibility even if the judge says, you know, the law is something different?

VENIREPERSON TAYLOR: No, I could put it aside because, you know, like he was saying, there's good cops and there's bad ones. So I just -- I think it would just depend with me what was said, too, you know. I mean, yeah, would start off thinking they know a lot because like, you know, with my family, I know what they go through, the training and their experience and everything. But then it would ultimately matter to me, you know, actually what they did say.

MR. BRILEY: Okay.

VENIREPERSON TAYLOR: And with everything else into account, you know, the witnesses and all that. Did I answer that, or did I get off of that?

MR. BRILEY: You answered it, but I heard two things.

VENIREPERSON TAYLOR: Okay.

MR. BRILEY: You know, thank you very much for your answer, but --

VENIREPERSON TAYLOR: Just to be sure, I mean

I'm more -- I more lean towards their experience. I mean that's what they do. That's their living. They do this every day. Like my brother-in-law was like a detective. They read people and they -- I just -- I just go more with that, you know, with their experience.

MR. BRILEY: And I heard that you could put it aside, but it was -- but you also said, you know, after you heard some of what they said -- and what the rule, I suppose, is going to be is that before --

VENIREPERSON TAYLOR: Well, I mean you're asking me -- I have the previous -- yes, I do believe when I'm probably going in that I am a little more on the side with the law enforcement, but I wouldn't make a decision just on that. I would weigh in what -- everything I heard. But I do -- I do have a preconceived idea before because if they're going to, you know, bring an experienced person in, I'm gonna think they're really experienced in that area, you know. Does that make sense?

MR. BRILEY: Yes, I appreciate that.

VENIREPERSON TAYLOR: Okay.

MR. BRILEY: But would you say that even starting off, before the officer testifies, you would probably have a little bit --

VENIREPERSON TAYLOR: I'd probably have some,

yeah, I will.

MR. BRILEY: -- a little bit of added credibility?

VENIREPERSON TAYLOR: Yeah, I do. Yeah.

MR. BRILEY: Okay. And if the judge said that you can't do that; you have to put that aside, do you think that that's still going to be there in the back of your mind? You're going to give them a little bit more credibility?

VENIREPERSON TAYLOR: Well, I don't know. I've never had to do this. I've never had to do it. I mean I would hope that I would do what the judge told me to do and I would try.

MR. BRILEY: Okay.

VENIREPERSON TAYLOR: But --

MR. BRILEY: Okay. Thank you.

VENIREPERSON TAYLOR: I can't say as a matter of fact. I've mean I've never done it so I don't know. I don't have any experience at doing that.

MR. BRILEY: Okay. Thank you, Ms. Taylor.

VENIREPERSON TAYLOR: Okay.

MR. BRILEY: Mr. Teakell, you also agreed that you would give the police officer added credibility before he took the stand. And, again, if the judge tells the jury that's --

VENIREPERSON TEAKELL:  I can go along with what the judge says.

MR. BRILEY:  Okay.

VENIREPERSON TEAKELL:  But I've been brought up all my life to respect officers because they put a badge on and take an oath.  And that's just the way I feel.  And if the judge says take that out, I can.  But in the back of my mind, I respect the police department.

MR. BRILEY:  Well, and the question is would you give them added credibility?  Would you say that your opinion that you're going to give them added credibility is pretty strong?

VENIREPERSON TEAKELL:  I would think so.

MR. BRILEY:  And if the judge asks you to put that opinion aside, can you do that?

VENIREPERSON TEAKELL:  I can do it, yeah.

MR. BRILEY:  Thank you.  Ms. Wright, you also agreed with that statement, and you have an opinion that you might start off a police officer with added credibility.  Is that something you can put aside, or is that going to be something that remains?

VENIREPERSON WRIGHT:  No, I could put it aside, you know, if that's something that, again, they stated that the judge order ordered us to do.  But I just think in general probably the notion is that most of us -- my

opinion is citizens feel like we should be able to trust police officers and those that protect us. So I -- not knowing a lot of the training and stuff that goes on behind the scenes or prior to, I can't weigh that in. And I don't have anybody in my family that's a police officer or anything like that, so I mean I think I could be partial, I mean not one side or the other, I guess, if you will.

MR. BRILEY: Okay.

VENIREPERSON WRIGHT: Does that make sense?

MR. BRILEY: Yes, it does. Okay. Ms. Hair, you also agreed with that statement. Would you say that you could put that opinion that you're going to start a police officer with added credibility aside, or is that something that, you know, is a strong enough opinion that you probably couldn't put that aside?

VENIREPERSON HAIR: Yes, I could put it to the side. There's good cops and there's bad cops. I would listen to both sides. I wouldn't just automatically go to one side. I could put it aside.

MS. KUCERA: Judge, can we approach?

(At the bench, off the record)

MR. BRILEY: Mr. Garcia, you also agreed that, you know, just because a police officer is in a uniform or badge, you might give them added credibility before

they took the stand?

VENIREPERSON GARCIA:  Right, because there's a certain respect that.  But I could -- you know, if you can't do that, you can't do that.

MR. BRILEY:  Okay.  Thank you.  Sergeant Foster, you said you slightly agree with that statement?

VENIREPERSON FOSTER:  Right.  We're talking about -- you said credibility, added credibility.  I want to clarify again on that because I think we've gone back to the original question, and that is what I'm having a problem with resorting back to that.  To answer your question, if somebody's in a uniform, just the mere fact that they wear a uniform and a badge, it's the slightly, if I remember right.  It's just a little bit just like I felt with the D. A.'s office, just a little bit is why I slightly agree with that.  Now, if you're going to use added credibility by being a police officer, then you take into account the credibility and experience, and my number would probably be higher if you're going to include that.

MR. BRILEY:  Okay.  Mr. Billing?

VENIREPERSON BILLING:  I'd give them a slight edge on credibility just due to the nature of their job, put them in the same category as firemen, those people that serve in the military, just the risks that they take

with their job. So right off the bat, I give them more credibility.

MR. BRILEY: Okay.

VENIREPERSON billing: But I could set that aside. The individual is presumed innocent until proven guilty.

MR. BRILEY: So if the judge instructed you, do you think that you could put that opinion aside?

VENIREPERSON BILLING: Yeah.

MR. BRILEY: And judge their credibility only from the stand?

VENIREPERSON BILLING: Yeah.

MR. BRILEY: Ms. Vale?

VENIREPERSON VALE: Yes, I could set it aside and just base it on the facts and put my faith in the process.

MR. BRILEY: Okay. Thank you. Actually, let me skip to Ms. Steele. You said that you agree with the fact that you would give a police officer added credibility just because of the fact that he's in a uniform and badge before he takes the stand?

VENIREPERSON STEELE: Yes.

MR. BRILEY: Are you saying that could you put that aside if the judge asked you, or is that a pretty strong opinion and you're probably going to give them

added credibility before they take the stand even if the judge tells you differently?

VENIREPERSON STEELE:  I could put it aside.

MR. BRILEY:  Thank you.  Carlos Chavez, would you say that your opinion is strong enough that you couldn't put it aside, or if the judge told you to judge the credibility only from the stand?

VENIREPERSON CHAVEZ:  I could put it aside.

MR. BRILEY:  You could put it aside?

VENIREPERSON CHAVEZ:  Yes.

MR. BRILEY:  Okay.  Thank you.  I'll move on to my next question.  Actually, it's a new topic.  That's the standards of proof.  Mr. Billing let us know that in this case the State is going to have to prove beyond a reasonable doubt every element of the crime.  There's other standards of proof such as reasonable suspicion, probable cause, preponderance of the evidence, and clear and convincing evidence.  And those are all in order up to the highest, which is beyond a reasonable doubt.  Sergeant Foster, could I pick on you, I suppose, and use your knowledge?

VENIREPERSON FOSTER:  Sure.

MR. BRILEY:  Could you tell us about reasonable suspicion a little bit?

VENIREPERSON FOSTER:  Well, it's like having --

say I work third shift, and there's a business closed and I see somebody walking around behind the building, and I have a reasonable suspicion at that point that he's probably committing a crime like burglary or some kind of theft or something like that, which would give me enough to detain him to either prove or disprove if you get to the point of probable cause and that stuff.

MR. BRILEY:  Okay.  And then let's say that you investigated and you found some additional facts and that gave you probable cause that the crime had been committed, what could you do then?

VENIREPERSON FOSTER:  Make an arrest.

MR. BRILEY:  Okay.  Thank you.  After a reasonable suspicion and probable cause, the next standard of proof that the law provides is -- or at least one of them is by a preponderance of the evidence.  And that would be something that we use in civil cases, and that would be a case where like one side versus the other and whose case is more likely than not.  Perhaps at the end of the trial you wouldn't have a firm belief to either one of them, but it's more likely than not.  And that would be preponderance of the evidence.

I don't know that that alone makes sense.  Does that make sense to you, Mr. Billing?

VENIREPERSON BILLING:  Yes.

MR. BRILEY:  Okay.  Does anybody have a question on that?  Okay.  Like I said, that would be used in civil trials.  The next thing would be clear and convincing evidence.  The best example of that would be if the State was going to come and take somebody's children away, they would need clear and convincing evidence of their allegations.  And the definition for that is that the proof would have to be so much to produce in the mind of the trier of fact or the jury or the judge that it would produce a firm belief as to the allegations, that the allegations were true.  So they have to produce enough evidence to give you a firm belief that those allegations are true.

And the reason I bring all this up is I kind of want to compare that with beyond a reasonable doubt, since we can't tell you what beyond a reasonable doubt is.  We don't have a definition.  Like the State said, what's reasonable to one person might be different than another person's, so we don't have a definition of beyond a reasonable doubt.  But we do know that it's higher than clear and convincing evidence, and we know that that is enough evidence that would produce in your mind a firm belief.

So I suppose my question is -- Ms. Vale, can I ask you this question?  Could you imagine a situation

where you firmly believe something but still have a reasonable doubt as to the allegation?

VENIREPERSON VALE:  It's hard.  I'd have to have all the facts.  I'm a facts person.  I'm a trained person with the government, so based on facts and processes. Yeah.

MR. BRILEY:  I suppose -- have you ever seen a news story where maybe you haven't seen the trial, you haven't heard all the facts?

VENIREPERSON VALE:  Right.

MR. BRILEY:  But you've heard a little bit, and you firmly believe something happened.

VENIREPERSON VALE:  Like the Trevon Martin case or any of the special cases that you hear on the media or stuff?  It's not enough for me to make a decision on unless I'm there listening to all the facts.  I'm a facts person.

MR. BRILEY:  Thank you.

VENIREPERSON VALE:  Uh-huh.

MR. BRILEY:  Is there anybody here who would say on the first row that, you know, they couldn't differentiate between that.  If I firmly believed something, if they prove something enough that I firmly believe it, it wouldn't be possible for me to have a reasonable doubt?  Anybody here?

VENIREPERSON FOSTER:  Say it again.

MR. BRILEY:  Actually, let me ask it this way. Who here on the first row would say, yes, to the statement, I could firmly believe something and still have a reasonable doubt?  So how about no to that answer?  Everybody said no.  Okay.  And, you know, the State gave the situation of the Friends picture.  And my example, there's been times where I've parked in the garage and I'm heading to work and I get halfway down the street and I start to think, did I close the garage door, did I not close the garage door.  Anybody had that experience?  There are times where I may firmly believe that I did close the garage door, but I have enough of a hesitation, I have enough of a reasonable doubt to say I might need to turn back and actually go see if the garage door actually closed.  Most of the times the garage is closed.  There have been a couple of times where it hasn't been, and I'm glad I did turn back.  That's where clear and convincing evidence where you have a firm belief of something to beyond a reasonable doubt where you still may have a reasonable doubt.

Does anybody have any questions about that? Sorry if I made it confusing.  Well, that -- that's all the questions that I have for you.  Thank y'all very much for your time and attention.

THE COURT: All right. Ladies and gentlemen, that was the conclusion of the voir dire process. This will take a few minutes. There will be some of you that will be called back in to clarify possibly some of your answers, so they can exercise their strikes after that. This process will take a little bit longer, usually about 30 minutes. But in the meantime, like I said, people will be coming back in. I think there are some we need to call back in. And then once we get done with that, they're gonna exercise their strikes; I'll bring you back in and let you know who the lucky six are like I said before; and then at that time I'll be able to release the rest of you.

So this will be a little bit longer delay, but it's worth it to all of you except six. So if you'll just have a seat out in the hall, go to the restroom, whatever you need to do, and we'll bring you back in. When you come back in, you don't need to sit in any order, either. Thank you.

(Open court, defendant present, no panel)

I'll start with the State. Is there anybody that you think we need to bring back in to clear up?

MS. HONEY: Can we bring in juror No. 6?

THE COURT: Juror No. who?

MS. HONEY: Six, Mr. Foster.

THE COURT: Really? You can, that's fine.

MR. BRILEY: From the defense, just 1 and 3.

THE COURT: That's one of the ones I had. Okay. Just one and three and six. Okay. Ms. Taylor, please.

THE BAILIFF: No. 1?

THE COURT: No. 1.

THE BAILIFF: Cheryl Taylor? Ms. Taylor? And you can go up on the front bench.

THE COURT: Yeah, you can just stand right up here, Ms. Taylor, or you can sit if you'd like. This is a little bit less formal here.

VENIREPERSON TAYLOR: Okay.

THE COURT: There were some questions with regard to your answers.

VENIREPERSON TAYLOR: Okay.

THE COURT: Unfortunately, in this process, sometimes your answers have to be yes or no. So I understand the difficulty with it, especially with the areas that we're dealing with.

VENIREPERSON TAYLOR: Yes.

THE COURT: But, unfortunately, we have to kind of narrow it down. Mr. Briley, you wanted Ms. Taylor?

MR. BRILEY: Ms. Taylor, we talked about you having feelings for police officers and you may give them added credibility before they take the stand. And you

would try to set that aside, but you wouldn't -- I'm not trying to put words in your mouth.

VENIREPERSON TAYLOR: Yes.

MR. BRILEY: But you may not be able to put those feelings aside. And we're just trying to get a yes or no.

VENIREPERSON TAYLOR: Well, I would honor the judge if that's what he told me to do. You know, I would do that. But -- yes.

MR. BRILEY: I know you want to follow.

VENIREPERSON TAYLOR: Yes.

THE COURT: Yes, that you would set it aside?

VENIREPERSON TAYLOR: Yes, because I would want to do what I was -- what you would want me to do.

MR. BRILEY: I know that you want to follow the rules --

VENIREPERSON TAYLOR: Yes.

MR. BRILEY: And I'm not saying anything about that. But you might have feelings so strong that it might not be possible.

VENIREPERSON TAYLOR: Well, you know, I do respect law enforcement. I think they're, you know, they're authoritive. And I know in courts that's the reason they bring in specialists or doctors or, you know, people, you know, that have experience in that particular

area.  And that's -- you know, we kind of think, well, they know something or they wouldn't be bringing them in. That's kind of just my -- you know, what I think, but --

THE COURT:  Let me ask it this way.  You're going to have possibly in this trial witnesses that are officers and witnesses that are not officers.

VENIREPERSON TAYLOR:  Yes, uh-huh.

THE COURT:  When they take the stand, you know nothing about them, either one.

VENIREPERSON TAYLOR:  Uh-huh.

THE COURT:  You have no idea what their experience may be.

VENIREPERSON TAYLOR:  Yes.

THE COURT:  Are you going to assign the officer extra credibility, before you hear any testimony at all, over a layperson, a normal person, simply because he takes the stand wearing a badge and a uniform?

VENIREPERSON TAYLOR:  I don't know how to ask -- I don't -- I want to be truthful, but I don't --

THE COURT:  You haven't heard anything about his experience.  You haven't heard anything about his training.

VENIREPERSON TAYLOR:  If I don't know anything about his experience -- because you're gonna bring in the ones that was actually -- you had listed on the thing?

THE COURT: That's them. They will, possibly.

VENIREPERSON TAYLOR: Oh. I mean the ones to see if we knew or not.

THE COURT: But what I'm saying is before they even start testifying, you know nothing about his experience.

VENIREPERSON TAYLOR: Uh-huh.

THE COURT: You know nothing about his training, who trained him, how he was trained, what he was trained in. He walks in just like any other person. The only difference is he wears a badge and possibly a uniform. Are you going to give that person extra credibility simply because he is an officer? There's no wrong answer, so either way.

VENIREPERSON TAYLOR: I know. I know. I just want to be truthful. I'll say no, but because, like you said, I think they have some credibility and experience or they wouldn't be there. But, like you say, I don't know the individual policeman or whoever, so I don't know how much credibility they do have.

THE COURT: Okay.

VENIREPERSON TAYLOR: Did I -- I don't know. I guess I don't really know how to answer it.

THE COURT: I understand.

VENIREPERSON TAYLOR: You know, so I'm -- I was

brought up to respect officers and --

THE COURT: There's a difference between respecting somebody and giving them credibility.

VENIREPERSON TAYLOR: I know, but, you know, I -- that's their job and I just think most of them, I think, are credible. But, like you say, the particular ones, I don't know. So I would have to put it aside because I don't know that individual, how credible he is, until he testified or whatever.

MS. KUCERA: I think everyone understands what you're saying, so, one, thank you for being honest. We appreciate that because it makes our jobs a little easier. What we're asking is -- what my slide said was, you know, officers, obviously, we understand that they go through certain training and experience, right?

VENIREPERSON TAYLOR: Uh-huh.

MS. KUCERA: What we're asking you to do is -- let's say the officer, before you hear anything about -- he could have one day of training or he could have 15 years, okay.

VENIREPERSON TAYLOR: Uh-huh.

MS. KUCERA: Before we talk about anything in his training and experience, if he gets on the stand, it sounds to me like you're saying if the judge tells you you can't automatically assume he's telling the truth

before he gets on the stand, then as long as you can wait until you hear what he has to say and what his training and experience is, is that -- do you understand what I'm saying? That you can wait until he gets on the stand before you evaluate his training and his experience, his demeanor, like we talked about. Do you think you could do that?

VENIREPERSON TAYLOR: Yes. I would have to wait till after he told what experience they had. But then after he did that, I might have some -- is that wrong?

MS. KUCERA: The law says you can, when you're evaluating what he's saying, you can consider that he's had this much training or this much experience. You can consider that when you're evaluating his ability to tell the truth. We talked about demeanor and is he consistent in what he says. Those are things you can think about and consider. The only thing the law says you can't do is automatically assume he's telling the truth before he ever gets on the stand.

VENIREPERSON TAYLOR: I understand.

MS. KUCERA: You understand, okay. Do you think you could follow the law in that case? Because the law says --

VENIREPERSON TAYLOR: Yes.

MS. KUCERA: Okay. You could follow the law?

VENIREPERSON TAYLOR:  Yes.

THE COURT:  Anything further, Mr. Briley?

MR. BRILEY:  Ma'am, you stated that you had a nephew who works for the Wichita Falls Police Department.

VENIREPERSON TAYLOR:  Uh-huh.

MR. BRILEY:  Who is that nephew?

VENIREPERSON TAYLOR:  Tristan Dosier.

MR. BRILEY:  Thank you.

THE COURT:  All right.  Okay.  Thank you, Ms. Taylor.

(Venireperson Taylor exits courtroom)

Is there a challenge for cause?

MR. BRILEY:  Yes.

THE COURT:  Challenge for cause on the basis of --

MR. BRILEY:  She would give added credibility to police officers before they take the stand.

THE COURT:  Challenge for cause denied.  Next one would be Karen Wright.

THE BAILIFF:  Ms. Wright?

THE COURT:  Hello, Ms. Wright.  We wanted to call you back in to try to clarify an answer.

VENIREPERSON WRIGHT:  Okay.

THE COURT:  And like I tell people, I know it's

difficult in this situation with some of these concepts -- you can sit down. It's okay. With some of these concepts, it's hard to say yes or no. However, in these situations, sometimes we have to narrow it down to get to a yes or no answer. Mr. Briley, I believe.

MR. BRILEY: Yes. Ms. Wright, I think we were pretty clear on the credibility issue, but you also mentioned that you know Officer Iper.

VENIREPERSON WRIGHT: I do.

MR. BRILEY: How well do you know Officer Iper?

VENIREPERSON WRIGHT: Through our kids sports.

MR. BRILEY: Okay. Do you think you would give him specifically more credibility before he takes the stand because --

VENIREPERSON WRIGHT: No.

MR. BRILEY: Thank you.

THE COURT: Anything from the State?

MS. HONEY: No.

THE COURT: Thank you, Ms. Wright.

VENIREPERSON WRIGHT: Uh-huh.

(Venireperson Wright exits courtroom)

THE COURT: Any challenge with regard to Ms. Wright for cause?

MR. BRILEY: No, Your Honor.

THE COURT: I believe the last one that you were

asking to have brought back in was Sergeant Foster?

MS. HONEY: Yeah. You can disregard our request.

THE COURT: All right. And I believe, Mr. Briley, you had No. 11?

MR. BRILEY: No, I think that's all that we need.

THE COURT: Okay. I'm sorry. All right. Mr. Briley, do you have your challenges for cause ready?

MS. HONEY: There are none from the State.

MR. BRILEY: Just No. 6.

THE COURT: No. 6 challenge for cause will be granted. All right. So let me see if I got this straight. There's a challenge for cause on Ms. Taylor. I believe that was denied. Challenge for cause on Ms. Wright. There was a challenge for cause on Sergeant Foster, correct? That was granted. No other challenges for cause by either the State or defense?

MS. HONEY: No, Your Honor.

THE COURT: Good. How long do you need to make your strikes? Ten minutes?

MS. HONEY: Yes.

THE COURT: Three strikes each. Let's see if we can get it done in 10 minutes. Off the record.

(Preemptory strikes exercised)

(Open Court, defendant present, no panel)

THE COURT: Let's go back on the record now in Cause No. 58017-E. State's present; defendant's present; defendant's attorney is present, outside the presence of the venire panel. The State and the defense have been given time to exercise their strikes. Has the State got theirs and the defense? If you would hand them to me, please. All right.

The State has struck Anthony Garcia, No. 5; Gerald Litteken, No. 9; and Thomas Vasquez, No. 10. The defense has struck No. 1, Cheryl Taylor; No. 2, Ronnie Teakell; No. 7, Douglas Billing, leaving us with a jury of -- keep up and make sure I've got this right -- No. 3, Karen Wright; No. 4, Jamie Hair; No. 8, Eileen -- is it Vale? Is that correct?

THE BAILIFF: Yes, sir.

THE COURT: Okay. No. 11, Tyler Thomason and No. 12, Linda McClesky and No. 13, Tina Schmidt. Is that what y'all have?

MS. HONEY: Yes, Your Honor.

THE COURT: Mr. Briley, is that correct?

MR. BRILEY: Yes, Your Honor.

THE COURT: All right. Just so the record is clear, No. 22 was previously stricken by the court or excused by the court and No. 6, Sergeant Foster, the

challenge for cause was granted.  Anything further at this time from the defense or the State before we bring the jury back in and seat them?

MS. KUCERA:  No, Your Honor.

MR. BRILEY:  No, Your Honor.

THE COURT:  All right.  Let's go off the record.

(Discussion off the record)

(Open court, defendant and jury panel present)

THE COURT:  Okay.  Y'all be seated, please.  All right.  As I call your name, will you please come forward and have a seat here in the jury box.  Just so the record is clear, back on in this cause, 58071, I believe?  58017-E.  Venire panel, of course, is back present in the courtroom, defendant, defendant's attorneys, and the State.  Let's see.  Karen Wright, No. 3.  And there's -- as you come forward to have a seat in the jury box, there's instructions and a button for you.  No. 4, Jamie Hair,; No. 8, Eileen Vale.  Did I pronounce your name right?  Is it Vale?

JUROR VALE:  Uh-huh.

THE COURT:  Okay.  Thank you.  No. 11, Tyler Thomason; No. 12, Linda McClesky; and finally, No. 13, Tina Schmidt.  All right.  If each member of the jury will please stand and raise their right hand for me.

(The jury was sworn)

THE COURT: All right. Thank you. Be seated, please. All right. That's our lucky six. For everybody else who's here on the panel, I spoke with the district clerk, and me releasing you here today here in just a couple minutes will end your service for the week. There's no other trials starting this week, so you don't have to check back in like you have been doing. I appreciate you being here. I appreciate you going through the voir dire process. I hope it's been somewhat of a learning experience if you've never been through it before.

I apologize for all the technical difficulties and the delays we've had today. I try to do things to limit those, but there's always going to be a certain amount of those with this system. Another thing, too, I really appreciate you being here, because you serve a very important role just by sitting through the voir dire process to give these attorneys to question you and your feelings and to seat a jury in this matter. It's important to everybody: The State, the defendant and also the Court. And on behalf of everyone, I thank you for your service and you're released at this time.

(Remaining jury panel exits courtroom)

(Open court, defendant and jury present)

COURT'S INSTRUCTIONS TO JURY

THE COURT:  All right.  Y'all be seated.  All right.  Ladies and gentlemen of the jury, I'm going to read to you some more instructions.  I believe you have a copy in front of you.  The first five instructions are the instructions I gave to you previously, so I'm going to start with No. 6.

6.  Do not investigate this case on your own.  For example, do not:

A.  Try to get any information about the case, the lawyers, the witnesses, or issues from outside this courtroom;

B.  Go to places mentioned in the case to inspect the places;

C.  Inspect items mentioned in this case unless they are presented as evidence in court;

D.  Look anything up in a law book, dictionary, or public record to try to learn more about the case;

E.  Look up anything on the Internet to try to learn more about the case; or

F.  Let anyone else do any of these things for you.

This rule is very important because we want a trial based only on evidence admitted in open court.  Your conclusions about this case must be based only on

what you see and hear in this courtroom because the law does not permit you to base your conclusions on information that has not been presented in open court. All the information must be presented in open court so the parties and their lawyers can test it and object to it if necessary.  Information from other sources, such as the Internet, will not go through this important process in the courtroom.  In addition, information from other sources could be completely unreliable.  As a result, if you investigate this case on your own, you could compromise the fairness to all parties in this case and jeopardize the results of this trial.

7.  Do not tell the other jurors your own personal experiences or other people's experiences.  For example, you may have special knowledge of something in the case, such as technical or professional information. You may even have even have expert knowledge or opinions, or you may know what happened in this case or a similar case.  If you have expert knowledge or opinions, you may not share that expert knowledge or those opinions with other jurors and you may not rely on your expert knowledge or opinions in arriving at your verdict.  If you share such information or rely on such information, you and the other jurors will be considering things that were not admitted in court.

8.    I will decide matters of law in this case. It is your duty to listen to and consider the evidence and to determine fact issues that I expect to submit to you at the end of the trial.  After you have heard all of the evidence, I will give you instructions to follow as you make your decision.  The instructions also will have questions for you to answer.

Every juror must obey all the instructions you have received and others that you will be given during the trial.  If you do not follow the instructions, you will be guilty of juror misconduct, and I may have to order a new trial and start the process over again.  This would waste your time and the parties' money, and would require the taxpayers of the county to pay for another trial.

Please keep these instructions and review them as we go through the case.  If anyone does not follow these instructions, please tell me."

All right.  At this time I'll call the State to come forward and read the information.

MS. HONEY:  May I approach?

THE COURT:  You may.  And if the defendant would please rise.

MS. HONEY:  "In the name and by the authority of the State of Texas, before me, the undersigned assistant

criminal district attorney of Wichita County, Texas, in behalf of the State of Texas, and presents in and to the County Court At Law 1 of Wichita County, Texas that in Wichita County, Texas, Byrias Robert Roberson, herein after called defendant, on or about the 10th day of July, A. D., 2012, in said county and state, did then and there intentionally prevent or obstruct officer Gabriel Vasquez, a person defendant knew to be a peace officer, from effecting an arrest of the defendant by using force against said peace officer, against the peace and dignity of the state.

THE COURT:  To that, how does the defendant plead?  Guilty or not guilty?

THE DEFENDANT:  Not guilty.

THE COURT:  Thank you.  Be seated, please.  All right.  Ladies and gentlemen of the jury, it's about 3 o'clock.  We've had kind of a rough day going back and forth.  So, all right, what I'm gonna do is I'm gonna release you at this time, give you a little bit of an earlier day to make some arrangements hopefully with work or with child care for the next day.

Optimistically, we can get this case to you late tomorrow afternoon.  Possibly could run into Friday.  I would expect it to be done by Friday at noon after talking with the attorneys.  So that would be your

service. You're lucky this is not a three-week long products liability trial or something along those lines. So your service will be completed this week.

One question I have for you is, typically, courts start at nine o'clock. If you would like to start at 8:30 and get an extra 30 minutes in, those 30 minutes do add up and can help move this along for your convenience. Would you like to start at 8:30, or would you like to start at 9:00? The Court can do whatever y'all would like to do. Let me ask it this way. I'm sorry. Is there anybody who does not want to start at 8:30 and would rather start at 9:00? You'd rather start at 9:00? Sometimes it's hard to get here at 8:30, and I understand that, because we have other commitments. So let's do this. We will start with our testimony tomorrow morning, opening statements and then testimony at nine o'clock. The parties and I are going to work for the rest of this afternoon and a little bit earlier than y'all get here in the morning to try to move things along once the trial does get started. Okay?

So with that, I'm going to release you today and ask that you be back here about ten till nine tomorrow so we can get started at nine o'clock. Okay. One other thing, I'm sorry. Wear your buttons. It lets everybody know that you're a juror and lets them know that you're

under the rules that we've talked about and that they're not supposed to speak with you or speak about the case in your presence, okay.  Thank you very much.  We'll see you in the morning.

(Open court, defendant present, no jury)

THE COURT:  Back on the record.  Ms. Honey, just after we went off the record and released the jury, I believe there was an incident with your investigator?

MS. HONEY:  Yes, Your Honor.  As I was proceeding upstairs to our office, I spoke to our investigator, Donnie Cavinder, and he mistakenly spoke to one of the now jurors in this particular case.

THE COURT:  Okay.  And, Mr. Briley, would you like for Mr. Cavinder to be sworn to testify as to what was said between --

MR. BRILEY:  Yes, Your Honor.

THE COURT:  All right.  Mr. Cavinder, if you'd raise your right hand for me, please.

(Witness sworn)

MR. DONNIE CAVINDER,

having been first duly sworn, testified as follows:

EXAMINATION

BY THE COURT:

All right. Mr. Cavinder, an issue has come up that there might have been some contact between you and a juror who was just sworn in; is that correct?

INVESTIGATOR CAVINDER: Yes.

THE COURT: All right. Could you tell the Court what that contact was, please, in as much detail as you can?

INVESTIGATOR CAVINDER: Yes. I left the courtroom prior to the jury being sat and took the equipment back upstairs. As I was coming down the ramp, I noticed a female coming out of the courtroom, which I believed to be Ms. Steele, Juror No. 15, I believe, who had made a comment during voir dire that she recognized me or knew of me or something to that effect.

THE COURT: Juror No. -- to be clear for the record, Juror No. 15 was released from service?

INVESTIGATOR CAVINDER: Right. And that's who I believed I was speaking to. And when I was starting to talk to her, she goes, No, that was Ms. Steele. So I didn't realize at the time the lady I was talking to had actually made the jury, either, and it came up that she

was the one that went to game warden school a couple years ago. And I asked her what had happened there, and she told me she did it for two years, but it was down south of the border and it was dangerous down there and that's why she got out of it. And we just kind of exchanged pleasantries about that.

Nothing was brought up about the trial, the defendant, anything like that. And then I saw her, she had a button down in her right hand next to her side. And that's when I said, Oh, you are on the jury. She said, yes, sir. And I said, Okay, thank you. We didn't discuss the case at all.

THE COURT: Mr. Briley, is there any inquiry you would like to make as to the conversation?

MR. BRILEY: No, Your Honor.

THE COURT: Ms. Honey?

MS. HONEY: Nothing from the State, Your Honor.

THE COURT: I'll speak with Ms. Vale in the morning when they come back just before we go back on the record. If she confirms what Investigator Cavinder was saying, I don't see that there's been any misconduct or any type of tampering with regard to this matter, since the case wasn't discussed, unless you have anything otherwise that you'd like me to hear.

MR. BRILEY: Not at this point, Your Honor. I'd

like to hear what she says in the morning.

THE COURT:  Sure.  Like I said, up to this point, I don't see anything, but we'll speak with Ms. Vale in the morning.  Anything else?

MS. HONEY:  None from the State.

THE COURT:  All right.  Let's go off the record.  Thanks.

(Evening recess taken)

STATE OF TEXAS      )

COUNTY OF WICHITA  )

I, Cayce Coskey, Official Court Reporter in and for the County Court At Law No. 1 of Wichita County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and accurately reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by Wichita County.

WITNESS MY OFFICIAL HAND this the 4th day of February, 2014.

_____
CAYCE COSKEY, CSR 6938, RPR
Expiration Date:  12/31/2014
900 7th Street, Suite 201
Wichita Falls, Texas 76301
940.766.8266 Fax 940.766.8156

REPORTER'S RECORD

VOLUME 4 OF 6

TRIAL COURT CAUSE NO. 58017-E

THE STATE OF TEXAS          §       IN THE COUNTY COURT
                            §
VS.                         §       AT LAW NO. 1
                            §
BYRIAS ROBERSON             §       WICHITA COUNTY, TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEFENDANT'S MOTION FOR MISTRIAL
FOLLOWING JUROR COMMUNICATION
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 22nd day of August, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gary W. Butler, Judge presiding, held in Wichita Falls, Texas, Wichita County, Texas:

Proceedings reported by computerized stenotype machine in real-time. Reporter's Record produced by computer-aided transcription.

A P P E A R A N C E S

Ms. Victoria Honey
SBOT NO. 24073195
Ms. Allyson Renee Kucera
SBOT NO. 24081858
Assistant District Attorneys
WICHITA COUNTY CRIMINAL DISTRICT ATTORNEY
900 7th Street
Third Floor
Wichita Falls,TX 76301-2402
940.766.8113
ATTORNEYS FOR THE STATE OF TEXAS

-AND-

Mr. Mark Richard Briley
SBOT NO. 24069418
WICHITA COUNTY PUBLIC DEFENDER'S OFFICE
600 Scott Ave
Suite 204
Wichita Falls, TX  76301-2531
940.766.8199
Ms. Kristen Homyk Howcroft
SBOT NO. 24032433
THE LAW OFFICES OF JEFF MCKNIGHT, P.C.
900 8th Street
Suite 815
Wichita Falls, TX 76301
940.687.1576
ATTORNEYS FOR DEFENDANT BYRIAS ROBERSON

I N D E X

VOLUME 4

(DEFENDANT'S MOTION FOR MISTRIAL
FOLLOWING JUROR COMMUNICATION)

AUGUST 22, 2013                              Page     Vol.

Appearances.................................   2      4

WITNESSES
                        Direct   Cross   Voir Dire    Vol.
EILEEN VALE              5                             4

Defendant's Motion For Mistrial............   7      4

Court's Ruling.............................   9      4

Adjournment................................  10      4

Court Reporter's Certificate...............  11      4

P R O C E E D I N G S

(Open court, defendant present, no jury)

THE COURT: Mr. Briley, with regard to the -- yesterday when investigator Cavinder testified with regard to his contact with Ms. Vale. Would you like me to get Ms. Vale in here to inquire as to that, or would his testimony yesterday be sufficient? It's up to you. What I'll tell you is what I'm gonna do is I'm gonna reiterate my warnings to the jury this morning about contact with anybody, so that may -- that may help.

But if you would like to -- if you would like to have her come in and let me ask her about the contact yesterday, I'd be more than happy to do that for you on the record.

MR. BRILEY: I would like that, Your Honor.

THE COURT: All right. Let's go off the record while we get Ms. Vale.

(Juror Vale enters courtroom)

Good morning. How are you, Ms. Vale?

JUROR VALE: Good.

MS. EILEEN VALE,

having been subsequently sworn, testified as follows:

EXAMINATION

BY THE COURT:

It's my understanding that yesterday as we were all leaving, Investigator Cavinder and you had a conversation. Investigator Cavinder has already, when he realized you were an actual seated juror in this, came in, made the Court aware of it, made both sides aware of it, and told us what the conversation was about. Would you please tell us, in your own words, what the conversation was you had with Investigator Cavinder?

JUROR VALE: He was just asking me about my experience as a game warden. And I told them that I did cross fit with Marissa Cervantes.

THE COURT: Okay. And Marissa Cervantes is?

JUROR VALE: She's a detective on the police criminal vice squad.

THE COURT: Okay. Thank you. Did he inquire anything about this case?

JUROR VALE: From what I remember, he -- he kind of made a comment about -- I'm trying to -- because I was heading down the stairs and he was telling me and then saying about -- I'm trying to remember. Let me just -- I just said it was okay, but we stopped the conversation

right there because he didn't realize that at point I was a juror, a selected juror, I guess.

THE COURT: You don't remember? We just have to be very specific.

JUROR VALE: I know.

THE COURT: Because it pertains to this case.

JUROR VALE: Right.

THE COURT: You're sure his question or comment pertained to this particular case?

JUROR VALE: He just said -- uh, I think he said, "You were struck, but then we got you on" or something, or something to that effect, which I think -- which I think -- it didn't -- I mean, to me, it didn't -- I kinda said, okay, whatever. I'm going to leave right now.

THE COURT: Was that all?

JUROR VALE: Yeah, I'm being honest.

THE COURT: I want you to be. I'm sorry. I guess I should have put you under oath before we did that, but let me go ahead and do that. Would you raise your right hand for me?

JUROR VALE: Yes.

(Juror sworn)

THE COURT: The statements that you previously made to me, they were the truth; is that correct?

JUROR VALE:  Yes, correct.

THE COURT:  Even though you weren't under oath, you understood that you were to tell me the truth?

JUROR VALE:  Yes, right, because that's the way I was --

THE COURT:  Mr. Briley?

MR. BRILEY:  Where was your juror badge at the time that you were talking?

JUROR VALE:  On my purse.  I was wearing it on my purse.

THE COURT:  Okay.  Anything further?

MR. BRILEY:  No, Your Honor.

THE COURT:  Okay, Ms. Vale.  Thank you.

(Juror Vale exits courtroom)

THE COURT:  Mr. Briley, any motions?

MR. BRILEY:  Would you mind if I took two minutes with my client.

THE COURT:  Go right ahead.

(Attorney-client discussion)

THE COURT:  Back on the record.  Mr. Briley?

DEFENDANT'S MOTION FOR MISTRIAL

MS. HOWCROFT:  Your Honor, at this time the defense has a motion.  We're going to move for a mistrial in this case.  It's our belief that Ms. Vale's testimony here before the court today was, "You were struck, but

then we got you on."  That's her recollection of what occurred.  The problem with that, obviously, is there's a "we."  We got you on; we liked you; we, from the State, wanted you on it and you were struck, being the defense obviously did not want you.  The statement creates relationships with the State and against the defense, and I think we have no choice at this point but to ask the Court to strike this entire panel and start this process over.

THE COURT:  Response from the State?

MS. HONEY:  Your Honor, I would just ask the Court if we could re-call Donnie Cavinder, our investigator, just so we can clear up this discrepancy between him and this juror.

MS. HOWCROFT:  Whether or not there's a discrepancy, Judge, the juror clearly believes that that's the conversation she had, and no clearing up of the testimony, whether or not it factually happened -- and we're certainly not casting dispersions on Mr. Cavinder --

THE COURT:  I know.

MS. HOWCROFT:  This is her recollection, and the question is whether or not she was influenced by the event.  We believe that the statement can't reflect anything but influence.  She was clearly uncomfortable

when presenting it to the court. And we would ask for a mistrial.

MS. HONEY: Your Honor, can we allow for the opportunity to have Ms. Vale come back to ask whether or not she was influenced at all by what she recalls?

COURT'S RULING

THE COURT: No, I don't think that's necessary. What I'm dealing with now is something that would -- whether there was any -- and I'm not saying there was any intention on it; I'm not saying who said what. However, what remains is the appearance. And the appearance that there was in her, at least in her mind, from her testimony -- I mean that's -- Ms. Howcroft stated correctly. That's exactly what I heard.

And I want both sides to have a fair trial. And with that appearance that there was some influence with regard to that juror, I am left with no option except granting a mistrial. There is no way it can be remedied. And I -- I know y'all have -- we have been through a rough day yesterday. And I apologize that that work is for naught. And I'm not casting fault on Investigator Cavinder at all. I understand that was an honest mistake. I completely believe that he believed he was speaking to Ms. Steele.

However, it's that appearance that we just

cannot get by in this matter. So for that reason, I'm going to grant a mistrial. Now, we'll talk later whether double jeopardy has attached. I don't think it has, in my opinion, at this point, but I haven't done any research on it. We'll deal with that issue at another time.

So what I'm going to do this morning, I'll bring the jurors in; I'm gonna declare a mistrial. I'll just say there was a motion brought up this morning outside their presence. I'll declare a mistrial and I'm going to release them.

And then if neither party has a problem with it, I'm going to have the jurors come back to my chambers and I'm going to explain to them what's happened. I'm not going to go into a lot of detail about a mistrial, but it's just part of the legal process. And then I'm gonna try to talk to them about this nightmare we had yesterday. So if y'all don't have any problem with that, I think it's appropriate in this instance.

So give me just a couple minutes. I'm going to go ahead and get my robe on and I'll have Karen bring the jury in and I'll do it at that time, okay. All right. Off the record.

(Proceedings concluded)

STATE OF TEXAS        )

COUNTY OF WICHITA   )

    I, Cayce Coskey, Official Court Reporter in and for the County Court At Law No. 1 of Wichita County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this Reporter's Record of the proceedings truly and accurately reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

    I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by Wichita County.

    WITNESS MY OFFICIAL HAND this the 4th day of February, 2014.


                    _____
                    CAYCE COSKEY, CSR 6938, RPR
                    Expiration Date:  12/31/2014
                    900 7th Street, Suite 201
                    Wichita Falls, Texas 76301
                    940.766.8266 Fax 940.766.8156

REPORTER'S RECORD

VOLUME 5 OF 6

TRIAL COURT CAUSE NO. 58017-E

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE COUNTY COURT |
| | § | |
| VS. | § | AT LAW NO. 1 |
| | § | |
| BYRIAS ROBERSON | § | WICHITA COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPLICATION FOR WRIT OF HABEAS CORPUS
SEEKING RELIEF FROM DOUBLE JEOPARDY
AND
MOTION TO DISMISS THE INFORMATION
BASED ON PREVIOUS MISTRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 12th day of November, 2013, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Gary W. Butler, Judge presiding, held in Wichita Falls, Texas, Wichita County, Texas:

Proceedings reported by computerized stenotype machine in real-time. Reporter's Record produced by computer-aided transcription.

A P P E A R A N C E S

Ms. Victoria Honey
SBOT NO. 24073195
Ms. Allyson Renee Kucera
SBOT NO. 24081858
Assistant District Attorneys
WICHITA COUNTY CRIMINAL DISTRICT ATTORNEY
900 7th Street
Third Floor
Wichita Falls,TX 76301-2402
940.766.8113
ATTORNEYS FOR THE STATE OF TEXAS

-AND-

Mr. Mark Richard Briley
SBOT NO. 24069418
WICHITA COUNTY PUBLIC DEFENDER'S OFFICE
600 Scott Ave
Suite 204
Wichita Falls, TX  76301-2531
940.766.8199
Ms. Kristen Homyk Howcroft
SBOT NO. 24032433
THE LAW OFFICES OF JEFF MCKNIGHT, P.C.
900 8th Street
Suite 815
Wichita Falls, TX 76301
940.687.1576
ATTORNEYS FOR DEFENDANT BYRIAS ROBERSON

I N D E X

VOLUME 5

APPLICATION FOR WRIT OF HABEAS CORPUS
SEEKING RELIEF FROM DOUBLE JEOPARDY
AND
MOTION TO DISMISS THE INFORMATION
BASED ON PREVIOUS MISTRIAL

NOVEMBER 12, 2013                          Page      Vol.

Appearances................................   2       5

Defendant's Oral Motion For Continuance.....   3       5

Defendant's Writ of Habeas Corpus..........   3       5

DEFENDANT'S WITNESSES

|                    | Direct | Cross | Voir Dire | Vol. |
|--------------------|--------|-------|-----------|------|
| CHRISTINA ROBERSON | 10     | 13    | 7,10      | 5    |

Court's Ruling.............................  18       5

Defendant's Motion To Withdraw.............  19       5

Court's Ruling.............................  21       5

Adjournment................................  21       5

Court Reporter's Certificate...............  22       5

EXHIBIT INDEX

APPLICANT'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|-----|-------------|---------|----------|------|
| 1 | Volume 1 of 3 Reporter's Record Defendant's Motion For Mistrial | 16 | 16 | 5 |
| 2 | Volume 2 of 3 Reporter's Record Defendant's Motion For Mistrial | 16 | 16 | 5 |
| 3 | Volume 3 of 3 Reporter's Record Defendant's Motion For Mistrial | 16 | 16 | 5 |

P R O C E E D I N G S

THE COURT: Court's going to take up 58017-E styled the State of Texas versus Byrias Roberson. We're here on a writ of habeas corpus based upon the mistrial that's been filed October 7th by Mr. Briley based on a double jeopardy claim barring prosecution. The reply from the State was filed today. I've had opportunity to read both the, of course, the application and its brief and the bench brief in opposition.

Mr. Briley, this is your motion. Is there anything that you would like to submit to the court other than what you have already stated in your brief?

MR. BRILEY: Yes, Your Honor. And, actually, at this time I'm going to ask for a continuance on this hearing to secure another witness, Donnie Cavinder. There were just a few questions that I was going to follow up with him. I did not subpoena him to this hearing. I asked if he could be made available for this hearing last week. I was told that they would check. I didn't hear back. I did not subpoena him. I just have a few questions for him. I have a few questions for Ms. Roberson and the transcript.

MS. HONEY: Your Honor, the State is absolutely opposed to defense counsel's motion for a continuance in this case. Your Honor, the Court has already granted the

mistrial.  We're confined to the record as it was on the date the Court granted the mistrial.  Defense counsel moved for a mistrial on August 22nd, almost two months ago.  He had the opportunity at that point to ask Investigator Cavinder questions if he felt the need to do so and did not.  He can't now come into court and try to recreate the record that he should have created at the time that he moved for a mistrial in this case.

THE COURT:  Mr. Briley, this is typically legal argument based upon the situation that occurred on a mistrial.

MR. BRILEY:  And, Your Honor, actually, the questions that I would be following up with Mr. Cavinder really wouldn't be about what took place that day, but rather that he was an experienced investigator and was familiar with the rules.

MS. HONEY:  And, Your Honor, I object to that, one, as being outside the record in the case.  At the time defense counsel moved for mistrial, none of that testimony was ever brought forward.  Again, he failed to ask any questions when he was given the opportunity.  If he had wanted to ask Investigator Cavinder questions at the time that he moved for the mistrial, it would have been on August 22nd, not November 12th, almost two months later.

MR. BRILEY: This is a separate motion. I don't know of any rule that prohibits me to put on evidence for my motion.

MS. HONEY: But, Your Honor, the motion has already been granted by the court.

MR. BRILEY: That was the motion for mistrial. This is a motion to dismiss the case.

MS. HONEY: But it's based on double jeopardy based on the court's granting of the mistrial. It all goes back to what happened on August 22nd. You can't come back in almost two months later and try to re-ask the questions you should have asked then.

THE COURT: Mr. Briley, what efforts were made to try to secure the attendance of the investigator at this hearing?

MR. BRILEY: Only making the criminal district attorney Ms. Honey aware that we did intend to call him and asked would he be available today. She told me, I will check. That's it.

THE COURT: All right. Motion to continue is denied. Go forward.

MR. BRILEY: Your Honor, I would call Ms. Roberson, Ms. Christine Roberson.

MS. HONEY: Your Honor, prior to defense counsel questioning Ms. Roberson, I would like to take the

witness on voir dire to determine what -- to determine what relevance her testimony is going to have to our current proceeding today.

THE COURT: That's fine. Come on up, ma'am. Raise your right hand.

(Witness sworn)

THE COURT: Thank you. Just have a seat. Ms. Honey?

MS. CHRISTINA ROBERSON,

having been first duly sworn, testified as follows:

VOIR DIRE EXAMINATION

BY MS. HONEY:

Q   Ms. Roberson, where are you currently employed?

A   I'm not.

Q   Have you -- have you ever been employed by the State of Texas?

A   No.

Q   You were not employed with the State of Texas on August 22nd of this year?

A   No.

Q   Are you familiar with the -- the proceeding that took place on August 22nd of this year?

A   Yes.

Q   How are you familiar with it?

A   I was in the courtroom.

Q    And what was your role in the courtroom on that day?

A    I was an observer sitting in the back.

Q    So you weren't an employee of the State of Texas on that day, were you?

A    No.

Q    You weren't an agent of the State of Texas that day?

A    No.

Q    You didn't speak to anyone who was employed by the State of Texas that day, did you?

A    No -- my --

Q    That's a no?

A    No.

Q    So are you familiar with what the State of Texas's intent, if any, was on August 22nd?

A    Yes.

Q    How are you familiar with the State of Texas' intent on August 22nd?

A    I'm married to Byrias Roberson.

Q    Let me rephrase my question.  Are you familiar with -- are you familiar with why Investigator Cavinder spoke to Juror Vale?

A    Am I?

Q    Are you familiar with why Investigator Cavinder

spoke to Juror Vale in this case?

    A    Yes.

    Q    Did you personally observe the conversation between the two of them?

    A    No.

    Q    Did you overhear anything that was said?

    A    No.

    Q    Did you see them speaking to each other?

    A    No.

    Q    Did you speak to Investigator Cavinder after that conversation took place?

    A    No.

    Q    Did you speak to Juror Vale after that conversation took place?

    A    No.

    MS. HONEY:  Pass the witness.

    MR. BRILEY:  Ms. Roberson, I was just going to ask you a few questions about where you were and what you saw that day.

    MS. HONEY:  Objection, Your Honor.  We've already addressed this during voir dire of the witness.

    THE COURT:  Mr. Briley, I'm puzzled.  She took the witness on voir dire.  She said she didn't observe the conversation, observe the two, didn't hear the conversation.

MR. BRILEY:  I'm sorry.  Could I proceed?

THE COURT:  Go ahead.  I'll give you some rope.

                    VOIR DIRE EXAMINATION

BY MR. BRILEY:

Q    Ms. Roberson, did you witness when and where Investigator Cavinder was at certain times in this courtroom?

A    Yes.

MR. BRILEY:  Nothing further, Your Honor.

MS. HONEY:  Nothing further from this witness, Your Honor.

THE COURT:  You may step down.

MR. BRILEY:  Your Honor, there may have been some objection to her testimony, but I wanted to create for the record what she saw that day and where Mr. Cavinder was at certain times.

THE COURT:  So you have further questions for the witness?

MR. BRILEY:  Yes, I do, not on voir dire.

THE COURT:  Go ahead and take the stand, ma'am.

                    DIRECT EXAMINATION

BY MR. BRILEY:

Q    Ms. Roberson, were you in the courtroom during Byrias' trial earlier this year?

A    Yes.

Q     Where were you seated most of the time?

A     The back row in the corner.

Q     Were you there the whole time or did you miss parts?

A     No, I was there the whole time.

Q     When the panel was dismissed so that the attorneys could decide which panel members they wanted to strike, were you there at that point?

A     Yes.

Q     Did you see Mr. Cavinder in the court at that point?

A     Yes.

Q     When the attorneys came back from deciding which preemptory strikes they wanted to use and they gave those strikes to the court, were you in the courtroom at that point?

A     Yes.

Q     Did you see Mr. Cavinder at that point?

A     Yes.

Q     When the panel was called back in, was Mr. Cavinder back in the courtroom at that point?

A     Yes.

Q     When the jury was seated, was Mr. Cavinder in the courtroom at that point?

A     Yes.

Q    When the panel was dismissed for the day, was Mr. Cavinder in the courtroom at that point?

A    Yes.

Q    When the jurors, six jurors that were picked, were read further instructions, was Mr. Cavinder in the courtroom?

A    Yes.

Q    And when the six jurors were dismissed for the day, was he in the courtroom at that point?

A    Yes.

Q    And when did he leave the court?

A    He left when the jurors had left.  Everybody was out of the courtroom.

Q    How many minutes would you estimate between the time that the panel was dismissed and the time that the six jurors were dismissed?

A    Ten to fifteen minutes.

Q    And how many minutes would you estimate between the time that the six jurors were released and when Mr. Cavinder and the assistant district attorney's came back in to alert the court and the defense about the conversation that took place?

A    Between, I would say, maybe 5 and 10 minutes. It wasn't that long.

MR. BRILEY:  Pass the witness.

CROSS-EXAMINATION

BY MS. HONEY:

Q    Ms. Roberson, you're married to the defendant in this case; is that correct?

A    Correct.

Q    How long have y'all been married?

A    We've been married 23 years.

Q    Do y'all have kids together?

A    Yes, we do.

Q    How many kids do y'all have?

A    Two.

Q    Now, because you're married to the defendant, you don't want to see him get in trouble, do you?

A    I wanna tell the truth.

Q    You wanna tell the truth, but you also want this case to go away, don't you?

A    I want it resolved, yes.

Q    Okay.  In order to make that case go away, you're willing to say a lot of things, aren't you?

A    No, ma'am.

Q    Okay.  Now, Investigator Cavinder testified on August 21st that he was not present in the courtroom whenever the jurors were sworn in.  Were you here when he testified to that?

A    No.

Q    So you weren't in the courtroom the entire time that this case was going on, were you?

A    No.

Q    So there are parts --

A    Well, yes, when the case was going on, yes.

Q    So when Investigator Cavinder testified under oath that he was not present in the courtroom when the the jurors were sworn in, you were in here, weren't you?

A    Yes.

Q    And you heard him say that, didn't you?

A    Yes.

Q    Ms. Roberson, do you have any formal training involving conducting observations?

A    Just my eyes.

Q    Okay.  So you don't have any formal training doing observations?

A    No, ma'am.

MS. HONEY:  Pass the witness.

THE COURT:  Mr. Briley, any further questions?

MR. BRILEY:  No.

THE COURT:  You may step down, ma'am.  Thank you.

MR. BRILEY:  Your Honor, at this time I'd like to ask the Court to take judicial notice of all the court proceedings that happened in this Cause No. 58017-E.

THE COURT: Were you also -- for the record as well, the previous record?

MR. BRILEY: Sorry?

THE COURT: The previous record as well as the testimony?

MR. BRILEY: Yes, all records that have -- of any hearings.

THE COURT: Okay. The Court will take judicial notice notice of that.

MR. BRILEY: And I'd offer Applicant's Exhibits 1, 2, and 3, which are the Reporter's Records Volume 1, 2, and 3 of the trial.

MS. HONEY: I have no objections to that.

THE COURT: One, two, and three are admitted. Thank you. Any further witnesses or evidence, Mr. Briley?

MR. BRILEY: No, Your Honor, although I would just re-urge my motion for continuance, adding only that shortly -- within five minutes of this hearing, I did go to the front desk and ask for Mr. Cavinder. I also e-mailed him. That's the only additional actions that I've taken.

THE COURT: All right. I understand. The court's previous ruling will stand. I note your objection to the ruling for the record.

MR. BRILEY:  Applicant rests.

THE COURT:  Ms. Honey?

MS. HONEY:  State rests, Your Honor.

THE COURT:  All right.  Anything -- argument that's not in the briefs, Mr. Briley?

MR. BRILEY:  Well, yes, Your Honor.  I hope I don't --

THE COURT:  That's all right.  Go ahead.

MR. BRILEY:  -- repeat too much.  But, of course, we're here today on our application for writ of habeas corpus, seeking dismissal of the information based on double jeopardy grounds.  The defendant does have a right to have his trial completed by the first jury impaneled.  Although we were the ones who asked for the mistrial in this case, the State's conduct was the cause of that mistrial, and we believe that the objective facts show that it was with the intent to goad us into a mistrial.

Investigator Cavinder intentionally approached Ms. Vale.  Certain statements were made that showed partiality on the part of Ms. Vale.  We believe that it was not a mistake, and I'll go into it shortly in just one second.  They then approached the defense counsel and the court letting us know about the conversation, which I assume happened either way.  And as far as motive, I

don't believe that we are forced to show a motive, but there were certain parts in the pretrial hearing that could cause a motive to want more time. For example, more time to give notice of any extraneous bad acts.

As far as -- I think this really comes down to whether or not this was a mistake or this was something with the intent to goad. I believe that Mr. Cavinder is an experienced investigator in this case or certainly an experienced investigator. He's familiar with the rules and procedures of the trial process. He participated in this case. He helped pick which jurors would be struck. He was present for most of the proceedings. There might be a difference in what he said than what Ms. Roberson says as far as when he was there, but he was present for a lot of the proceedings.

Several minutes went by between when 25 people were released into the hallway, the jurors were read the Court's instructions, and then six people were let out into the hallway. An experienced investigator, I don't think, would have made that mistake.

Further, the statement, "You were struck, but then we got you on." When a person would say something like that or something to that effect, they would show that they knew at that time that that person was a juror. We ask that you dismiss based on double jeapordy.

THE COURT: Ms. Honey, any response that's not already addressed in your brief?

MS. HONEY: Your Honor, I will keep it very, very, very brief. Defense counsel has not met his burden in this case. His burden is intentional misconduct. I just want to leave the court with something that the court said at the time of the granting of the motion: "I'm not casting fault on Investigator Cavinder at all. I understand that that was an honest mistake. I completely believe that he believed he was speaking to Ms. Steele." Your Honor, even defense counsel just said "I don't believe an experienced investigator would make that mistake." Your Honor, we were all on the same page. It was a mistake. It was not intentional. He is not entitled to a dismissal of this case.

COURT'S RULING

THE COURT: Okay. All right. I'm going to take that under advisement and have a ruling by five o'clock tomorrow because I want to review the State's brief a little bit further with regard to the standard that was appropriately set forth in Wheeler.

Mr. Briley, we're set tomorrow on a motion to withdraw as counsel for you in this same matter. Would -- did you want to address that today, or would you wait until tomorrow? And, Mr. Roberson, the same. Do you

want to address it today and save yourself having to come back up tomorrow?  That would be fine with the Court if you're ready to do that.

MR. ROBERSON:  I think we can go ahead and do this today.

DEFENDANT'S MOTION TO WITHDRAW

THE COURT:  Go ahead and do it today?  Okay.  So you both know, I've read the motion to withdraw as counsel.  I've also read the letter that you had filed as well.  If you want to add more to that, you certainly can at these proceedings.  You don't have to.  You can stand upon -- if that's all you have to say, that's fine.  I understand.  Mr. Briley, the same.  It's up to you.

MR. BRILEY:  Your Honor, could we have just two or three minutes?

THE COURT:  Sure.  Let's go off the record.

(Discussion off the record)

THE COURT:  Back on the record.  Mr. Briley?

MR. BRILEY:  Thank you, Your Honor.  The only thing that I would change about my motion for withdrawal --

THE COURT:  Yes, sir.

MR. BRILEY:  -- would be in Paragraph 2 where it says that defendant has lost confidence in his representation and does not trust counsel.  I mean, I

would withdraw that or take that away.  Really, my only concern would be that in this last trial, you know, in the quickness of things, there was a conflict of personality that led to some miscommunication or lack of communication, which after the trial was done led to an argument, which is what caused the motion to withdraw.

THE COURT:  Okay.

MR. BRILEY:  Since then, I've spoken with Byrias.  We're civil.  I don't have a personal problem with him.  My only concern would be that when we come back to trial, if we do come back to trial, that that problem would exist again.  The only changing factor, I think, is that Ms. Kristen Howcroft, who was counsel at the time, she would not be here at this time.  That might have been a factor then, but --

THE COURT:  Okay.

MR. BRILEY:  That's the only thing that I would have to change about the motion to withdraw.

THE COURT:  All right.  Mr. Roberson, you can speak to the motion if you like.  However, I've reviewed your letter again, so --

MR. ROBERSON:  Well, everything that I wrote to you, Your Honor, in my letter stands.  I agree with Mr. Briley.  I think that the conflict that existed that day has been resolved, so I don't see any future

conflicts at this time. I don't have a problem with Mark. I think we work very well together. So I would like to keep him on as my attorney.

THE COURT: Okay. Now, I assume the State doesn't have a dog in the fight?

MS. HONEY: Your Honor, we don't.

COURT'S RULING

THE COURT: Okay. All right. I'll issue a ruling on that at the same time that I issue the ruling on the writ, okay. And it will be by five o'clock tomorrow that I send it out. I'll send it out by fax or e-mail, okay. All right. Thank you.

(Proceedings concluded)

STATE OF TEXAS        )

COUNTY OF WICHITA    )

I, Cayce Coskey, Official Court Reporter in and for the County Court At Law No. 1 of Wichita County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and accurately reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by Wichita County.

WITNESS MY OFFICIAL HAND this the 4th day of February, 2014.


_____
CAYCE COSKEY, CSR 6938, RPR
Expiration Date:  12/31/2014
900 7th Street, Suite 201
Wichita Falls, Texas 76301
940.766.8266 Fax 940.766.8156

NO. 02-11-00253-CR

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

JOE DALE JOHNSON            )(    ON APPEAL IN NO. 46,432-C

V.                          )(    FROM THE 89TH DISTRICT COURT

STATE OF TEXAS              )(    OF WICHITA COUNTY, TEXAS

                            )(    THE HONORABLE MARK T.
                                  PRICE, PRESIDING

========================================================

STATE'S MOTION FOR EN BANC RECONSIDERATION

========================================================

TO THE COURT OF APPEALS:

Pursuant to Rule 49.7 of the Rules of Appellate Procedure, the State submits its motion for en banc reconsideration of the court's reversal of two Life sentences for aggravated sexual assault of a child committed by a previously-convicted sex-offender.

The State seeks en banc reconsideration for two reasons: 1) because the memorandum opinion issued on February 14, 2013 makes repeated factual assertions that do not comport with the reporter's record of the actual testimony and statements of the attorneys in the case; and 2) because the memorandum opinion fails to apply the Court of Criminal Appeals *Irby* analysis for determining whether the juvenile adjudication was admissible.

**I. The memorandum opinion contains multiple factual inaccuracies that do not comport with the trial record.**

    **1. While the memorandum opinion claims the State left a false impression with the jury about the reason for counseling, the record reveals that it was defense counsel, not the prosecutor, who interjected counseling into the proceeding.**

The memorandum opinion states "The State left the impression with the jury that the complainant's emotional problems, watching pornography, conflict with his parents, and need for counseling all arose as a result of his victimization by school bullies and by Appellant...This was a false impression that Appellant

2

was entitled to rebut..." *See Memorandum Opinion* at *10.*

The record, however, reveals that it was defense counsel, not the State, who interjected counseling into the proceedings. During cross-examination of the State's first witness, the child's father, defense counsel asked for permission outside the presence of the jury to question the witness about the victim undergoing counseling in the fall of 2007. (R.R. 7:58-63). The trial court permitted the defense attorney to question the witness about the victim attending counseling. (R.R. 7:63). Then, in front of the jury, the defense attorney asked the witness about the victim attending counseling and why he was in counseling. (R.R. 7:64-65). Thus, it was defense counsel who first interjected counseling into the proceedings.

### 2. A fair reading of the record reveals that the prosecutor only mentioned the victim's counseling in response to the defense attorney's questions.

On re-direct after the defense attorney had brought up counseling, the prosecutor asked the father two very

3

short questions about the counseling: "Did you consider it counseling or therapy?" and "So was he seeing a counselor?" (R.R. 7:67)

Then, when the child testified, the prosecutor asked the child three short questions relating to counseling:

"Were you seeing a counselor during that time period?"
"Were you having some emotional troubles?" and
"Did you tell your counselor about those things?"
(R.R. 7:106).

This minimal inquiry, initiated after defense counsel had already asked the father about counseling, is completely unrecognizable from the memorandum opinion's characterization of the State leaving "the impression with the jury that the complainants emotional problems, watching pornography, conflict with his parents, and need for counseling all arose as a result of his victimization by school bullies and by Appellant, who caused him to participate in sexual activities. This was a false impression that Appellant was entitled to rebut..." *See Memorandum Opinion* at 10.

4

**3. The fact that the State did not mention anything related to counseling in opening or closing conflicts with the memorandum opinion's assertion that the State was relying upon some false impression in front of the jury.**

The prosecutor did not mention anything relating to the victim attending counseling in his opening statement or in his closing argument. (R.R. 7:9-17; 9:85-91, 98-108). Thus, the prosecution was not advancing any false impression about the reason the victim was in counseling.

**4. The defense could not open its own door to the juvenile adjudication by interjecting counseling into the trial.**

The memorandum opinion strangely opines that "the State's questioning of the complainant and his father painted an incomplete and misleading picture of the complainant and the circumstances of his outcry. By developing the testimony as it did, the State opened the door to evidence that could have accurately conveyed why the complainant was in counseling, what motivation he may have had to make up a false accusation, and the degree to which he understood

5

sexual matters and to which he personally appreciated legal consequences imposed upon sex offenders." *See Memorandum Opinion* at 13.

This statement oddly overlooks the fact that it was the defense, not the State, who first interjected counseling into the proceedings. (R.R. 7:58-63). This statement also completely mischaracterizes the minimal questions by the prosecutor about counseling. (R.R. 7:67; 106). Finally, this statement ignores the fact that the State made no mention to the victim attending counseling in either its opening or its closing. (R.R. 7:9-17; 9:85-91, 98-108).

Rather, it was defense counsel who opened-the-door to the discussion of counseling through his questions of the victim's father. (R.R. 7:58-63). Under the open-door doctrine, the defense cannot broach a subject and then complain when the State inquires into that subject. *See Heidelberg v. State*, 36 S.W.3d 668, 672 (Tex. App.—Houston [14th Dist.], no pet.).

6

Furthermore, a party cannot through its own questioning and maneuvering open a door to get into collateral matters, extraneous offenses, and bad acts that would otherwise be inadmissible. *See Shipman v. State*, 604 S.W.2d 182, 185 (Tex. Crim. App. 1980). Thus, the law prohibits defense counsel from questioning the victim's father about the victim attending counseling, and then claiming because he raised the subject and interjected counseling into the proceedings, he has now opened the door for the juvenile adjudication to be admitted.

The fact that the memorandum opinion fails to acknowledge that it was defense counsel who interjected the victim's counseling into the proceedings and instead incorrectly claims that it was the State who opened the door is troubling.

5. **The memorandum opinion confuses and conflates counseling that the child was receiving in the fall of 2007 with court-ordered sex offender treatment that the child received after his adjudication in July 2008.**

The memorandum opinion also confuses and conflates counseling the child received in the fall of 2007 with court-ordered treatment in July 2008: "The complainant also testified that his parents put him in counseling because he was sexually abusing his sister. There was evidence that the counseling was court-ordered as a result of the complainant's sexual abuse of his younger sister over several years." *See Memorandum Opinion* at 6.

This statement is not accurate. Both the child and the child's father testified that his parents put him in counseling in the fall of 2007. (R.R. 7:61, 161-162). The child was not ordered into treatment by a court until he was adjudicated on July 18, 2008. *See Defense Exhibit 1 July 18, 2008 Order of Probation.*

This offense was reported to the Burkburnett Police Department on November 29, 2007. (R.R. 8:16).

8

Therefore, any court-ordered counseling of the child in July 2008 was irrelevant to this case, and to the child's mental state at the time the offense was reported. And, it is simply erroneous to say that there "was evidence that the counseling was court-ordered" when the counseling that the child was referring to was the fall 2007 counseling, which was clearly not court-ordered. (R.R. 7:61, 161-162).

### 6. The memorandum opinion incorrectly asserts that the State created a false impression that the child was innocent in sexual matters.

While the memorandum opinion suggests that the State left a false impression that the child was innocent in sexual matters, the record reveals no such impression. *See Memorandum Opinion* at 6, 13.

In fact, the State did not object to defense counsel's request to go into the child's pornography issues. (R.R. 7:63). The defense attorney asked both the father and the child about the child's issues with pornography. (R.R. 7:64-65, 149). Additionally, during closing argument the prosecutor never argued or

9

implied that the child was innocent in sexual matters. (R.R. 9:85-89, 98-108).

## II. The memorandum opinion fails to conduct the *Irby* analysis required by the Court of Criminal Appeals in determining whether a juvenile adjudication is admissible.

The Court of Criminal Appeals mandates that for a juvenile adjudication to be admissible, there must be a logical connection between the adjudication and a motive or bias that could affect the child's testimony. *See Irby v. State*, 327 S.W.3d 138, 153 (Tex. Crim. App. 2010).

The memorandum opinion fails to conduct the *Irby* analysis,[1] or explain what the logical connection is between the juvenile adjudication and any motive the child had to lie. In fact, the juvenile charges were filed in May 2008, and the adjudication happened in July 2008. *See Defense Exhibit 1 May 12, 2008 Original Petition and July 18, 2008 Order of Probation.* The

---

[1]The State's Brief extensively cited the *Irby* opinion and explained the Court of Criminal Appeals' requirement for a logical connection between the juvenile adjudication and a bias or motive that could affect the witness's testimony. *See State's Brief* 4-15.

10

child's outcry about this case was in November 2007. (R.R. 8:16). The memorandum opinion fails to explain how a juvenile adjudication 8 months after the child's outcry of sexual abuse provided any motive for the child's allegations of sexual abuse. Therefore, under the *Irby* rubric, the juvenile adjudication was not admissible.

While the memorandum opinion cites Rule of Evidence 101(c) for the proposition that the rule barring impeachment by a juvenile adjudication was trumped by the right to confrontation, in *Irby* the Court of Criminal Appeals limits this situation to "a specific mode of impeachment—bias and motive—when the cross-examiner can show a logical connection between the evidence suggesting bias or motive and the witness's testimony." *See Irby* at 151. The Court of Criminal Appeals explained the important interest "in protecting the anonymity of juvenile offenders." *Id*. The memorandum opinion violates this very interest without demonstrating the logical connection between the

11

juvenile adjudication and any potential motive or bias affecting the child's testimony.

## PRAYER

The State prays that the Court grant the motion for en banc reconsideration, withdraw the opinion of February 14, 2013, and affirm the judgment of the trial court.

Respectfully submitted,

John Gillespie
First Asst. Criminal District Attorney
Wichita County, Texas
State Bar No. 24010053

John W. Brasher
Asst. Criminal District Attorney
Wichita County, Texas
State Bar No. 02907800
Wichita County Courthouse
900 Seventh Street
Wichita Falls, Texas 76301
(940) 766-8113
FAX: (940) 766-8177

12

## CERTIFICATE OF COMPLIANCE

The State certifies that the brief contains 1723 words, after the applicable exclusions.

_____
John Gillespie

## CERTIFICATE OF SERVICE

I certify that a correct copy of the State's Motion For En Banc Reconsideration was mailed to the office of Jeff Eaves, 900 8th Street, Suite 1400, Wichita Falls, TX 76301, (940) 322-2002, on this the 21st day of February, 2013.

_____
John Gillespie

13